UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | : | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
|     AGC, INC., | : | Case No. 13-_____ |
| | : | |
|     Debtor. | : | |
| | : | |

**MOTION FOR ORDER (i) APPROVING AUCTION PROCEDURES TO BE EMPLOYED IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO 11 U.S.C. §§ 105 AND 363; (ii) SCHEDULING DATE, TIME AND PLACE FOR SALE HEARING; (iii) APPROVING BREAK UP FEE; (iv) APPROVING FORM AND MANNER OF NOTICE; AND (v) DISPENSING WITH APPRAISAL REQUIREMENTS**

AGC, Inc. ("AGC"), as above-captioned debtor and debtor in possession hereby moves for the entry of an Order (i) approving auction procedures to be employed in connection with the sale of certain of the assets of AGC and its affiliated debtor Rajon Realty Corporation ("Rajon" and together with AGC, the "Debtors"); (ii) scheduling the date, time and place for a sale hearing; (iii) approving a break-up fee; (iv) approving form and manner of notice of such sale; and, (v) dispensing with appraisal requirements (the "Procedures Motion").  Rajon has filed an identical motion in its bankruptcy case. In support of the Procedures Motion, the Debtors rely on the Declaration of R. Bruce Andrews in Support of First Day Motions (the "Andrews Declaration") and further state as follows:

    1.    On April 16, 2013 (the "Petition Date"), AGC, Inc. ("AGC") and Rajon Realty Corporation ("Rajon" and together with AGC, the "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  In accordance with §§ 1107 and

2709810v4

1108 of the Bankruptcy Code, the Debtors are authorized to continue in possession of their properties and operate and manage their businesses as a debtors-in-possession. An official committee of unsecured creditors has not yet been appointed in these cases.

2. AGC is a sixty-one year old manufacturing company located in Meriden, Connecticut. AGC is a manufacturer of engine components and assemblies for commercial and military aviation, with a specialty in the area of non-metallic components and the bonding of these components to metal parts. AGC sells its products to original equipment manufacturers and suppliers.

3. Rajon owns the real property and building located at 106 Evansville Avenue, Meriden, Connecticut (the "Meriden Property"), at which AGC operates its business. AGC and Rajon are parties to a lease by which Rajon leases the Meriden Property to AGC.

4. RCS I, LP ("RCS I") is the sole shareholder of both Rajon and AGC. RCS I is controlled by its general partner, RCS II, Inc. ("RCS II"), which has a one-percent (1%) limited partnership interest in RCS I. The remaining limited partners of RCS I are the Raymond C. Schmitt Revocable Trust ("Revocable Trust"), which owns a fifty percent (50%) limited partnership interest, and the following individuals: Candace Beacham, Heidi Pascucci, Gary Schmitt, Jeanne Ritchie, and Jeannette Womble (collectively, with the beneficiary of the Revocable Trust, the "Beneficiaries"), who own the remaining forty-nine percent (49%) limited partnership interest. The sole shareholder of RCS II is the Revocable Trust.

2709810v4

5.      As of February 28, 2013, the Debtors, on a consolidated basis, had balance sheet stated assets totaling approximately $7,456,013, and liabilities totaling approximately $8,355,737.  For the year ending February 28, 2013, the Debtors had a net loss of approximately $845,167.

6.      The Debtors primary secured creditor is TD Bank, N.A. ("TD Bank") to which it owes approximately $5,461,277 (the "TD Bank Debt").

7.      The Debtors have been experiencing significant financial distress for a number of years due to, among other things, the cumulative effects of the recession starting in 2008, the theft of trade secrets by a former employee in 2009 and subsequent litigation, and the ongoing debt service required under the TD Bank Debt.

8.      Although management was able to stabilize the Debtors' finances by early 2012, the Debtors, in consultation with TD Bank, determined that the best course of action to maximize recovery to its creditors was to effectuate a sale as a going concern.  Toward that end, the Debtors engaged Alderman & Company Capital, LLC ("Alderman"), an investment banker in the aerospace and defense industry, to market the business for sale.  The Debtors and Alderman undertook a thorough marketing of the business by contacting approximately 209 potential purchasers, engaging in multiple rounds of bidding, responding to all inquires from potential purchasers, and allowing potential purchasers to conduct significant due diligence.

9.      As the result of litigation commenced by certain of the Beneficiaries related to the efforts to sell the business, which is described in detail in the Andrews Declaration, the marketing process was halted in late 2012.  In February 2013, the

2709810v4

Debtors restarted the marketing process by soliciting new offers from the potential purchasers that had expressed significant interest in buying the business as of late 2012.

10. As the result of the Debtors' most recent marketing efforts, which are detailed in the Andrews Declaration, the Debtors determined that it is in the best interest of their creditors to enter into a certain Asset Purchase Agreement dated April 16, 2013 (together with related documents, agreements and instruments, the "APA") for the sale of substantially all of the Debtors' assets as more particularly set forth in the APA (the "Assets") to Harlow Aerostructures LLC and/or one ore more of its affiliates or subsidiaries (hereinafter, the "Stalking Horse Buyer").

11. As more particularly described in the APA, the Debtors will receive $5.7 million in cash, plus the assumption of the Assumed Liabilities (as defined in the APA) in exchange for the Assets.

12. As set forth in the Motion for Interim and Final Orders Authorizing Post-Petition Financing ("DIP Motion") filed contemporaneously herewith, the Stalking Horse Buyer has agreed to extend up to $400,000 in post-petition financing of which the first $100,000 shall be the Good Faith Deposit under the APA.

13. Contemporaneously herewith, the Debtors have filed a Motion to Sell Assets Out of the Ordinary Course of Business and Free and Clear of Security Interests (the "Sale Motion"). A copy of the APA is attached as Exhibit A to the Sale Motion, which is deemed incorporated herein by reference.

14. Given the Debtors' continued financial difficulties, lack of funding, continued constraints on cash flow, and the loss of confidence of their largest customer

due to their ongoing financial instability, the value of the Assets will deteriorate since the Debtors will not be able to continue to operate the Assets as a going concern absent a sale to the Stalking Horse Buyer (or maker of the prevailing bid at any auction contemplated herein).

15. In accordance with the APA, the Debtors request that this Court consider the entry of the proposed form of Order attached hereto: (i) providing for the auction procedures described herein; (ii) authorizing the break-up fee to Buyer and payment thereof; and (iii) approving the form and manner of notice of the sale.

## BREAK UP FEE

16. The Stalking Horse Buyer has expended significant time and money conducting its due diligence and has incurred substantial expenses relating to the negotiation of the APA. To compensate Stalking Horse Buyer for the expenses it has incurred and will in the future incur in connection with the transaction contemplated by the APA, and as an incentive for the Stalking Horse Buyer to continue to pursue its efforts to purchase the Assets, the Debtors have agreed in the course of arms' length negotiations, subject to this Court's approval, that they will pay a break up fee equal to 4% of the purchase price in the Winning Bid (as that term is defined in the Auction Procedures) under the terms and conditions set forth in the APA (the "Break-Up Fee") upon the earlier of (i) consummation and closing of an competing transaction, out of proceeds at the closing of such competing transaction; or (ii) any default related to a competing transaction pursuant to which the Debtors retain any deposit of such competing transaction or, in the event of any dispute regarding whether Debtors may

5

2709810v4

retain such deposit, upon a final order providing that Debtors may retain such deposit, which deposit shall be used to pay the Break-Up Fee immediately.

17. The Stalking Horse Buyer is not an insider of either of the Debtors as that term is defined in § 101(31)(b) of the Bankruptcy Code.

18. "Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer." In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009); see In re Integrated Res., Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable.")

19. In evaluating break-up fees, courts have looked to the following three factors: "(1) is the relationship of the parties who negotiated the breakup fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price." Metaldyne Corp., 409 B.R. at 670.

20. Here, all three factors are satisfied. First, the Stalking Horse Buyer is not an insider of the Debtors, and the Break-Up Fee was negotiated at arms' length. Second, the Break-Up Fee will not hamper bidding and it is not unreasonable in relationship to the purchase price. It is fair and reasonable, and will encourage the solicitation of higher and better offers by having brought a buyer ready, willing and able to consummate this transaction. Further, as noted above, the Break-Up fee is 4% of purchase price of the

winning bid, which is within the range of break-up fees that have been commonly approved by Bankruptcy Courts. See Metaldyne, 409 B.R. at 670 (finding break-up fee of less than 3% reasonable and within range of what courts in jurisdiction have found to be acceptable); In re CXM, Inc., 307 B.R. 94, 97-98, 103 (Bankr. N.D. Ill. 2004) (approving break-up fee of up to approximately 3.2%); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (approval of $500,000 break-up fee without discussion); see also In re Tama Beef Packing, Inc., 321 B.R. 496, 498 (B.A.P. 8th Cir. 2005) (observing, in dicta, that "break-up fees are . . . usually limited to one to four percent"); In re Texas Rangers Baseball Partners, 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010) (observing that courts have approved break-up fees of as much as 4%).

## THE AUCTION PROCEDURES

21.     To promote an orderly sale and to maximize the value of the Assets, the Debtors and the Stalking Horse Buyer have agreed, subject to Court approval, on the auction procedures (the "Auction Procedures") set forth on Exhibit B hereto.

22.     In the Debtors' judgment, the proposed Auction Procedures are fair, reasonable, appropriate, and will likely result in the maximum recovery to their estates.

23.     The propose that any Qualified Bids (as defined in the Auction Procedures) shall be submitted to Debtors' counsel by May 8, 2013, at 4:00 p.m. (prevailing Eastern Time).

24.     If any Qualified Bids are timely submitted, the Debtors propose that an auction be held on May 13, 2013, at the offices of Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut at 10:00 a.m. (prevailing Eastern Time) (the

2709810v4

"Auction"). The offer contained in the APA, or a higher or better offer obtained at the Auction, would then be presented to the Bankruptcy Court at the earliest possible hearing, which the parties respectfully request to be scheduled for May 20, 2013 (the "Sale Hearing"). The Debtors reserve the right to ask the Bankruptcy Court to further shorten the time for the Auction and Sale Hearing in open Court.

25. The Debtors propose that objections, if any, to the sale would be considered by the Court at the Sale Hearing and that only objections filed with the Bankruptcy Court and served upon counsel for the Debtors, the Debtors' twenty largest unsecured creditors, counsel for TD Bank, and counsel for the Stalking Horse Buyer on or before May 15, 2013 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline") should be considered at the Sale Hearing.

## PROPOSED FORM AND MANNER OF NOTICE

26. Bankruptcy Rule 6004(a) provides that notice of a proposed sale of property other than in the ordinary course of business shall be given to all known creditors and parties in interest. Pursuant to § 102 of the Bankruptcy Code and Bankruptcy Rule 2002, such notice may be limited by Order of the Court.

27. Bankruptcy Rule 2002(a)(2) provides that not less than twenty-one (21) days notice by mail shall be given of a proposed sale of property other than in the ordinary course of business unless the Court, for cause shown, shortens the time or directs another method of giving notice, which relief the Debtors has sought under Fed. R. Bankr. P. 9006(c). Bankruptcy Rule 7004, which is made applicable by Bankruptcy Rule 9014, permits service by first class mail or publication.

2709810v4

28. Bankruptcy Rule 2002(c)(1) governs the contents of the notice of a proposed sale and requires that notice include, *inter alia*, the terms and conditions of any private sale and the time fixed for filing objections. A general description of the property to be sold is also required. A copy of the proposed notice is annexed hereto as Exhibit C (the "Sale Notice").

29. The Sale Notice will inform recipients of the Debtors' intention to sell the Assets free and clear of all liens, claims, encumbrances and interests, subject only to the Bankruptcy Court's consideration of higher or better bids than the offer made by the Buyer. In addition, the Sale Notice shall provide a summary of the relevant terms of the APA. The Sale Notice will also inform recipients of the Auction Procedures and the date and time of the Sale Hearing.

30. The Debtors propose to serve the Sale Notice by first class mail upon the following parties: all of the Debtors' creditors and interest holders, all entities known to the Debtors to have expressed a *bona fide* interest in acquiring all or portions of the Assets, all taxing authorities or recording offices which have a reasonably known interest in the relief requested, the Office of the United States Trustee, counsel to TD Bank, all federal, state and local regulatory authorities with jurisdiction over the Debtors, the office of the United States Attorney for the District of Connecticut, all non-debtor parties to the Leases and Contracts (defined below), all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets, the Beneficiaries, other known parties-in-interest, and any other parties entitled to receive notice in this case.

31. The Debtors also propose to place an abbreviated form of the Sale Notice as a legal notice advertisement in the Hartford Courant of a size and placement deemed suitable by the Debtors, to be run on a date within five business days of the entry by the Bankruptcy Court of the Order approving the Procedures Motion (the "Procedures Order").

32. As set forth on Exhibit A hereto, the Debtors are party to certain unexpired leases of non-residential real property leases and executory contracts that may be assumed by the Debtors and assigned to the Stalking Horse Buyer or maker of the winnig bid at the Auction (collectively, the "Leases and Contracts").

33. To facilitate the assumption and assignment of the Leases and Contracts in connection with the sale, the Debtors will serve a notice (the "Cure Amount Notice"), similar to the form attached hereto as Exhibit D upon each counterparty to the Leases or Contracts. The Debtors will attach to the Cure Amount Notice its calculation of the cure amounts that the Debtors believe must be paid to cure all defaults under all Leases and Contracts (the "Cure Amounts"). Unless the non-debtor party to a Lease or Contract files and serves an objection to its scheduled Cure Amount by the Objection Deadline, and in the manner set forth below, such non-debtor party shall (i) be forever barred from objecting to the Cure Amount and from asserting that any additional cure or other amounts are owed as of the date of assignment with respect to such Lease or Contract, and the Debtors, the Stalking Horse Buyer, and maker of the winning bid at the Auction shall be entitled to rely solely upon the Cure Amount; and (ii) be forever barred and estopped from asserting or claiming against the Debtors and the Stalking Horse Buyer or

10

the maker of the winning bid at the Auction that any additional amounts are as of the date of assignment due or defaults exits under such Lease or Contract or any other claims with respect to such Lease or Contract.

34.     No assumption or assignment shall be deemed effective unless and until the sale of the Assets closes.

## LOCAL RULE 6004-1

35.     The Debtors also requests an order from this Court dispensing with the appraisal requirement in LBR 6004-1. An appraisal is not warranted under the facts of this case insofar as the Debtors have already engaged in extensive marketing of the Assets and negotiated a sale of the Assets to the Stalking Horse Buyer on reasonable and fair terms, which sale is subject to higher and better bids as set forth herein.

WHEREFORE, the Debtors request this Court to enter the proposed form of Procedures Order in substantially the form attached hereto as Exhibit E (i) providing for bidding procedures for the sale of the Assets, (ii) authorizing the Break-Up Fee, (iii) approving the form and manner of Sale Notice and Cure Amount Notice, (iv) authorizing the Debtors to dispense with an appraisal of the Assets, and (v) granting such further

2709810v4

relief as justice requires.

        Dated at Hartford, Connecticut, this 16th day of April, 2013.

                                         By: /s/Kathleen M. LaManna
                                              Kathleen M. LaManna (ct 16740)
                                              Eric S. Goldstein (ct 27195)
                                              Shipman & Goodwin LLP
                                              One Constitution Plaza
                                              Hartford, CT  06103-1919
                                              Tel. (860) 251-5000
                                              Fax: (860) 251-5218
                                              klamanna@goodwin.com
                                              egoldstein@goodwin.com

                                              *Proposed Counsel for AGC, Inc.*

2709810v4