## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| In Re: | : | Chapter 11 |
| | : | |
| AGC, INC. and | : | Case No. 13-_____ |
| RAJON REALTY CORPORATION, | : | Case No. 13-_____ |
| | : | |
| Debtors. | : | |
| | : | |

## DECLARATION OF R. BRUCE ANDREWS IN SUPPORT OF
## FIRST DAY MOTIONS

R. BRUCE ANDREWS declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the Chief Executive Officer and President of AGC, Inc. ("AGC"), a corporation organized under the laws of Connecticut, and one of the above-captioned debtors and debtors in possession.  I am also a member of the Board of Directors of Rajon Realty Corporation ("Rajon" and together with AGC, the "Debtors"), a corporation organized under the laws of Connecticut, and one of the above-captioned debtors and debtors in possession.  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these

Chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedures.

3.      I submit this declaration (the "Declaration") to provide an overview of the

Debtors and these Chapter 11 cases and to support the Debtors' voluntary petitions and

first day motions (each, a "First Day Motion," and collectively, the "First Day

Motions").  Except as otherwise indicated herein, all facts set forth in this Declaration

are based upon my personal knowledge of the Debtors' operations and finances,

information learned from my review of relevant documents, information supplied to me

by other members of the Debtors' management team and the Debtors' advisors, or my

opinion based on my experiences with and knowledge of the Debtors' operations and

financial condition.  I am authorized to submit this Declaration on behalf of the Debtors,

and if called upon to testify, I could and would testify competently to the facts set forth

herein.

## I.      Company History and Corporate Structure

4.      AGC is a sixty-one year old manufacturing company located in Meriden,

Connecticut.  AGC is a manufacturer of engine components and assemblies for

commercial and military aviation, with a specialty in the area of non-metallic components

and the bonding of these components to metal parts.  AGC sells its products to original

equipment manufacturers and suppliers.

5.      Rajon owns the real property and building located at 106 Evansville

Avenue, Meriden, Connecticut (the "Meriden Property"), at which AGC operates its

2

business.  AGC and Rajon are parties to a lease by which Rajon leases the Meriden Property to AGC.

6.    For much of its history, AGC was successful and operated profitably under the guidance of its founder and then-sole shareholder, Raymond Schmitt.

7.    Mr. Schmitt died in 1998, and as part of his estate plan, the current corporate ownership structure of AGC and Rajon was formed.  In particular, RCS I, LP ("RCS I") is the sole shareholder of both Rajon and AGC.  RCS I is controlled by its general partner, RCS II, Inc. ("RCS II"), which has a one-percent (1%) limited partnership interest in RCS I.  The remaining limited partners of RCS I are the Raymond C. Schmitt Revocable Trust ("Revocable Trust"), which owns a fifty percent (50%) limited partnership interest, and the following individuals: Candace Beacham, Heidi Pascucci, Gary Schmitt, Jeanne Ritchie, and Jeannette Womble (collectively, with the beneficiary of the Revocable Trust, the "Beneficiaries"), who own the remaining forty-nine percent (49%) limited partnership interest.  The sole shareholder of RCS II is the Revocable Trust.

## II.    Debtors' Financial Distress and Efforts to Sell Their Assets as Going Concerns

8.    The Debtors are indebted to TD Bank, N.A. ("TD Bank") as set forth below (collectively, the "TD Bank Debt"):

A.    Note issued on or about August 31, 2001, in the principal amount of $1,410,000.00;

B.    Term Note issued on or about May 31, 2007, in the principal amount of $900,000.00;

2738424v5

C.      Term Note issued on or about November 20, 2008, in the principal amount of $1,200,000.00;

D.      Line of Credit issued on or about August 26, 2009, with a principal balance of $2,800,000.00;

E.      Term Note issued on or about September 1, 2012, in the principal amount of $1,500,000.00; and

F.      Term Note issued on or about October 1, 2012, in the principal amount of $211,690

9.      As of April 1, 2013, approximately $5,461,277 is owed under the TD Bank Debt.

10.      To secure the TD Bank Debt, TD Bank claims a lien on substantially all of the Debtors' assets, including a mortgage on the Meriden Property.

11.      In addition, in or about November 30, 2009, AGC entered into a loan with the Connecticut Development Authority, which is now known as Connecticut Innovations, Incorporated ("CI" and together with TD Bank, the "Secured Creditors"), in the principal amount of $217,120.00 (the "2009 CI Loan").

12.      Servicing the foregoing debt obligations has placed a strain on AGC by precluding it from having the available funds to make necessary reinvestments in its business.

13.      AGC's most recent financial trouble began in earnest with the recession commencing in 2008. The effects of the recession were exacerbated by a failed sale of the Debtors' business, which resulted in significant liabilities for professional fees. In

4

addition, AGC suffered a significant loss of business in 2009 due to the departure of a

key employee, who took AGC's trade secrets and used them to compete against AGC

resulting in the loss of approximately $2 million in annual revenue.  AGC commenced

litigation against this former employee and ultimately obtained an injunction.  However,

the litigation expenses were significant and all of the business that went to the competing

entity did not return.

14.    In connection with that litigation, in the fall of 2010, AGC experienced a

cash shortfall, which caused it to borrow additional funds from TD Bank on the Line of

Credit.  Further, in or about May 2011, AGC obtained an additional $750,000 term loan

from CI, pursuant to the terms of that certain Promissory Note dated May 5, 2011 (the

"2011 CI Loan" and together with the 2009 CI Loan, the "CI Loans").  To secure the

2011 CI Loan, CI claims a lien on substantially all of AGC's assets (subsequent in right

to TD Bank).  Further, Rajon guaranteed the CI Loan pursuant to the terms of that

certain Guaranty dated May 5, 2011.  To secure the Guaranty, Rajon claims a mortgage

on the Meriden Property (subsequent in right to TD Bank's mortgage) and a collateral

assignment of leases and rents.

15.    As of April 1, 2013, approximately $721,566.00 is owed to CI under the

CI Loans.

16.    After obtaining the additional financing, the Debtors' business operations

rebounded in early 2012.  At that time, the Debtors, in consultation with TD Bank,

determined that the best course of action to maximize recovery to its creditors was to

effectuate a sale as a going concern.  Accordingly, the Debtors' engaged Alderman &

5

Company Capital, LLC ("Alderman"), an investment banker in the aerospace and defense industry, to market the business for sale. As part of Alderman's marketing efforts, approximately 209 prospective buyers were identified that may have interest in acquiring the Debtors' business. Of these 209 prospective buyers, 62 parties entered into non-disclosure agreements and were provided with a Confidential Information Memorandum.

17.    In late July 2012, interested parties were instructed to submit indications of interest ("IOIs") with a minimum offer of $10 million. In response, the Debtors received 9 IOIs with an average midpoint value of $9,542,000.

18.    In or about August 28, 2012, the Debtors and TD Bank entered into a forbearance agreement, pursuant to which the parties agreed to a timeline for the sale of the Debtors' business by December 31, 2012, with penalties if such sale did not occur.

19.    Between August and October 2012, the Debtors provided management presentations to the top seven parties that submitted IOIs and one additional party that had more recently expressed interest in acquiring the Debtors. During this process, the Debtors informed the prospective buyers that the outlook for EBITDA for 2012 would be $2.4 million, which was $500,000 less than what had been projected in the Confidential Information Memorandum. In addition, the Debtors responded to substantial due diligence requests from the interested parties, most of which had to do with the shortfall in 2012 EBITDA.

20.    In October 2012, the Debtors requested second round offers from the eight interested parties. Six second round offers were received, but due to the negative

6

variance in 2012 EBITDA, the offers decreased in value from the IOIs.  The second round offers ranged from approximately $7.7 million to $10.7 million.

21.     In late October 2012, after subsequent discussions with the six remaining interested parties, four final non-binding offers were received with purchase prices ranging from $8.5 million to $9.7 million.

22.     On November 20, 2012, certain Beneficiaries brought suit against, among others, the Debtors and certain of their officers and directors in Connecticut Superior Court, which case is captioned <u>Pascucci, et al. v. Cooper, et al.</u>, Case No. UWY-CV12-5016433-S (the "<u>Beneficiary Litigation</u>").  In the Beneficiary Litigation, the plaintiffs moved for a temporary restraining order to halt the sale of the Debtors' businesses.

23.     While the Connecticut Superior Court has not entered an injunction, the Beneficiary Litigation in effect put the sale process on hold and caused TD Bank to declare a default under the TD Bank Debt.

24.     Compounding matters, the Debtors' business operations suffered a severe downturn in November and December 2012, with monthly sales falling from $1.6 million per month in October 2012, to $1 million in November 2012, and then $800,000 in December 2012.  This fall in revenues is believed to largely be the result of a decline in business for AGC's largest customer, United Technologies ("UTC").  UTC and its subsidiaries accounted for approximately 60% of AGC's total sales in fiscal year 2012.

25.     Further, UTC has informed AGC that it is not satisfied with AGC's financial stability.  Based on AGC's financial condition, UTC is unwilling to provide future opportunities for new business.

7

26.     Due to the downturn in business, the Debtors took significant steps to reduce costs, such as a plant shut down in December, reduced work hours for labor, and biweekly furloughs for management.  In addition, layoffs and early retirements were completed by December 2012.  However, even with these reduced costs, it is still anticipated that projected revenues will be insufficient to cover expenses.

27.     As of February 28, 2013, the Debtors, on a consolidated basis, had balance sheet stated assets totaling approximately $7,456,013, and liabilities totaling approximately $8,355,737.  For the year ending February 28, 2013, the Debtors had a net loss of approximately $845,167.

28.     Due to the decline in revenues and resulting constraints in cash flow, the Debtors, through Alderman, re-started the sale process in February 2013.  Alderman contacted the parties who had expressed interest in October 2012.  By February 15, 2013, the Debtors received seven bids, four of which were from entities that had done significant due diligence in the 2012 sale process and were therefore deemed the most credible bids.  The total value of the four most credible bids ranged from approximately $4 million to $6.9 million. The significant drop in the offer price for the Debtors' business appears to be the result of the Beneficiary Litigation and downturn in earnings and revenue at the AGC's fiscal year 2013.

29.     Subsequent discussions were held with the four bidders with the result that two of those bidders submitted revised offers.  Harlow Aerostructures LLC ("Harlow") was the highest bidder.  On March 5, 2013, the Debtors and Harlow entered into a letter of intent to purchase substantially all of the Debtors' assets (the "Assets").

2738424v5

30.     On April 16, 2013, the Debtors and Harlow entered into an Asset

Purchase Agreement ("APA"), pursuant to which Harlow and/or one or more of its

subsidiaries or affiliates (the "Stalking Horse Buyer") has agreed to purchase the Assets

for $5.7 million plus the assumption of the Assumed Liabilities (as defined in the APA),

subject to, among other things, (i) the sale being approved by this Court, and (ii) this

Court entering an order authorizing the sale of the Assets free and clear of all liens,

claims, and encumbrances with the exception of the Assumed Liabilities and Permitted

Encumbrances (as defined in the APA).

## III.    EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

31.     Concurrently with the filing of their Chapter 11 petitions, the Debtors

have filed a number of First Day Motions seeking relief that the Debtors believe is

necessary to enable them to operate with minimal disruption and loss of productivity.

32.     I have reviewed each of the First Day Motions discussed below and the

facts set forth in each First Day Motion are true and correct to the best of my knowledge

and belief with appropriate reliance on corporate officers and advisors.

### A.      Motion for Interim and Final Order Authorizing Debtors in Possession to (A) Use Cash Collateral and (B) Continue Engaging in Transactions under Pre-Petition Supplier Agreement (the "Cash Collateral Motion")

#### 1.      Use of Cash Collateral

33.     In the ordinary course of business, the Debtors use cash on hand and cash

flow from operations to fund their business operations.  As described above, the Secured

Creditors may claim an interest in the Debtors' Cash Collateral.[1]  The Debtors reserve

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the relevant First Day Motion.

their rights to dispute the amount, extent, validity and priority of such interests in the

Debtors' Cash Collateral.

34.     As a result of the Secured Creditors' claims and interests, the Debtors

have insufficient unencumbered cash with which to operate and manage their businesses,

maintain the value of their business and assets, and attempt to reorganize under Chapter

11 of the Bankruptcy Code.  Specifically, the Debtors require access to Cash Collateral

to, among other things, (a) make payments to vendors, suppliers, and employees; (b)

satisfy the ordinary costs of the Debtors' operations; and (c) fund the administrative costs

of these Chapter 11 cases, including implementing the proposed sale of the Assets and

commencing an orderly wind-down of their businesses, as may be necessary.  In the

absence of authority to use Cash Collateral, the Debtors will not be able to operate their

businesses and they will suffer severe and irreparable harm through an immediate

destruction of value.  Accordingly, authority to use cash collateral is critical to the

success of these Chapter 11 cases and imperative to the Debtors' ability to preserve value

of their estates.

35.     Before the Petition Date, the Debtors approached TD Bank to discuss the

terms on which it would agree to allow the Debtors to use Cash Collateral.  After good

faith, arms' length negotiations between the Debtors and TD Bank, they have agreed on

the terms set forth on the proposed interim order authorizing the use of Cash Collateral

(the "Interim Cash Collateral Order"), in the form annexed as Exhibit B to the Cash

Collateral Motion. Specifically, the Debtors are authorized to use Cash Collateral in the

amounts and for the purposes set forth in the Budget, which is attached as Exhibit A to

10

2738424v5

the Cash Collateral Motion.  The Interim Cash Collateral Order authorizes the Debtors to

use Cash Collateral from the Petition Date to the expiration of the Cash Collateral

Period.

### 2.    Continuation of Supplier Agreement

36.    On May 10, 2004, AGC and Citibank, N.A. ("Citibank") entered into that

certain Supplier Agreement (as amended from time to time, the "Supplier Agreement"),

pursuant to which Citibank agreed to buy certain accounts receivable of AGC at a

discount in accordance with the formula set forth in that agreement.  A true and accurate

copy of the Supplier Agreement is attached as Exhibit D to the Cash Collateral Motion.

The discounting formula is set forth in the Supplier Pricing Schedule annexed to the

Supplier Agreement.

37.    Since 2004, AGC has been regularly using the Supplier Agreement to

liquidate in an efficient and timely manner the accounts receivable owed to it by UTC.

The Supplier Agreement provides AGC with critical cash flow necessary to sustain its

ongoing operations.

38.    TD Bank has executed a Lien Priority Agreement, which is also annexed

at Exhibit D to the Cash Collateral Motion, by which it has subordinated its claimed

interest in AGC's accounts receivable to Citibank in order to allow the parties to

effectuate the Supplier Agreement.

**B.    Motion for Entry of Financing Orders (I) Authorizing Debtors-in-
Possession to Obtain Post-Petition Financing; (II) Granting Liens, Security
Interests and Superpriority States; (III) Authorizing Use of Cash
Collateral; (IV) Granting Adequate Protection; (V) Modifying the
Automatic Stay; and (VI) Scheduling a Final Hearing (the "DIP Motion")**

39.     By the DIP Motion, the Debtors seek an order on an interim and final

basis:  (i) authorizing the Debtors to incur post-petition indebtedness (the "Post-Petition

Financing") in accordance with a Loan and Security Agreement dated as of  April 16,

2013 (the "DIP Agreement," a copy of which is attached as Exhibit A to the DIP

Motion), with the Stalking Horse Buyer, with administrative superpriority and secured

by senior, priming liens in substantially all assets of the Debtors pursuant to section

364(c)(l), (c)(2), and (d) of the Bankruptcy Code; (ii) authorizing the Debtors to use cash

collateral and granting adequate protection; and (iii) scheduling an interim and a final

hearing.

40.     The Debtors have an immediate need to enter into the Post-Petition

Financing. The Debtors have an emergency need to obtain financing as proposed in the

DIP Motion to timely meet their post-petition obligations, to preserve value, and to avoid

immediate and irreparable harm.

41.     The Debtors are entirely unable to obtain any other post-petition

financing, and have been told by their prepetition lender, TD Bank, that it would no

longer provide financial support to the Debtors.  The Debtors are simply "out of cash"

with which to operate their businesses. As a result, the Stalking Horse Buyer was the

only viable source of DIP financing.  The Stalking Horse Buyer has presented to the

Debtors the only available financing package, which includes a favorable price,

commitment amount, and other factors. The proposed Post-Petition Financing is the only

facility that can provide the Debtors with the timely ability to meet their various and

urgent financing needs within the Debtors' time constraints. As negotiated, the Post-

2738424v5

Petition Financing will enable the Debtors to compensate their employees, pay their post-petition creditors and vendors, operate their businesses, and maximize the value of their businesses and properties. The Debtors ability to realize the maximum value for their assets is dependant upon their ability to obtain the post-petition credit sought herein, and the Post-Petition Financing is the best — and only — viable alternative available to them.

42.     The Debtors negotiated the terms of the Post-Petition Financing and the DIP Agreement with Stalking Horse Buyer at arm's length and in good faith, with all parties represented by experienced counsel.

**C.     Motion for Order Directing Joint Administration of Chapter 11 Cases**

43.     Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 cases will jointly affect both Debtors.  The Debtors are affiliated by ownership and share some of the same creditors.  Thus, the Debtors believe the interests of the various Debtors, their estates and creditors, as well as other parties in interest would be best served by the joint administration of these Chapter 11 cases for procedural purposes because it will ease the administrative burdens on all of these parties.  For these reasons, I believe it is in the best interests of the estates and all parties in interest for the Court to approve the joint administration of these Chapter 11 cases for procedural purposes only.

2738424v5

**D.** **Motion for Entry of Interim and Final Orders Authorizing the Debtor to Continue to Use Its Cash Management System and Maintain Existing Business Forms (the "Cash Management Motion")**

44.     By the Cash Management Motion, the Debtors request an order (1) authorizing the Debtors to continue to operate the Cash Management System and maintain their existing business forms; and (2) authorizing the Bank to (a) continue to maintain, service, and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks or electronic funds transfers drawn on the Bank Accounts that are presented for payment at the Bank or exchanged for cashier's checks before the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date and (iii) undisputed, outstanding Bank Fees before and after the Petition Date.

45.     The Debtors have the following existing accounts (collectively, the "Bank Accounts") at TD Bank, N.A. (the "Bank"):

(a)     AGC Checking Account at the Bank with an account number bearing the last four digits: "3585";

(b)     AGC Money Market Account at the Bank with an account number bearing the last four digits: "7733"; and

(c)     Rajon Checking Account at the Bank with an account number bearing the last four digits: "5003".

14

46.     In the ordinary course of business, the Debtors engage in transactions by
check, debit, wire or ACH and other similar methods using their respective Bank
Accounts (collectively, the "Cash Management System").

47.     Furthermore, in the ordinary course, the Bank charges, and the Debtor
pays, honors, or allows the deduction from the appropriate account, certain service
charges and other fees, costs and expenses (collectively, the "Bank Fees").

48.     In the ordinary course of business, the Debtors use a variety of checks and
business forms.  To minimize expenses to their estates, the Debtors believe it is
appropriate to continue to use all correspondence and business forms (including
letterhead, purchase orders and invoices) as such forms were in existence immediately
before the Petition Date - without reference to the Debtors' status as debtors in
possession - rather than requiring the Debtors to incur the expense and delay of ordering
entirely new business forms.

49.     Nonetheless, as soon as practicable, after the Petition Date, the Debtors
will include the notation "D.I.P." or "Debtor-In-Possession" on all checks.

50.     The Debtors believe that it would be difficult and burdensome to close
their existing Bank Accounts and establish new accounts.

51.     The delays that would result from opening these accounts, revising cash
management procedures, and instructing customers to redirect payments would disrupt
the Debtors' business at this critical time.  Further, the Debtors believe that if their
ability to conduct transactions by debit, wire, ACH or other similar methods is impaired,

15

the Debtors' business operations may be unnecessarily disrupted and their estates will incur additional costs.

52.    The Debtors believe that parties in interest will not be harmed by their maintenance of the existing Cash Management System and the Bank Accounts because the Debtors have implemented appropriate mechanisms to ensure the unauthorized payments will not be made on account of prepetition obligations.

**E.    Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Other Compensation, and Reimbursable Employee Expenses, and (B) Continue Employee Benefit Programs (the "Employee Wages Motion")**

53.    In the Employee Wages Motion, the Debtors request an order (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, commissions, and other compensation, taxes, withholdings, and related costs, including Unpaid Payroll Service Fees (as defined below), and reimbursable expenses (collectively, the "Employee Wages"), (b) pay and honor obligations relating to the Employee Benefit Plans (as defined below) (collectively, with the Employee Wages and as more particularly described herein, the "Employee Obligations"), and (c) continue the Employee Benefit Plans on a post-petition basis; (ii) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments requests related to the foregoing; (iii) authorizing the Debtors, upon entry of the Final Order, to honor, pay, satisfy or remit certain claims for Unpaid Vacation Time (as defined below) owed to the Debtors' current and former Employees, to the extent that such prepetition amounts are outstanding; and (iv) scheduling a final hearing on the relief sought therein.

16

54.    As of the Petition Date, the Debtors employ approximately 110 employees (the "Employees").  The Debtors pay approximately 79 of the Employees on an hourly basis, while the remaining 31 are paid on a salaried basis.  The Debtors' workforce is not unionized and the Debtors are not party to any collective bargaining agreements.

55.    In addition to the Employees, the Debtors supplement their workforce by utilizing two independent contractors (the "Independent Contractors") who are vital to the Debtors' businesses.  The Debtors remit compensation of the Independent Contractors directly.

56.    The Employees and Independent Contractors perform a variety of critical functions, including sales, customer service, manufacturing, inspection, engineering, and a variety of administrative, legal, accounting, financial, and management related tasks.

### 1.    Wages, Payroll and Other Compensation

#### (a)    Wage Obligations

57.    In the ordinary course of business, the Debtors incur payroll obligations for base wages owed to their Employees and Independent Contractors (collectively, the "Wage Obligations").  The Wage Obligations for hourly Employees and Independent Contractors are paid on a weekly basis each Friday, and salaried Employees are paid bi-weekly on Fridays.  The Debtors estimate that Wage Obligations average a total of approximately $67,600 for the weekly payments to hourly Employees and Independent Contractors, and $84,500 for the bi-weekly payments to salaried Employees.

58.    The Debtors' payroll is administered by ADP (the "Payroll Administrator"), a third-party service provider, which distributes payroll, either directly

17

to the Employees via check or through direct deposits with funds advanced by the

Debtors to the Payroll Administrator.  The Debtors' payroll for the period ending April

7, 2013, as well as prior periods, have already been paid to the Payroll Administrator

and debited from the Debtors' bank account.  Nonetheless, certain limited prepetition

payroll amounts may remain unpaid as of the Petition Date because, among other things,

wire transfers may not have been effectuated or various checks may not have cleared

before the Petition Date.  Further, Wage Obligations are currently outstanding for the

period from April 8, 2013, to the Petition Date.

59.    Specifically, outstanding prepetition Wage Obligations include the

following (collectively, the "Unpaid Compensation"):

  a.    Employee Compensation.  Employee compensation consists of
        amounts owed to the Employees, including prepetition wages,
        salaries, commissions, and sales incentives, but excluding
        severance and vacation time.  As of the Petition Date, the Debtors
        estimate that they owe approximately $105,000 on account of
        Employee compensation in the ordinary course of business.

  b.    Independent Contractor Compensation.  As of the Petition Date,
        the Debtors estimate that approximately $4,000 has accrued and
        remains outstanding on account of prepetition services provided by
        Independent Contractors, each of whom are individuals, and none
        of whom are owed in excess of $12,475 on an individual basis.

### (b)    Unpaid Payroll Services Fees

60.    As noted above, the majority of the Wage Obligations are made by direct

deposit through the electronic transfer of funds to the Payroll Administrator, which then

directly transfers funds to each Employee's bank account, with the remaining Employees

receiving checks.

2738424v5

61.     Specifically, the Payroll Administrator is responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state and local tax filings.  In addition, for each payroll period, the Payroll Administrator processes direct deposit transfers, and administers payroll checks to Employees from certain of the Debtors' accounts.  The Payroll Administrator is crucial in providing the Debtors with a payroll system that functions seamlessly.

62.     The Debtors incur approximately $350 per week and an additional $2000 per month in fees for the Payroll Administrator's services.  As of the Petition Date, the Debtors estimate that approximately $1,350 has accrued and remains outstanding on account of fees owed to the Payroll Administrator for services rendered before the Petition Date (the "Unpaid Payroll Service Fees").

### 2.     Deductions and Payroll Taxes

63.     The Debtors routinely deduct certain amounts from Employees' gross pay, including garnishments, child support and similar deductions (collectively, the "Deductions"), which either the Debtors or a third-party service provider then forwards to the appropriate recipients.  The Debtors estimates that Deductions total approximately $250 per week for hourly Employees, and $430 per bi-weekly pay period for salaried Employees.  As of the Petition Date, the Debtor estimates that no Deductions have been collected but not yet remitted to the appropriate third-party recipients (collectively, the "Unremitted Deductions").

2738424v5

64.     In addition to the Deductions, the Debtors are required by law to withhold amounts from Employees' wages that are related to federal, state and local income taxes, including social security and Medicare taxes and unemployment insurance, for remittance to the appropriate taxing authorities (collectively, the "Employee Payroll Taxes").  The Debtors estimate that Employee Payroll Taxes total approximately $13,525 for each weekly payroll period for hourly Employees and $33,350 for each biweekly payroll period for both hourly and salaried Employees.

65.     The Debtors must match from their own funds social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes, including portions paid by the Debtors and portions paid by the Employees, total approximately $22,720 for each weekly payroll period for hourly Employees and $49,565 for each biweekly payroll period for both hourly and salaried Employees.  As of the Petition Date, the Debtors estimate that approximately $4,000 in Payroll Taxes has been collected for Employees, but not yet remitted to the appropriate third-party recipients (collectively, the "Unremitted Payroll Taxes").

### 3.     Reimbursable Expenses

66.     In the ordinary course of business, the Debtors reimburse certain Employees for reasonable, customary and approved expenses incurred on behalf of the Debtors in the scope of their employment and service, including travel expenses and

2738424v5

credit cards, in accordance with the Debtors' policies (collectively, the "Reimbursable

Expenses").

67.      As of the Petition Date, the Debtors estimate that there will be no

outstanding unpaid Reimbursable Expenses.  To avoid unnecessary disruption, the

Debtors seek the authority to continue to honor Reimbursable Expenses in the ordinary

course of business on a post-petition basis.

### 4.      Employee Benefits Plans

68.      The Debtors maintain various employee benefit plans and policies,

including medical and dental plans, life and accidental death and dismemberment plan,

disability insurance plans, and a 401(k) retirement savings plan (collectively, and as

discussed in more detail below, the "Employee Benefit Plans").

### (a)      Health Benefit Plans

69.      All full-time Employees and part-time Employees who work at least 32

hours per week are eligible to receive medical and dental insurance coverage after ninety

days of employment as described below (collectively, the "Health Benefit Plans").  The

Debtors pay approximately 62% of the cost of the Medical Policy (as defined below), but

the Employees pay all of the costs of the Dental Policy (as defined below).

> a.      Medical Insurance.  The Debtors are parties to a group health
> insurance policy with Aetna, pursuant to which Employees and
> their eligible dependants are provided with group health insurance,
> including prescription drug coverage (the "Medical Policy").  The
> Debtors' average monthly premium owed under the Medical Policy
> is approximately $90,000.00.  As of the Petition Date, the Debtors
> estimate that they owe $45,000.00 in prepetition obligations under
> the Medical Policy.

      b.    <u>Dental Policy</u>.  The Debtors are parties to a group dental policy with BeneCare, pursuant to which Employees and their eligible dependants are provided with group dental insurance (the "<u>Dental Policy</u>").  The Debtors' average monthly premium owed under the Dental Policy is approximately $3,000.00.  As of the Petition Date, the Debtors estimate that they owe $1,500.00 in prepetition obligations under the Dental Policy.

70.    In addition to the amounts owed on account of the Health Benefit Plans, the Debtors have collected approximately $13,750 pursuant to payroll deductions for the Health Benefit Plans, which funds are held in trust and which the Debtors seek to remit to the appropriate third-party providers on behalf of the Employees (collectively, the "<u>Unpaid Health Benefits</u>").  Considering that the Health Benefit Plans are vital to the Employees and that the Unpaid Health Benefits are held in trust for the Employees, and therefore, not property of the Debtors' estates, the Debtors seeks the authority to remit the Unpaid Health Benefits.  The Debtors also seek to continue the Health Benefit Plans in the ordinary course of business on a post-petition basis.

### (b)    *Disability and Life Insurance*

71.    The Debtors provide short-term disability, long-term disability, and life and accidental death and dismemberment insurance coverage for their full-time Employees (at no cost to the Employees) (the "<u>Life and Disability Plans</u>").  Aetna provides the insurance coverage for the Life and Disability Plans.  The monthly premium for the Life and Disability Plans is $3,000.00.

72.    As of the Petition Date, the Debtors owe approximately $1,500.00 in prepetition obligations owed on account of Life and Disability Plans (collectively, the "<u>Unpaid Life and Disability Premium</u>").

(c)    401(K) Retirement Savings Plan

73.    The Debtors maintain a retirement savings plan for the benefit of all eligible Employees that meets the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  Approximately 46 Employees participate in the 401(k) Plan, which is administered by Retirement Alliance.

74.    Additionally, the Debtors withhold approximately $1,250.00 (in the aggregate) from hourly Employees weekly paychecks and $7,000.00 (in the aggregate) from the salaried Employees weekly paychecks on account of their contributions to the 401(k) Plan.  As of the Petition Date, the Debtors hold in trust approximately $4,750.00 in Employee 401(k) Plan contributions ("Unremitted 401(k) Contributions").  The Debtors seek authority to remit the Unremitted 401(k) Contributions held in trust for their Employees and continue the 401(k) Plan in the ordinary course of business on a post-petition basis.

(d)    Workers' Compensation Programs

75.    The Debtors maintain workers' compensation insurance for their Employees at the mandated level required by law (the "Workers' Compensation Program") under that certain policy with CBIA / FutureComp (the "Workers' Compensation Policy").  The Debtors pay approximately $11,263.00 in monthly premium under the Workers' Compensation Policy.

76.    As of the Petition Date, the April 2013 premium has been paid in full.

2738424v5

### 5.    Vacation Time and Paid Holidays

77.     The Debtors provide all full-time Employees with vacation time as a paid, time-off benefit ("Vacation Time").  The amount of available Vacation Time, and the rate at which such Vacation Time accrues, is generally determined by the Employee's length of full-time employment.

78.     As of the Petition Date, the Debtors estimate that it is responsible for Vacation Time totaling approximately $250,000 (the "Unpaid Vacation Time").

79.     The Debtors also maintain a policy whereby Employees receive compensation for certain non-working holidays (the "Paid Holidays").  The Debtors observe nine (9) Paid Holidays per calendar year.  The Debtors anticipate that their Employees will utilize any accrued Vacation Time in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

### 6.    Necessity for Relief Sought in Employee Wages Motion

80.     The skills and experience of the Employees and Independent Contractors, as well as their relationship with customers and vendors and knowledge of the Debtors' business are essential to the Debtors' ongoing operations and ability to effectuate a going concern sale that maximizes value for all stakeholders.  The vast majority of the Employees and Independent Contractors rely exclusively on their compensation to pay their daily living expenses.  To minimize personal hardship that the Employees and Independent Contractors would suffer if prepetition Employee Obligations were not paid when due or as expected, and to maintain morale and enhance the Debtors' ability to

24

retain employees during this critical restructuring process, the relief sought in the

Employee Wages Motion should be granted.

81.     A stable work force will play a critical role in the uninterrupted

continuation of the Debtors' business and the maximization of value through a going

concern sale in these Chapter 11 cases.  Any significant departures or deterioration in

morale among the Employees or Independent Contractors at this time will immediately

and substantially adversely impact the Debtors' efforts in Chapter 11 and result in

immediate and irreparable harm to the Debtors' estates and creditors.  There is a real and

immediate risk that if the Debtors are not authorized to continue to honor their Employee

Obligations to these parties in the ordinary course, the Employees and Independent

Contractors would no longer support and maintain the operations of the Debtors, thereby

crippling the Debtors' business operations.  Accordingly, the Debtors strongly believe it

is critical that they be permitted to continue to pay and honor in the ordinary course the

Employee Obligations and the Employee Benefit Plans.

> **F.**     **Motion for an Order Authorizing the Debtors to Provide Adequate
> Assurance of Future Payment to Utility Companies Pursuant to 11 U.S.C.
> § 366 (the "Utilities Motion")**

82.     By the Utilities Motion, the Debtors seek an order (a) prohibiting the

Utility Companies from altering, refusing, or discontinuing Utility Services on account of

any unpaid prepetition invoices; (b) providing that the Utility Companies have "adequate

assurance of payment" within the meaning of § 366(c) of the Bankruptcy Code by virtue

of the Debtors providing each with one-month's deposit; (c) establishing procedures for

determining requests for additional adequate assurance of payment; (d) providing that

2738424v5

any Utility Company that does not timely request additional adequate assurance of payment, as provided for herein, shall be deemed to have adequate assurance under § 366(c) of the Bankruptcy Code; and (e) providing that, in the event that a Determination Motion is filed or a Determination Hearing is scheduled, any objecting Utility Company shall be deemed to have adequate assurance of payment under § 366(c) of the Bankruptcy Code without the need for payment of additional deposits or other securities until an order of the Court is entered to the contrary in connection with such Determination Motion or Determination Hearing.

83.     In the ordinary course of business the Debtors' incur water, natural gas, oil, electricity, telephone, internet service, and similar utility services by approximately six (6) different Utility Companies, a nonexclusive list of which is attached as Exhibit A to the Utilities Motion.  On average, the Debtors spend approximately $47,750.00 on monthly payments to the Utility Companies for Utility Services.  As of the Petition Date, the Debtors estimate that approximately $104,827.45 in utility costs is outstanding to the Utility Companies.

84.     Uninterrupted utility services are essential to the Debtors' ongoing operations, and, thus, the success of these Chapter 11 cases.  If the Utility Companies are permitted to terminate Utility Services on the thirty-first day after the Petition Date, there will be severe disruptions in the Debtors' business affairs.  Indeed, any interruption of Utility Services, even for a brief period of time, would substantially negatively affect the Debtors' operations, customer relationships, and revenues.

2738424v5

85.    To that end and to provide additional assurance of payment for future services to the Utility Companies, the Debtors propose to deposit into a segregated, interest bearing account an amount equal to the average monthly payment to each of the Utilities Companies over the twelve month period preceding the Petition Date as set forth on Exhibit A to the Utilities Motion (the "Adequate Assurance Deposit").[2]

86.    The Debtors believe that the Adequate Assurance Deposit, together with the availability of funds as described in the cash collateral budget annexed to the Cash Collateral Motion, constitutes adequate assurance to the Utility Companies.

**G.    Motion for Order (i) Approving Auction Procedures to be Employed in Connection with the Sale of Certain of the Debtor's Assets Pursuant to 11 U.S.C. §§ 105 and 363; (ii) Scheduling Date, Time and Place for Sale Hearing; (iii) Approving Break Up Fee; (iv) Approving Form and Manner of Notice; and (v) Dispensing with Appraisal Requirements (the "Bid Procedures Motion")**

87.    By the Bid Procedures Motion, the Debtors seek an order (i) approving auction procedures to be employed in connection with the sale of certain of the Debtors' Assets; (ii) scheduling the date, time and place for a sale hearing; (iii) approving a break-up fee; (iv) approving form and manner of notice of such sale; and (v) dispensing with appraisal requirements under LBR 6004-1.

88.    As the result of the Debtors' extensive marketing efforts over the last year, including the re-solicitation of offers in February 2013, as described above, the

---

[2] This is with one exception related to East River Energy, which is the provider of oil. As of January 1, 2013, the Debtors switched over to using primarily natural gas for their energy and heating needs and thereby greatly reducing their need for oil. As a result, the Debtors are proposing a deposit amount based on their reduced expected use of oil during the post-petition period.

2738424v5

Debtors determined that it is in the best interest of their creditors to enter into the APA
with the Stalking Horse Buyer.

89.     As more particularly described in the APA, the Debtors will receive $5.7
million in cash, plus the assumption of the Assumed Liabilities (as defined in the APA)
in exchange for the Assets.

90.     Absent a sale to the Stalking Horse Buyer, given the Debtors' continued
financial difficulties, lack of funding, continued constraints on cash flow, and the loss of
confidence of the Debtors' largest customer due to their ongoing financial instability, the
value of the Assets will deteriorate since the Debtors will not be able to continue to
operate the Assets as a going concern.

91.     The Stalking Horse Buyer has expended significant time and money
conducting its due diligence and has incurred substantial expenses relating to the
negotiation of the APA.  To compensate Stalking Horse Buyer for the expenses it has
incurred and will in the future incur in connection with the transaction contemplated by
the APA, and as an incentive for the Stalking Horse Buyer to continue to pursue its
efforts to purchase the Assets, the Debtors have agreed in the course of arms' length
negotiations, subject to this Court's approval, that they will pay a break up fee equal to
4% of the purchase price of the Winning Bid for the Assets.

92.     The Stalking Horse Buyer is not an insider of either of the Debtors as that
term is defined in § 101(31)(b) of the Bankruptcy Code.

93.     The Debtors and the Stalking Horse Buyer have agreed to Auction
Procedures, which are attached as Exhibit B to the Bid Procedures Motion.  The Debtors

2738424v5

believe that the proposed Auction Procedures are fair, reasonable, appropriate, and will likely result in the maximum recovery to their estates.

94.    By the Bid Procedures Motion, the Debtors also requests a waiver of the appraisal requirement in LBR 6004-1 because they have already engaged in extensive marketing of the Assets and negotiated a sale of the Assets to the Stalking Horse Buyer on reasonable and fair terms, which sale is subject to higher and better bids as set forth herein.

29

I declare under penalty of perjury that the foregoing is true and correct, and that this

Declaration was executed on April 16, 2013.


/s/ R. Bruce Andrews
R. Bruce Andrews
President and Chief Executive Officer, AGC, Inc.
Director, Rajon Realty Corporation