## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In Re: | : | Chapter 11 |
|  | : |  |
| AGC, INC. and | : | Case No. 13-30681 |
| RAJON REALTY CORPORATION, | : | Case No. 13-30682 |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| AGC, INC. and | : |  |
| RAJON REALTY CORPORATION, | : |  |
|  | : |  |
| Movants. | : |  |
|  | : |  |
| VS. | : |  |
|  | : |  |
| TD BANK, N.A., CONNECTICUT | : |  |
| INNOVATIONS, INCORPORATED, | : |  |
| CITIBANK, N.A. TOWN OF GROTON, | : |  |
| DE LAGE LANDEN FINANCIAL | : |  |
| SERVICES, INC., AND | : |  |
| CITY OF MERIDEN | : |  |
| Respondents. | : |  |

## DEBTORS' MOTION TO (I) SELL SUBSTANTIALLY ALL OF THEIR ASSETS OUT OF THE ORDINARY COURSE OF BUSINESS AND FREE AND CLEAR OF ALL SECURITY INTERESTS, LIENS, CLAIMS, (II) ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY, AND (III) APPROVE PAYMENT OF KEY EMPLOYEE INCENTIVE PAYMENT OUT OF SALE PROCEEDS

AGC, Inc. ("AGC") and Rajon Realty Corporation ("Rajon" and together with

AGC, the "Debtors"), as debtors and debtors in possession, hereby move, pursuant to 11

U.S.C. §§ 105 and 363(b), (f) and (m), and 503, and Bankruptcy Rules 2002 and 6004,

for an order authorizing (I) the sale of substantially all of their assets out of the ordinary

course of business and free and clear of security interests, claims, and encumbrances, (II)

the assumption and assignment of certain executory contracts and unexpired leases of

nonresidential real property in connection with such sale, (III) a key employee incentive

plan for R. Bruce Andrews (the "KEIP"), and (IV) payment out of the sale proceeds to

the City of Meriden on its sewer lien, TD Bank on its first priority secured claim, and R.

Bruce Andrews under the KEIP.

In support thereof, the Debtors rely on the Declaration of R. Bruce Andrews in

Support of First Day Motions ("Andrews Declaration") and further state as follows:

## I.    Jurisdiction, Venue and Basis for Relief

1.    On April 16, 2013 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the

Debtors continue to operate their businesses and manage their properties, affairs, and

assets as debtors-in-possession.

2.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).

3.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The bases for the relief requested herein are §§ 105 and 363(b), (f) and

(m), 365(a) and (f), 503, 1107 and 1108(a) of title 11 of the United States Code (the

"Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure2002 and 6004.

2

II.    <u>Background</u>

5.    AGC is a sixty-one year old manufacturing company located in Meriden, Connecticut.  AGC is a manufacturer of engine components and assemblies for commercial and military aviation, with a specialty in the area of non-metallic components and the bonding of these components to metal parts.  AGC sells its products to original equipment manufacturers and suppliers.

6.    Rajon owns the real property and building located at 106 Evansville Avenue, Meriden, Connecticut (the "<u>Meriden Property</u>"), at which AGC operates its business.  AGC and Rajon are parties to a lease by which Rajon leases the Meriden Property to AGC.

7.    RCS I, LP ("<u>RCS I</u>") is the sole shareholder of both Rajon and AGC. RCS I is controlled by its general partner, RCS II, Inc. ("<u>RCS II</u>"), which has a one-percent (1%) limited partnership interest in RCS I.  The remaining limited partners of RCS I are the Raymond C. Schmitt Revocable Trust, which owns a fifty percent (50%) limited partnership interest, and the Raymond C. Schmitt Irrevocable Trust, which owns a forty-nine percent (49%) limited partnership interest (collectively, the "<u>Trusts</u>" and the beneficiaries thereof are referred to herein as the "<u>Beneficiaries</u>").  The sole shareholder of RCS II is the Raymond C. Schmitt Revocable Trust.

8.    As of February 28, 2013, the Debtors, on a consolidated basis, had balance sheet stated assets totaling approximately $7,456,013, and liabilities totaling approximately $8,355,737.  For the year ending February 28, 2013, the Debtors had a net loss of approximately $845,167.

3

2718260v2

A.    Secured Creditors

9.     The Debtor's primary secured creditor is TD Bank ("TD Bank").  The

Debtors owe TD Bank approximately $5,461,277.  TD Bank claims a first priority

security interest in substantially all of the Debtors' assets.

10.    Connecticut Innovations, Incorporated ("CI" and together with TD Bank,

the "Secured Creditors"), as successor to the Connecticut Development Authority, has

also been granted a security interest, subsequent in right to that of TD Bank, on

substantially all of the Debtors' assets.  The Debtors owe CI approximately $721,566.

11.    In addition to the Secured Creditors, the following additional entities may

claim a security interest in some of the Debtors' assets:

(i)    Citibank, N.A. may claim a lien in certain accounts receivable

from United Technologies Corp. purchased by Citibank, N.A. pursuant to the terms of

the Supplier Agreement between Debtors and Citibank, N.A.

(ii)    Town of Groton may claim a lien in certain property declared on

the Town of Groton's Grand List for October 1, 2009 and October 1, 2010.

(iii)    De Lage Landen Financial Services, Inc. may claim a lien in

certain equipment described in Contract No. 25042455.

(iv)    City of Meriden claims a superpriority statutory sewer lien on the

Meriden Property in the amount of $68,434.42 (the "Sewer Lien").

12.    As more fully described in the Andrews Declaration, starting in early

2012, the Debtors determined that the best course of action to maximize recovery to its

creditors was to effectuate a sale of their businesses as a going concern.  This decision

4

was made in consultation with TD Bank. Toward that end, the Debtors engaged

Alderman & Company Capital, LLC ("Alderman"), an investment banker in the

aerospace and defense industry, to market the business for sale. The Debtors and

Alderman undertook a thorough marketing of the business by contacting approximately

209 potential purchasers, engaging in multiple rounds of bidding, responding to all

inquires from potential purchasers, and allowing potential purchasers to conduct

significant due diligence.

13.    As the result of litigation commenced by certain of the Beneficiaries

related to the efforts to sell the business, which is described in detail in the Andrews

Declaration, the marketing process was halted in late 2012. In February 2013, the

Debtors restarted the marketing process by soliciting new offers from the potential

purchasers that had expressed significant interest in buying the business as of late 2012.

14.    As the result of the Debtors' most recent marketing efforts, which are

detailed in the Andrews Declaration, the Debtors determined that it is in the best interest

of their creditors to enter into a certain Asset Purchase Agreement dated April 16, 2013

(together with related documents, agreements and instruments, the "APA") for the sale

of substantially all of the Debtors' assets as more particularly set forth in the APA (the

"Assets") to Harlow Aerostructures LLC and/or one ore more of its affiliates or

subsidiaries (hereinafter, the "Stalking Horse Buyer"). A copy of the APA is attached

hereto as Exhibit A.

15.     The Debtors have further determined that it is in the best interest of its estates to conduct an auction to solicit higher and better bids for the Assets on terms substantially similar to those contained in the APA.

16.     Contemporaneously herewith, the Debtors have filed a Motion for Order (i) Approving Auction Procedures to be Employed in Connection with the Sale of Substantially All of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105 and 363; (ii) Scheduling Date, Time and Place for Sale Hearing; (iii) Approving Break Up Fee; (iv) Approving Form and Manner of Notice; and (v) Dispensing with Appraisal Requirements (the "Bid Procedures Motion"), pursuant to which the Debtors seek an order establishing an auction procedure governing the sale of substantially all of their assets.

### B.     Proposed Key Employee Incentive Plan

17.     In connection with the sale, the Debtors seek authorization to implement the KEIP, as described herein, in favor of R. Bruce Andrews ("Mr. Andrews") who serves as President and Chief Executive Officer of AGC and Director of Rajon.  The KEIP is necessary to induce Mr. Andrews to continue his substantial efforts in operating the Debtors' businesses and facilitating the sale of the Assets.

18.     Historically, the Debtors have used incentive and merit based compensation to reward key employees for their performance.  Upon his employment as President and Chief Executive Officer of AGC, Mr. Andrews entered into an executive employment agreement with AGC, pursuant to which he was to receive 4% of the gross sales price in any sale of the business.

2718260v2

19.    Because of the current financial condition of the Debtors, such an agreement unfortunately could not be maintained.  Nonetheless, the Debtors recognize the need to properly incentivize Mr. Andrews to work diligently to generate the greatest possible recovery for creditors.  Thus, an incentive pay program has been created for Mr. Andrews as a key employee whose services are vital to the going concern sale in these Chapter 11 cases.

20.    To maximize the value of their assets, the Debtors and TD Bank, the Debtors' primary secured creditor, recognize the need to properly incentivize M. Andrews.  The proposed KEIP provides incentive-based cash award to Mr. Andrews, as a key employee who possesses intimate knowledge of the Debtors' businesses and will be most capable of maximizing the Debtors' financial performance.

21.    The proposed KEIP would work as follows.  Upon a successful closing of the sale of the Assets to the Stalking Horse Buyer under the terms of the APA, the sale proceeds would be distributed as follows:  (i) the City of Meriden would be paid $68,434.42 (plus any additional statutory interest) in full satisfaction of its Sewer Lien; (ii) TD Bank would then be paid $4,500,000.00 in full satisfaction of its secured claims; and (iii) Mr. Andrews would receive the next $65,000.00.  All remaining sale proceeds would be payable upon further order of the Court to other secured, administrative, and unsecured creditors in order of their priority.  If a higher and better offer is received in the auction, the sale proceeds representing the amount of the over bid (the "Additional Sale Proceeds") would be paid as follows:

7

(i) first $28,000.00 in Additional Sale Proceeds would be paid to TD Bank

on its secured claim;

(ii) any remaining Additional Sale Proceeds would be paid to Mr.

Andrews up to a limit of $163,000.00 (which together with the first $65,000 received,

would total $228,000.00); and

(iii) all further remaining Additional Sale Proceeds would be payable to

TD Bank in full satisfaction of its secured claims, and then to other secured,

administrative, and unsecured creditors in order of their priority upon further order of

the Court.

22.     The size of the KEIP award will be determined upon the date an order is

entered approving this Motion (the "Award Determination Event").  No amounts will be

earned or paid to Mr. Andrews if the Debtors do not successfully sell their Assets as a

going concern.  Payment of the KEIP award will occur at closing of the sale of the

Assets.

23.     TD Bank has agreed to the payment of the proposed KEIP as described

above.

**III.    Relief Requested**

**A.    Sale of Assets**

24.     The Debtors hereby seek authorization to sell the Assets out of the

ordinary course of business to the Stalking Horse Buyer according to the terms of the

APA, pursuant to Bankruptcy Code § 363(b), (f) and (m).  Since the Debtors are selling

2718260v2

their business as a going concern, the Assets are not necessary to the Debtor's reorganization.

25.    The negotiation with the Stalking Horse Buyer for the APA was conducted as an arm's-length transaction.  Additionally, the Stalking Horse Buyer has agreed to purchase, and the Debtors have agreed to sell, the Assets in good faith.

26.    In Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983), the Second Circuit Court of Appeals held that a bankruptcy court may approve a debtor's application to sell property out of the ordinary course of business pursuant to Bankruptcy Code § 363(b) if the court "find[s] from the evidence presented before [it] at the hearing a good business reason to grant such an application."  The factors the bankruptcy court should consider in determining whether there is a good business reason to grant the application include the following:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

Id.

27.    The Debtors submit that the sale of the Assets is in the best interests of the Debtors and their estates under Lionel.  The Debtors based their decision to sell the Assets at an auction based on competitive offers to purchase their business as a going concern made by interested parties within the relevant market.  Additionally, as described above, absent the sale of the Assets following an auction, the Assets are likely

to decrease in value over time, due to the Debtors' lack of working capital. Moreover, the Debtors submit that the sale of the Assets as a going concern, after conducting a competitive auction, maximizes the value that the Debtors could receive for the Assets. Finally, the sale of the Assets as a going concern will save and maintain the jobs of nearly all of the Debtors' 110 hourly and salaried employees.

28.    Debtors further move that the sale of the Assets according to the terms of the APA described herein be made free and clear of the security interests in such property of TD Bank and CI, as well as any other creditors that allege to have a lien on the Assets, on either a consensual or nonconsensual basis, pursuant to Sections 363(b) and (f) of the Bankruptcy Code and Rules 6004 and 2002 of the Federal Rules of Bankruptcy Procedure, with any liens attaching to sale proceeds.

29.    The sale of the Assets free and clear of all security interests will maximize the value of the Assets for the benefit of the Debtors, their estates and creditors, including, but not limited to, its secured creditor, TD Bank. If the Assets are not sold as a package as set forth herein, the Debtors, their estates and creditors, including, but not limited to, TD Bank, will realize a significantly diminished return on the Assets.

30.    The Debtors further move that the fourteen (14) day stay of any order approving this Motion as set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure be waived. The reason for this request is the critical need described herein to effectuate a quick sale of the Assets to preserve their value as a going concern.

31.    It is in the best interest of the Debtor, their estates and creditors, including, but not limited to, TD Bank, for the Assets to be sold free and clear of any

security interests with any liens attaching to sale proceeds.  Moreover, by conducting a

sale of the Assets free and clear of any liens or other interests, any party claiming a

security interest would receive money satisfaction of such interest in the same or greater

amount than it could be compelled to accept in a legal or equitable proceeding.

### B.    Assumption and Assignment of Designated Contracts and Leases

32.    In order to effectuate the sale of the Assets to the Stalking Horse Buyer,

the Debtors seek to potentially assume the executory contracts and unexpired leases listed

on Exhibit A to the Bid Procedures Motion (the "Contracts and Leases"), pursuant to

Code § 365(a), and assign them to the Stalking Horse Buyer, pursuant to Code § 365(f).

The Debtors reserve the right to amend the list of Contracts and Leases by deleting

certain Contracts and Leases based upon the outcome of the auction and the agreement of

the Stalking Horse Buyer or successful bidder at the auction to assume the Contracts and

Leases.  Under the APA, the Stalking Horse Buyer will purchase the Assets, including

certain of the Contracts and Leases. Any amounts that the Debtors believe are necessary

to cure any defaults under the Contracts and Leases under Bankruptcy Code §§

365(b)(1)(A) and (b) (2) are listed on Exhibit A to the Bid Procedures Motion.

33.    To have this Court determine in an efficient and expeditious manner the

amounts necessary to cure any defaults under Bankruptcy Code §§ 365(b)(1)(A) and (b)

(2), pursuant to the Bid Procedures Motion, subject to the approval of this Court, the

Debtors will serve a notice (the "Cure Amount Notice"), similar to the form attached as

Exhibit D to the Bid Procedures Motion upon the counterparties to the Contracts and

Leases.  The Debtors will attach to the Cure Amount Notice their calculation of the cure

11

amounts that the Debtors believe must be paid to cure all defaults under the Contracts

and Leases (the "Cure Amounts").  Unless the non-debtor party to a Contract or Lease

files and serves an objection to its scheduled Cure Amount by the Objection Deadline as

defined in this Court's order approving the Bid Procedures Motion, such non-debtor

party shall (i) be forever barred from objecting to the Cure Amount and from asserting

that any additional cure or other amounts are owed as of the date of assignment with

respect to such Lease or Contract, and the Debtors and maker of the prevailing bid at the

auction shall be entitled to rely solely upon the Cure Amount; and (ii) be forever barred

and estopped from asserting or claiming against the Debtors or the maker of the

prevailing bid at the auction that any additional amounts are as of the date of assignment

due or defaults exits under such Contract or Lease or any other claims with respect to

such Contract or Lease.

34.    By assigning the Contracts and Leases to the Stalking Horse Buyer, the

Debtors will maximize the value of their estates by selling their business as a going

concern.  Both the auction and the negotiations for the APA were conducted as arm's-

length transactions.  Additionally, the Stalking Horse Buyer has agreed to purchase, and

the Debtors have agreed to sell and assign, the Assets, Contracts and Leases in good

faith. Accordingly, the assumption of the Contracts and Leases by the Debtors and their

assignment to Stalking Horse Buyer are in the best business interests of the Debtors and

their estates.

35.    The Debtors also seek to assign the Contracts and Leases notwithstanding

any provisions in the Contracts or Leases, or in applicable law, that prohibit, restrict, or

condition the assignment of such Contracts or Leases, or that terminate or modify such

Contracts or Leases or a right or obligation under such Contracts or Leases on account of

such assignment, pursuant to Bankruptcy Code § 365(f).

36.     To the extent required by Bankruptcy Code § 365(f), the counterparties to

the Contracts and Leases have been provided with adequate assurance of future

performance by the Stalking Horse Buyer.

**C.     Authorization to Pay Proposed KEIP Out of Sale Proceeds**

37.     The Debtors respectfully request the entry of an order pursuant to sections

363(b)(1), 503(c), and 105(a) of the Bankruptcy Code authorizing the Debtors to adopt

and implement the KEIP and make payments of amounts thereunder out of the proceeds

of the sale of the Assets.

38.     "Where the debtor articulates a reasonable basis for its business decisions

(as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants v.

Johns- Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986). "To facilitate the debtor's reorganization and to avoid excessive

judicial involvement in the debtor's affairs, § 363(b) of the Code authorizes a debtor to

'use … other than in the ordinary course of business, property of the estate' after notice

and a hearing. Thus ordinary course uses of estate property do not require a prior

hearing. Id. (Internal citation omitted). The implementation of the KEIP is a proper

exercise of the Debtors' business judgment.

2718260v2

39.    The KEIP is designed to provide incentives to Mr. Andrews to compensate him for the additional responsibilities that he has undertaken and will continue to perform in connection with the Debtors' bankruptcy and the impending sale. The Debtors' bankruptcy filings have resulted in Mr. Andrews having assumed significant additional responsibilities and time commitments to assist the Debtors in managing their operations.  In addition to his ordinary course activities in connection with the Debtors' operations, Mr. Andrews is now tasked with, among other things, providing extensive assistance to the Debtors' bankruptcy counsel and advisors with respect to issues arising in these Chapter 11 cases, due diligence in connection with the sale of the Debtors' Assets, providing information to potential buyers, and meeting with potential buyers.

40.    Moreover, the payment of the KEIP is not prohibited by Section 503(c) of the Bankruptcy Code.  As President and Chief Executive Office of AGC and Director of Rajon, Mr. Andrews is an "insider" as defined in Section 101(31) of the Bankruptcy Code.  Section 503(c) sets forth the criteria for courts to use in approving certain types of payments to insiders and other transfers or obligations that are outside the ordinary course of business.  First, the proposed KEIP is clearly an incentive plan and, therefore, §§ 503(c)(1) or 503(c)(2), which deal with retention and severance plans, are not applicable.  Next, the Debtors' implementation of the KEIP is not prohibited under § 503(c)(3) because the KEIP is justified by the "facts and circumstances" of the case. Section 503(c)(3) prohibits "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case."  Courts have

14

examined the following six factors to consider in determining whether an incentive plan

is appropriate under § 503(c)(3):

> (1)    Is there a reasonable relationship between the plan proposed and
> the results to be obtained, i.e., will the key employee stay for as long as it
> takes for the debtor to reorganize or market its assets, or, in the case of a
> performance incentive, *is the plan calculated to achieve the desired
> performance?*
> (2)    Is the cost of the plan reasonable in the context of the debtor's
> assets, liabilities and earning potential?
> (3)    Is the scope of the plan fair and reasonable; does it apply to all
> employees; does it discriminate unfairly?
> (4)    Is the plan or proposal consistent with industry standards?
> (5)    What were the due diligence efforts of the debtor in investigating
> the need for a plan; analyzing which key employees need to be
> incentivized; what is available; what is generally applicable in a particular
> industry?
> (6)    Did the debtor receive independent counsel in performing due
> diligence and in creating and authorizing the incentive compensation?

In re Global Home Products, LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (emphasis

in original).

41.    The KEIP is properly calculated to achieve the desired performance

because compensation is tied directly to the success of the Asset sale.  Payments under

the KEIP are tailored to motivate Mr. Andrews, as a key employee, to successfully sell

the Debtors' Assets at the highest possible price.  Absent achievement of the Debtors'

goals, Mr. Andrews will not receive payment under the KEIP.

42.    The cost of the KEIP is reasonable. The baseline KEIP payment is

$65,000.00, which is a modest sum relative to $5,700,000.00 purchase price under the

APA.  Achieving the baseline would allow Mr. Andrews to receive a KEIP payment

equal to 1.14% of the sale proceeds.  Mr. Andrews would only be able to earn higher

2718260v2

amounts, up to the $228,000.00 limit under the KEIP, if there were higher and better offers, which would have to be at least $6,028,000.00.

43.    The scope of the KEIP is fair and reasonable because it only includes the one employee who has the most significant ability to accomplish the Debtors' goals to sell their Assets.  Mr. Andrews' participation in the KEIP was based on his significant past contributions to the Debtors' financial and operational activities, his expertise and knowledge of the industry and the Debtors' businesses, and his unique ability to assist in this Sale.

44.    Notably, the KEIP has been discussed with and approved by TD Bank, the Debtors' primary secured lender.

45.    Lastly, § 105(a) of the Bankruptcy Code permits a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  As discussed above, the KEIP properly incentivizes Mr. Andrews to undertake the additional responsibilities to operate the Debtors' businesses throughout the Chapter 11 cases and in connection with the Asset sale.  The Debtors therefore respectfully submit that the KEIP requested herein is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their creditors and their estates.

## IV.    Conclusion

WHEREFORE, the Debtor prays for an order of this Court, substantially in the form of Exhibit B hereto, (i) approving the sale of the Assets out of the ordinary course of business according to the terms of the APA free and clear of all security interests in

16

2718260v2

the property; (ii) permitting the Debtors to assume the Contracts and Leases designated

by the Stalking Horse Buyer and assign such Contracts and Leases to the Stalking Horse

Buyer, notwithstanding any provisions in the Contracts or Leases, or in applicable law,

that prohibit, restrict, or condition the assignment of such Contracts or Leases, or that

terminate or modify such Contracts or Leases or a right or obligation under such

Contracts or Leases on account of such assignment; (iii) approving the KEIP for R.

Bruce Andrews; (iv) authorizing the payment out of the sale proceeds to the City of

Meriden on its sewer lien, TD Bank on its first priority secured claim, and R. Bruce

Andrews under the KEIP; (v) waiving the stay of such order under Fed. R. Bankr. P.

6004(h); and (vi) granting such further relief as justice requires.

Dated at Hartford, Connecticut, this 16th day of April 2013.

By: /s/Kathleen M. LaManna
    Kathleen M. LaManna (ct 16740)
    Eric S. Goldstein (ct 27195)
    Shipman & Goodwin LLP
    One Constitution Plaza
    Hartford, CT  06103-1919
    Tel. (860) 251-5000
    Fax: (860) 251-5218
    klamanna@goodwin.com
    egoldstein@goodwin.com

    *Proposed Counsel for AGC, Inc. and*
    *Rajon Realty Corporation*

2718260v2

*Execution Copy*

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into effective as of this 16th day of April, 2013 (the "Execution Date"), by and among **HARLOW AEROSTRUCTURES, LLC**, a Kansas limited liability company, its assignee or permitted designee (the "Buyer"), on the one hand, and **AGC INCORPORATED**, a Connecticut corporation ("AGC"), and **RAJON REALTY CORPORATION**, a Connecticut corporation ("Rajon") (each, a "Seller" and collectively, the "Sellers"), on the other hand (Sellers together with Buyer, the "Parties"), anticipating that AGC and Rajon will each become a debtor and debtor in possession in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court").

### RECITALS

**WHEREAS**, AGC is (a) engaged in the business of owning, managing and operating an aerospace manufacturing business at a facility having an address of 106 Evansville Avenue, Meriden, Connecticut (the "Facility") (such business is referred to herein as the "Business"); and (b) Rajon owns the real property at which the Facility is located, which premises are more particularly described in **Schedule A**, annexed hereto and incorporated herein by reference (the "Premises"); and

**WHEREAS**, it is anticipated that both AGC and Rajon will be filing for protection from their creditors under Chapter 11 of Title 11, United States Code (as amended from time to time, the "Bankruptcy Code") in the Bankruptcy Court (the "Chapter 11 Cases"); and

**WHEREAS**, Sellers have determined that it is in their best interests to sell to Buyer and Buyer desires to purchase, substantially all of the assets owned by Sellers and used or usable in connection with Sellers' Businesses, and that such sales should be free and clear of any and all liens, claims and encumbrances, except as may be specifically provided for herein; and

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Accounts Receivable" means all accounts, notes and other receivables, billed and unbilled, as are payable to Sellers, arising from a bona fide sale or lease of goods or rendering of services of the kind sold or rendered by Sellers in the Ordinary Course of Business.

"Action" means any claim, charge, action, suit, litigation, arbitration, mediation, inquiry, proceeding or investigation by any Person before any Governmental Authority or any material demand letter threatening the initiation of any of the foregoing.

"AGC" has the meaning set forth in the Preamble.

"Affiliate" shall mean, with respect to a specified Person, another Person that directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, including any Subsidiaries of a Person.

"Agreement" has the meaning set forth in the Preamble, including the Schedules and the Exhibits attached to this Agreement, as amended from time to time in accordance with its terms.

"Allocation Schedule" has the meaning set forth in Section 3.4.

"Applicable Environmental Law" means any and all federal, state, or local statutes, Laws, Regulations, ordinances, Orders, common law, and similar provisions currently in existence and applicable and having the force or effect of law, concerning public health or safety, worker health or safety, pollution or protection of the environment, including, but not limited to, the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Resource Conservation Recovery Act, 42 U.S.C. §6901 et seq. ("RCRA"), the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq. ("CERCLA"), the Occupational Safety and Health Act of 1970 (all as amended), and any and all other laws which govern: (i) the existence, cleanup, removal and/or remedy of contamination or threat of contamination on or about owned or leased real property; (ii) the emission or discharge of Hazardous Substances into the environment; (iii) the control of Hazardous Substances; or (iv) the use, generation, transport, treatment, storage, disposal, removal, recycling, handling or recovery of Hazardous Substances, including building materials.

"Assignment of Intangible Property" has the meaning set forth in Section 4.3.3.

"Assignment of Leases" has the meaning set forth in Section 4.3.1.

"Assumed Leases and Contracts" means the Other Leases and Contracts as identified on **Schedule 2.1.1-(i)** and **Schedule 2.1.1-(ii)** hereof.

"Assumed Liabilities" has the meaning set forth in Section 3.2.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Preamble, or such other court as may have jurisdiction over the Chapter 11 Cases.

"Bill of Sale" has the meaning set forth in Section 4.3.2.

"Books and Records" means all books, records, ledgers, files, reports, plans, drawings and operating records of every kind of Sellers exclusively or principally relating to Sellers, the Purchased Assets, the Facility or the Business including, without limitation, business and marketing plans of Sellers but excluding the originals of the minute books, stock books and

all tax returns of Sellers and any documents related primarily to the Excluded Assets and Excluded Liabilities.

"Broker" has the meaning set forth in Section 14.9.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Connecticut.

"Buyer" has the meaning set forth in the Preamble.

"Buyer's Deliveries" has the meaning set forth in Section 4.4.

"CERCLA" has the meaning set forth in the definition of Applicable Environmental Law.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"CI" has the meaning set forth in Section 5.2.13.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.2.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, together with the rules and regulations promulgated thereunder.

"Consent" means a consent, approval, authorization, waiver or notification from any Governmental Authority or other Person necessary to authorize, approve or permit the full or complete sale, conveyance, assignment, sublease or transfer of the Purchased Assets and to consummate and make effective the transaction contemplated by this Agreement, except to the extent any of the foregoing is not required pursuant to an Order of the Bankruptcy Court.

"Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of capital stock, as trustee (other than a Chapter 11 trustee) or executor, by contract or credit arrangement or otherwise.

"Cooperating Party" has the meaning set forth in Section 13.1.

"Cure Costs" means all monetary liabilities and obligations of Sellers that must be paid or otherwise satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to cure all of

Sellers' defaults under the Assumed Leases and Contracts at the time of the assumption thereof and assignment to Buyer as provided hereunder.

"DIP Fee" has the meaning set forth in Section 12.9.

"DIP Financing" has the meaning set forth in Section 5.2.14.

"Encumbrance" means any claim, charge, lease, covenant, easement, encumbrance, security interest, lien, recoupment, option, pledge, mortgage, hypothecation, or similar restriction (whether on voting, sale, transfer, disposition, or otherwise) against or with respect to tangible or intangible property or rights, whether imposed by agreement, understanding, law, equity, or otherwise, including the encumbrances set forth in **Schedule B** hereto.

"Environmental Liabilities" means any Liability or investigative, corrective or remedial obligation, whenever arising or occurring, but related to acts or omissions arising or occurring prior to the Closing arising under Applicable Environmental Laws with respect to Sellers or any of their predecessor(s) or Affiliates, the Business, the Purchased Assets or the Facility (including without limitation any arising from the on-site or off-site Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of Hazardous Substances).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, together with the rules and regulations promulgated thereunder.

"Escrow Agent" has the meaning set forth in Section 3.1.2(a).

"Escrow Agreement" has the meaning set forth in Section 3.1.2(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(iii).

"Excluded Liabilities" has the meaning set forth in Section 3.3.

"Execution Date" has the meaning set forth in the Preamble.

"Facility" has the meaning set forth in the Recitals.

"Facility Employees" has the meaning set forth in Section 9.

"Filing Date" has the meaning set forth in Section 5.2.1.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no

stay of the Order shall be in effect or (ii) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court Order or timely motion to seek review or rehearing of such Order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by Buyer.

"Financial Statements" means the audited financial statements of Sellers for the years ending 2010, 2011 and 2012 and the internally generated financial statements for the period ending February 28, 2013 attached hereto as **Schedule C**.

"GAAP" means generally accepted accounting principles in the United States of America that are in effect from time to time.

"Good Faith Deposit" has the meaning set forth in Section 3.1.2(a).

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Governmental Permits" has the meaning set forth in Section 2.1.8.

"Hazardous Substance" means any material or substance: (i) which is defined as a "hazardous substance," "pollutant" or "contaminant" pursuant to CERCLA and regulations promulgated thereunder; (ii) containing gasoline, oil, diesel fuel or other petroleum products, or fractions thereof; (iii) which is defined as a "hazardous waste" pursuant to RCRA and regulations promulgated thereunder; (iv) containing polychlorinated biphenyls (PCBs); (v) containing asbestos; (vi) which is radioactive; (vii) which is biologically hazardous; (viii) the presence of which requires investigation or remediation under any Law; (ix) which is defined as a "hazardous waste", "hazardous substance", "pollutant" or "contaminant" or other such terms used to define a substance having an adverse effect on the environment under any Law; or (x) which is toxic, explosive, dangerous, corrosive or otherwise hazardous substance, material or waste which is regulated by any federal, state or local Governmental Authority.

"Indebtedness" means, at any time and with respect to any Person, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than property, including inventory, and services purchased, and trade payables, other expense accruals arising, in the Ordinary Course of Business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent), (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of Seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded, (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness, and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and including in clauses (a) through (h) above any accrued and unpaid interest thereon.

"Intangible Property" has the meaning set forth in Section 2.1.5.

"Inventory" has the meaning set forth in Section 2.1.7.

"IRS" means the U.S. Internal Revenue Service.

"Laws" means any statute, law, ordinance, Regulation, rule, policy, code, Order, other requirement or rule of law of any federal, state, local or foreign government and all agencies thereof.

"Leased Real Property" has the meaning set forth in Section 2.1.2.

"Leasehold Improvements" has the meaning set forth in Section 2.1.3.

"Leases" has the meaning set forth in Section 2.1.1.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including, without limitation, any liability for Taxes.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is or could be reasonably expected to become, in the aggregate, materially adverse to (i) the Business, results of operation, condition (financial or otherwise) or Purchased Assets, (ii) the value of the Purchased Assets, or (iii) the validity or enforceability of this Agreement or the ability of Sellers to perform their obligations hereunder as set forth herein; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (a) any changes, conditions or effects in the United States economy or securities or financial markets in general; (b) the filing or commencement of the Chapter 11 Cases or the impact of such filing or any obligations arising pursuant thereto; (c) changes, conditions or effects that generally affect the industries in which the Business operates; (d) any change, effect or circumstance resulting from an action required or permitted by this Agreement, including without limitation, the public announcement of this Agreement or the Chapter 11 Cases or any action taken by the Sellers in the Ordinary Course of Business; (e) any changes in GAAP; (f) changes in any applicable governmental regulation; (g) changes, conditions or effects of the Sellers that Buyer had actual knowledge of; or (h) conditions caused by acts of terrorism or war (whether or not declared).

"Order" means any decree, order, injunction, rule, judgment, consent of or by any court or Governmental Authority.

"Ordinary Course of Business" — an action taken by any Seller will be deemed to have been taken in the "Ordinary Course of Business" only if:

        (a)    such action is taken in the ordinary course of the normal day to day operations of a business in the aerospace industry;

        (b)    such action is not required to be authorized by the board of directors of such Seller (or by any Person or group of Persons exercising similar authority);

        (c)    such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same or similar line of business as such Person;

        (d)    such action is in connection with the filing of a bankruptcy petition of the Sellers in the Chapter 11 Cases in the Bankruptcy Court and all activities and expenditures in connection therewith; and

(e)      such action is in connection with any post-petition activities or expenditures made to facilitate the sale of substantially all of the assets of Sellers pursuant to a bidding process under Section 363 of the Bankruptcy Code.

"Other Contracts" has the meaning set forth in Section 2.1.1.

"Other Leases and Contracts" has the meaning set forth in Section 2.1.1.

"Owned Real Property" has the meaning set forth in Section 2.1.2.

"Parties" has the meaning set forth in the Preamble.

"Permitted Encumbrances" mean (i) Encumbrances for unpaid property taxes, assessments or charges of any Governmental Authority related to the time period after the Closing Date; (ii) Encumbrances of landlords and Encumbrances of carriers, warehousemen, mechanics and materialmen, and created in the Ordinary Course of Business which is not then due or delinquent but only to the extent that such Encumbrances are related to an Assumed Liability; (iii) Encumbrances (other than any Encumbrance imposed under ERISA) incurred or deposits made in the Ordinary Course of Business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations or arising as a result of progress payments under government contracts but only to the extent that such Encumbrances are related to an Assumed Liability; and (iv) Encumbrances shown on **Schedule D** hereto.

"Person" means an individual, corporation, partnership, association, limited liability company, trust, joint venture, unincorporated organization, other entity or group (as defined in Section 13(d)(3) of the Exchange Act).

"Personal Property" has the meaning set forth in Section 2.1.4.

"Post-Signing Update" has the meaning set forth in Section 12.13.

"Premises" has the meaning set forth in the Recitals.

"Prepaid Expenses" means expenses prepaid by the Seller prior to the Closing Date and shown on **Schedule 1A** which shall be similar to those shown on the balance sheet for the month ending February 28, 2013, as "Prepaid Expenses."

"Prepaid Payables" means advance payments related to materials for, and services rendered in connection with the creation of, inventory by the Seller prior to the Closing Date and shown on **Schedule 1B** which shall be similar to those shown on the balance sheet for the month ending February 28, 2013, as "Prepaid Payables."

"Purchase Price" has the meaning set forth in Section 3.1.1.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Quitclaim Deed" has the meaning set forth in Section 4.3.4.

"Rajon" has the meaning set forth in the Preamble.

"RCRA" has the meaning set forth in the definition of Applicable Environmental Law.

"Receivables" has the meaning set forth in Section 2.1.6.

"Regulation" means any law, statue, regulation, ruling or Order of, administered or enforced by or on behalf of, any court or Governmental Authority.

"Release" has the meaning set forth in CERCLA.

"Sale Order" means as required, an order or orders of the Bankruptcy Court in form and substance reasonably satisfactory to Buyer and Sellers providing for, among other things, (i) the sale of the Purchased Assets to Buyer pursuant to section 363(b), (f) and (m) of the Bankruptcy Code free and clear of all Encumbrances except the Assumed Liabilities (if any) and Permitted Encumbrances, and (ii) the assumption by Sellers and assignment to Buyer pursuant to Section 365 of the Bankruptcy Code of all contracts, agreements, and leases to be assigned to Buyer under this Agreement.

"Schedules" means the Schedules to this Agreement.

"Schedule Update" has the meaning set forth in Section 12.13.

"Sellers' Deliveries" has the meaning set forth in Section 4.3.

"Sellers" has the meaning set forth in the Preamble.  All references to Sellers means both each Seller individually and all Sellers collectively.

"Subsidiary" means any corporation, partnership, joint venture or other legal entity of which Sellers or any other Person, as the case may be (either alone or through or together with any other Subsidiary), owns, directly or indirectly, 40% or more of the capital stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation, partnership, joint venture or other legal entity.

"Tax" or "Taxes" means any federal, province, local, or foreign income, gross receipts, license, payroll employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, provider or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Third Party" means any Person other than Sellers, Buyer, or any of their respective Affiliates.

"Transferred Employees" has the meaning set forth in Section 9.

2.      Transfer of Assets.

2.1      Purchase and Sale of Assets.  Subject to and in accordance with the terms of this Agreement, including the entry of a Sale Order, and in consideration of the covenants and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, on the Closing Date, Sellers shall unconditionally sell, assign, transfer, convey and deliver to Buyer or its designee(s), and Buyer or its designee(s) shall purchase from Sellers, (a) all of Sellers' right, title and interest in and to any and all assets, properties, cash on hand and in banks, cash equivalents, marketable securities, bonds and investments, and business of every kind and description used in connection with the operation of and otherwise relating to the Facility or the Business, whether tangible or intangible, real, personal or fixed wherever situated, owned, held or used by Sellers or which in relation thereto Sellers have any right, title or interest, other than the Excluded Assets and (b) the Premises, which shall be conveyed to Buyer free and clear of all liens, claims and encumbrances (collectively, (a) and (b) are the "Purchased Assets").  Pursuant to the Sale Order, the Purchased Assets shall be sold and conveyed free and clear of all claims or Encumbrances, including without limitation all claims based on any theory that Buyer or its designee(s) is a successor, transferee or continuation of Sellers or the Business, in each case, other than the Assumed Liabilities (if any) and the Permitted Encumbrances.  The Purchased Assets include, without limitation, the following:

2.1.1      Leases and Contracts.  (i) the equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements, including any and all deposits and security deposits related thereto, described on **Schedule 2.1.1-(i)** attached to this Agreement and incorporated herein by reference (collectively, the "Leases"); (ii) those other contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements described on **Schedule 2.1.1-(ii)** attached to this Agreement and incorporated herein by reference (collectively, the "Other Contracts" and together with the Leases, the "Other Leases and Contracts").  Notwithstanding the foregoing, not later than five (5) days prior to the Closing, Buyer shall have the option to reject any of the Leases or Contracts, in whole or in part, on written notice to Sellers prior to Closing. Any of the Leases or Contracts that are rejected by Buyer shall be deemed to be Excluded Assets for all purposes.

2.1.2      Real Property and Improvements; Leased Real Property.   The Premises relating to the Facility or the Business more particularly described on **Schedule 2.1.2A** attached to this Agreement and incorporated herein by reference, together with all buildings, structures, facilities, improvements and fixtures located thereon, and all easements, licenses, rights of way, all right, title and interest of any Seller in all related architects and engineers plans and specifications (to the extent in Sellers' possession as of the date hereof), and other rights and interests appurtenant thereto (collectively, the "Owned Real Property").  All leases for real

property listed on **Schedule 2.1.2B** and any and all related security deposits collectively, the "<u>Leased Real Property</u>").

      2.1.3  <u>Leasehold Improvements</u>.  The improvements, and appurtenances to such improvements, located on the Premises, the Owned Real Property, or the Leased Real Property and all right, title and interest of any Seller in all related architects and engineers plans and specifications (to the extent in Sellers' possession as of the date hereof), but in all events only to the extent of any Seller's interest in the same (collectively, the "<u>Leasehold Improvements</u>").

      2.1.4  <u>Personal Property</u>.  All of those items of equipment and tangible assets listed in **Schedule 2.1.4** attached to this Agreement and incorporated herein by reference and all other tangible personal property now or hereafter owned by any Seller listed on **Schedule 2.1.4** under the heading "Personal Property Seller", including, without limitation, all such furniture, vehicles, machinery, equipment, tools, spare parts, computers, computer servers, computer networks, fixtures and furnishings located at or on any of the Owned Real Property or the Leased Real Property, at the Facility owned or operated by Seller listed on **Schedule 2.1.4** under the heading "Personal Property Seller" and copies of all warranties and manuals with respect to such personal property to the extent such copies are in Sellers' possession as of the date hereof (collectively, the "<u>Personal Property</u>").  Without limiting the forgoing, the Personal Property shall expressly exclude any equipment or other tangible property held by any Seller pursuant to a lease, rental agreement, contract, license or similar arrangement where Buyer does not assume the underlying lease, rental agreement, contract, license or similar arrangement relating to such personal property at the Closing; and such personal property sold or disposed of by the Sellers in the Ordinary Course of Business prior to the Closing.

      2.1.5  <u>Intangible Property</u>.  All intangible personal property owned or held by any Seller and used in connection with the Facilities, together with all Books and Records and like items pertaining to any of the Facilities, including, without limitation, the right to use all trade names used by the Sellers, including but not limited to AGC, Rajon and any trade names and all variations thereof used in connection with any of the Facility and all other names listed in **Schedule 2.1.5** attached to this Agreement and incorporated herein by reference, the goodwill of the Business and the Facility, all websites, facsimile numbers and registered email addresses used by the Sellers in connection with the Business, the patents, processes, trademarks, trade names, service marks, catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, including all brochures, selling and promotional materials, handouts and promotional materials, software programs, and telephone exchange numbers in each case to the extent identified with any of the Facilities (collectively, the "<u>Intangible Property</u>").

      2.1.6  <u>Receivables</u>.  All Accounts Receivable, instruments, receivables, and unbilled costs and fees attributable to the Facility and the Business, including, without limitation, subject to Section 2.2, all such receivables, accounts receivables and unbilled costs and fees listed on **Schedule 2.1.6** and all causes of action and other claims of Sellers relating or pertaining to the foregoing (collectively, the "<u>Receivables</u>").

2.1.7    Inventory.  All supplies, goods, materials, inventory and stock in trade owned and held by any Seller for use in connection with the operation of the Facility or the Business, including, without limitation, all such supplies, goods, materials, inventory and stock in trade listed on **Schedule 2.1.7A** (collectively, the "Inventory") and as a subset of Inventory, all inventory that has had no sales of their related part numbers in the past 24 months is listed on **Schedule 2.1.7B**, excluding all such inventory sold or used by the Facility or the Business in the Ordinary Course of Business prior to Closing.

2.1.8    Governmental Permits.  To the extent transferable and assignable, all of Sellers' respective interests in all licenses, permits, registrations, certificates of public convenience and necessity, approvals, licenses, easements, authorizations and operating rights relating to the Facility or the Business issued or granted by any Governmental Authority, provided, however, that by written notice to Sellers prior to the Closing, Buyer shall have the right to exclude any of the foregoing from the Purchased Assets (collectively, the "Governmental Permits").

2.1.9    Escrows, Prepaid Expenses, Prepaid Payables and Deposits. Escrows, prepayments, Prepaid Expenses, Prepaid Payables, deposits, restricted accounts and reserved amounts held with respect to the Facilities or the Business and listed on **Schedule 2.1.9**, including without limitation, reserve replacement escrows, debt service escrows, utility deposits, restricted cash amounts, property tax escrows, insurance proceed escrows, and any refunds related to the foregoing.

2.1.10    Other Assets. All other assets used in connection with or related to the Facility, the Premises, or the Business wherever located as of the Closing not otherwise set forth above and which do not otherwise constitute Excluded Assets.

2.2    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall exclude all of the following (collectively, the "Excluded Assets"):

(i)    Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof;

(ii)    All Prepaid Expenses (and reimbursements related thereto) in respect of insurance policies (including, without limitation, any director and officer policies), unused professional fee retainers, proceeds, claims and causes of action with respect to or arising in connection with (A) any contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing;

(iii)    any real property lease, other lease or other contract to which any Seller is a party which is not listed or described on **Schedule 2.1.1-(i)** or **Schedule 2.1.1-(ii)**, except those assumed pursuant to Section 3.5 hereof (collectively, the "Excluded Contracts");

(iv)    all securities, whether capital stock or debt, of any Seller;

(v)      tax records, minute books, stock transfer books and corporate seals of any Seller;

(vi)      any letters of credit or similar financial accommodations issued to any third party(ies) for the account of any Seller and identified on **Schedule 2.2(vi)**;

(vii)      Except as set forth on **Schedule 2.2(vii)** relating to claims by Sellers against customers for non-payment, all suits, rights, claims, choses in action and causes of action of any Seller against any Third Party, including any current or former officers, directors, employees, members, principals, agents, and representatives of such Seller;

(viii)      all preference or avoidance claims and actions of Sellers, including, without limitation, any such claims and actions arising under Chapter 5 of the Bankruptcy Code;

(ix)      all instruments, Receivables, Accounts Receivable and unbilled costs and fees outstanding or owing between or among Sellers (or any entities comprising Sellers) and all causes of action relating or pertaining to the foregoing;

(x)      with Buyer's consent, any assets excluded pursuant to the Sale Order;

(xi)      escrow and reserved amounts held with respect to the Facility which are not Purchased Assets and which are listed on **Schedule 2.2(xi)**;

(xii)      any and all capital stock of the Sellers;

(xiii)      the insurance policies for which consent of the insurance companies to provide coverage to the Sellers, in accordance with the terms and conditions of such policies, for any claims asserted against Sellers that would otherwise be covered by said policies, for any claims asserted against Sellers that would otherwise be covered by said policies has not been obtained; and

(xiv)      any and all contracts between a Seller and any Affiliate of Seller, as set forth on **Schedule 2.2(xiv)**.

2.3      Instruments of Transfer.      The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer shall be made by assignments, bill of sale, deed and other instruments of assignment, transfer and conveyance provided for in Section 4 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Purchased Assets to Buyer as contemplated in the Sale Order, all of which documents and instruments shall be prepared by Buyer at its sole cost and expense.

3.    <u>Consideration.</u>

    3.1    <u>Purchase Price; Bidding Procedure.</u>

    3.1.1    <u>Amount and Adjustment.</u>  Subject to adjustment in accordance with Section 3.1.2(b) and the bidding procedures set forth in Section 3.1.3, the consideration to be paid by Buyer to Sellers for the Purchased Assets shall be an amount equal to **FIVE MILLION SEVEN HUNDRED THOUSAND Dollars and 00/100 ($5,700,000.00)** (the "<u>Purchase Price</u>") plus the assumption of Assumed Liabilities.

    3.1.2    <u>Method of Payment.</u>  The Purchase Price shall be paid as follows:

    (a)    Within one day of the Execution Date, the Buyer shall deposit with Updike, Kelly & Spellacy, P.C. (the "<u>Escrow Agent</u>") in their client trust IOLTA account for the benefit of Sellers a good faith non-refundable deposit in the amount of **ONE HUNDRED THOUSAND Dollars and 00/100 ($100,000)** (the "<u>Good Faith Deposit</u>"), which Good Faith Deposit shall be disbursed in accordance with the terms of the escrow agreement (the "<u>Escrow Agreement</u>") attached hereto as **Exhibit A**; provided, however, that, notwithstanding the foregoing, the Good Faith Deposit shall be returned to Buyer in the event (i) the conditions set forth in Section 5.2 have not been satisfied or waived by Buyer, (ii) this Agreement is terminated in accordance with Section 11, (iii) Seller has materially breached this Agreement, or (iv) a Third Party purchases the Purchased Assets in the Chapter 11 Cases and Buyer has not terminated this Agreement under Section 11 prior to such purchase.

    (b)    On the Closing Date, subject to the Sale Order, the Buyer shall pay the Sellers by federal wire transfer of immediately available funds the Purchase Price <u>less</u> the Good Faith Deposit and further subject to adjustment based upon (i) adjustments for real and personal property taxes in accordance with the usual and customary closing customs for New Haven County, (ii) any unemployment assessments levied by the U.S. federal government for periods prior to the Closing Date, (iii) all employee payroll, benefits and related items not limited to accrued payroll, taxes and benefits (including health insurance, dental insurance and 401(k) liabilities), and accrued vacation wages, incurred by Sellers and due prior to the Closing Date, (iv) the Buyer's right to "credit bid" as part of the consideration paid, with respect to any balance then due on any DIP Financing that may have been extended by the Buyer; provided, however, that with respect to clause (ii) above, as soon as such assessments become due and payable after the Closing Date, Sellers shall either (A) reimburse Buyer if Buyer chooses to pay such assessments directly or (B) promptly pay such assessments on behalf of Buyer.

    3.1.3    <u>Bidding Procedure.</u>  Any party that is interested in acquiring the Purchased Assets, must submit a qualifying bid in conformance with the bidding procedure set forth in **Exhibit B** which is incorporated by reference herein and made a part hereof.

3.2    Assumed Liabilities.  Buyer shall, effective as of the Closing Date, assume, and agrees to satisfy and discharge as the same shall become due, only those liabilities and obligations of Sellers specifically described and quantified on **Schedule 3.2** (collectively, the "Assumed Liabilities").  This Section 3.2 shall survive the Closing.

3.2.1  Environmental Liabilities.  Buyer will assume the liability for remediation of the Premises, which shall be included in **Schedule 3.2**.

3.3    Excluded Liabilities.    Except for the Assumed Liabilities specifically identified in **Schedule 3.2**, Buyer is not assuming and subject to the terms and conditions of this Agreement, the sale shall be free and clear of any other liabilities or obligations of any kind whatsoever of Sellers (collectively, the "Excluded Liabilities").  Without limiting the generality of the foregoing, Buyer is not assuming:

(i)    Liabilities or obligations of Sellers in connection with the conduct of the Business arising out of or relating to any occurrence or event happening before or after the Closing Date;

(ii)    Liabilities or obligations of Sellers for professional fees and expenses for its advisors, including without limitation, those retained pursuant to any Order of the Bankruptcy Court;

(iii)    Any administrative expense Claims accruing in the Chapter 11 Cases;

(iv)    Liabilities or obligations of any Seller (other than Assumed Liabilities) arising under any and all existing contracts with its officers, directors, advisors and consultants or equity owners not otherwise constituting an Assumed Lease or Contract;

(v)    Liabilities or obligations of any Seller arising under any and all employment and change in control contracts, equity option contracts and equity purchase contracts to which any Seller is a party other than any Liability arising pursuant to any Assumed Lease or Contract;

(vi)    Liabilities or obligations of any Seller arising under any and all contracts between such Seller and its Affiliates;

(vii)    Liabilities, obligations, or amounts payable (pursuant to contract or otherwise) to any existing or former equity or stakeholder of any Seller or in any way related to the right to or issuance of any capital stock or other equity interest of such Seller or any predecessor or Affiliate of such Seller including, without limitation, any stock options or warrants;

(viii)    Liabilities or obligations in connection with or relating to the Excluded Assets;

(ix)    Any Liability of any Seller for Taxes, including (A) any Taxes arising as a result of any Sellers' operation of its Business or ownership of its assets prior to the Closing Date including all real property Taxes that may be due in accordance with the usual and customary closing customs for New Haven County, (B) any Taxes that will arise as a result of the sale of its assets pursuant to this Agreement, and (C) any deferred Taxes of any nature;

(x)    Liabilities or obligations in connection with any Indebtedness of Seller, except pursuant to any Assumed Lease or Contract;

(xi)    Liabilities arising out of any Action pending against any of the Sellers, their Affiliates, the Business or any Person claiming any legal or equitable interest in any of the Sellers, directly or indirectly, as of the Closing Date or commenced after the Closing Date but arising out of or relating to any occurrence or event happening on or prior to the Closing Date;

(xii)    All pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables or general unsecured Claims;

(xiii)    Liabilities or obligations in connection with the Excluded Contracts;

(xiv)    Liabilities or obligations related to all insurance policies of any Seller other than Liabilities arising pursuant to any Assumed Lease or Contract;

(xv)    Liabilities and obligations of any Seller under this Agreement or any other document executed in connection herewith; and

(xvi)    any other Liability or obligation of any Seller not expressly assumed pursuant to Section 3.2.

3.4    Purchase Price Allocation. Buyer shall prepare and deliver to Sellers a schedule (the "Allocation Schedule") allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision ten (10) days prior to the Closing.

3.5    Post-Closing Assignment of Leases and Executory Contracts. For a period of thirty (30) days after the Closing Date with respect to any lease or executory contract that is not set forth on **Schedule 2.1.1-(i)** or **Schedule 2.1.1-(ii)** and which relates to the Facility or the Business and provided that such lease or executory contract has not been rejected by Sellers pursuant to section 365 of the Bankruptcy Code, upon written notice from Buyer, as soon as practicable, subject to any requirements of the Bankruptcy Court, Sellers (or one of them as appropriate) shall take all actions reasonably necessary to assume and assign to Buyer, provided Sellers shall not incur any material expense, for no additional consideration, pursuant to Section 365 of the Bankruptcy Code, any such lease or executory contract(s) set forth in Buyer's notice.

Subject to any requirements of the Bankruptcy Court, the Parties agree that any applicable Cure Costs shall be satisfied by Buyer. Sellers agree and acknowledge that (i) they shall provide Buyer with reasonable advance notice of any motion to reject any lease or executory contract and (ii) the covenants set forth in this Section 3.5 shall survive the Closing. Notwithstanding anything in this Agreement to the contrary, on the date any such lease or executory contract is assumed by Sellers and assigned to Buyer pursuant to this Section 3.5, such lease or executory contract shall be deemed an Other Lease and Contract and deemed scheduled on **Schedule 2.1.1-(i)** or **Schedule 2.1.1-(ii)** for all purposes under this Agreement. Upon request of Buyer, Seller shall provide to Buyer, in form and content satisfactory to Buyer, a written assignment of any such Lease or Executory Contract.

4.    Closing Transactions.

4.1    Closing. The Closing of the transactions provided for herein (the "Closing") shall be deemed to be remotely (or, at the option of the Parties, physically) held at the offices of Updike, Kelly & Spellacy, P.C., 100 Pearl Street, Hartford, Connecticut.

4.2    Closing Date. The Closing shall be held no later than the fifth (5th) day following the satisfaction of the last of the conditions set forth in Sections 5.1 and 5.2 below (as to each individual Seller, the "Closing Date"), for each individual Seller. Each Seller closing shall occur simultaneously. At the sole option of Buyer, should it deem it necessary and acceptable, each Seller closing may occur on separate dates, but to the extent necessary, the first closing to occur shall be in escrow, pending the successful second Seller closing. To the extent that more than one Closing Date shall be required and acceptable to Buyer, in no event shall the individual closings be more than five (5) calendar days apart. If both Closings cannot take place within the time period set forth herein, Buyer shall have the sole option to elect to proceed to consummate the transactions contemplated by this Agreement, or to terminate this Agreement and end the Buyer's obligations, without penalty.

4.3    Sellers' Deliveries to Buyer at Closing. On the Closing Date, Sellers shall make the following deliveries to Buyer (collectively, the "Sellers' Deliveries"):

4.3.1    An Assignment and Assumption of Leases and Contracts substantially in the form attached as **Exhibit C** hereto, duly executed by each appropriate Seller pursuant to which each Seller shall assign to Buyer its interest, if any, in the Other Leases and Contracts, including executory contracts with Sellers customers (the "Assignment of Leases"). Together with each Assignment and Assumption of Leases and Contracts, Seller shall use commercially reasonable efforts to obtain and provide to Buyer the contract counterparty's consent and agreement to such assignment.

4.3.2    A bill of sale, duly executed by each Seller substantially in the form attached hereto as **Exhibit D**, pursuant to which each Seller shall transfer its right, title and interest in and to the Personal Property, the Inventory and the Receivables to Buyer (the "Bill of Sale").

4.3.3    An assignment of intangible property, duly executed by each Seller, substantially in the form of the assignment attached as **Exhibit E** hereto, pursuant to which each Seller shall assign to Buyer its interest, if any, in and to the Intangible Property (the "Assignment of Intangible Property").

4.3.4    A Quitclaim Deed substantially in the form of **Exhibit F** hereto (the "Quitclaim Deed"), duly executed and acknowledged by the applicable Seller, pursuant to which such Seller quitclaims to Buyer its right, title and interest in the Premises. At the option and request of Buyer, Seller shall also provide to Buyer a duly executed acknowledgment and consent to the termination of any leasehold interest in the Premises.

4.3.5    A statement(s) under Section 1445 of the Code with respect to the Owned Real Property.

4.3.6    Any document or instrument effecting transfer which is required by Buyer or any title insurance company as is normal and customary in a bankruptcy sale to insure Buyer's fee simple title to the Owned Real Property under a title insurance policy or an endorsement thereto.

4.3.7    All keys to all locks on the Facility, the Premises and the Purchased Assets which shall be delivered at the Facility.

4.3.8    Such other documents and instruments as are contemplated by this Agreement or as Buyer or Buyer's counsel may reasonably request in order to evidence or consummate the transactions contemplated by this Agreement or to effectuate the purpose or intent of this Agreement.

4.4    Buyer's Deliveries to Sellers at Closing.    On the Closing Date, Buyer shall make or cause the following deliveries to Sellers (the "Buyer's Deliveries"):

4.4.1    A counterpart of the Assignment of Leases, duly executed by Buyer or its designee(s).

4.4.2    A counterpart of the Assignment of Intangible Property, duly executed by Buyer or its designee(s).

4.4.3    The Purchase Price.

4.4.4    A counterpart to the Escrow Agreement and evidence of delivery of the Good Faith Deposit to the Escrow Agent.

4.4.5    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Buyer to Seller at the Closing.

4.5    Sales, Use and Other Taxes.    Any sales, purchases, transfer, real estate conveyance, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, which

may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne 100% by Sellers.

       4.6   <u>Possession</u>.  Subject to the Closing occurring, right to possession of the Purchased Assets shall transfer to Buyer or its designee(s) on the Closing Date.

       5.   <u>Conditions Precedent to Closing</u>.

       5.1   <u>Conditions to Sellers' Obligations</u>.  Sellers' obligation to make Sellers' Deliveries required of Sellers at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Sellers of each of the following conditions:

       5.1.1  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed as of the Closing Date.

       5.1.2  The Buyer shall provide evidence reasonably satisfactory to Sellers that Buyer is in compliance with all requirements under the Connecticut Transfer Act, Section 22a-134 et seq. of the General Statutes of Connecticut, as amended.

       5.1.3  The Buyer shall pay the Purchase Price to Sellers in accordance with Section 3 hereof.

       5.1.4  The Buyer shall provide the DIP Financing to Seller.

       5.1.5  Evidence that the Good Faith Deposit was delivered to the Escrow Agent.

       5.2   <u>Conditions to Buyer's Obligations</u>.  In addition to the Sellers' obligations to have performed each agreement, Buyer's obligation to make Buyer's Deliveries required of Buyer at the Closing, and to otherwise close the transaction contemplated herein, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

       5.2.1  Sellers shall each have filed and be subject to the Chapter 11 Cases, which filing shall have been made on April 16, 2013 (such date, the "<u>Filing Date</u>"), subject to the written agreement by the Parties to a different date.

       5.2.2  The Sellers shall have obtained approval of the bid procedures attached hereto as **Exhibit B** from the Bankruptcy Court.

       5.2.3  Sellers shall have executed and be prepared to timely deliver to Buyer or its designee(s) the Assignment of Leases and Contracts, including the consents of counterparties; the Bill of Sale; the Assignment of Intangible Property; the Quitclaim Deeds and all other documents as may be necessary and appropriate under the circumstances for the conveyance and sale of the Purchased Assets (for avoidance of doubt, Seller shall be required to sell all of the Purchased Assets to Buyer).

5.2.4    Sellers shall have received Consents, in form and substance satisfactory to United Technologies Corporation, from its Subsidiaries and Affiliates including, without limitation, Pratt & Whitney, Hamilton Sundstrand, and Sikorsky, to the assignment of Sellers' customer contracts to Buyer.

5.2.5    Sellers shall have delivered, or shall be prepared to timely deliver to Buyer or its designee(s) at the Closing, all other documents required of Sellers to be delivered at the Closing.

5.2.6    Except as otherwise provided in **Schedule 5.2.6**, no action, suit or other proceedings shall be pending before any court, tribunal or Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

5.2.7    The Bankruptcy Court shall have entered the Sale Order no later than May 20, 2013, which Sale Order shall include a finding of good faith in accordance with Code Section 363(m) and the Sale Order shall not have been stayed as of the Closing Date. The Sale Order shall be in form and substance reasonably acceptable to Buyer.

5.2.8    Sellers shall have performed, in all material respects, all obligations, covenants and agreements required to be performed by them under this Agreement at or prior to the Closing Date.

5.2.9    Except as otherwise provided in **Schedule 5.2.9**, all material Consents shall have been obtained.

5.2.10    Except as otherwise provided in **Schedule 5.2.10,** Sellers shall not have received any information from any counterparty to a customer contract indicating that an existing contract is in jeopardy of being cancelled or subject to back charge, or that such contract counterparty has objected to or refused to allow and consent to the assignment of such contract.

5.2.11    All other requirements as provided for herein have been performed by the Sellers, and Sellers have not breached any representation or covenant made herein, to the Buyer's satisfaction.

5.2.12    All beneficiaries and trustees of any trust having a direct or indirect interest in any of the Purchased Assets shall have been given notice of the Chapter 11 Cases as well as of any hearing to approve the sale contemplated herein.

5.2.13    Sellers, or one of them as required, will (x) obtain the written consent of TD Bank, N.A. and provide notice to Connecticut Innovations f/k/a Connecticut Development Authority ("CI") and Citibank NA prior to the filing of the Chapter 11 Cases and (y) obtain an order of the Bankruptcy Court promptly after the Filing Date, in each case with respect to: (i) the use of cash collateral, as that term is defined in the Bankruptcy Code, in

accordance with a budget, which cash collateral may only be used in the Ordinary Course of Business; and (ii) the waiver of adequate protection payments. Sellers shall provide Buyer with a schedule detailing professional fees payable in connection with, or in contemplation of, the Chapter 11 Cases and a budget detailing operational costs and expenditures, such budget subject to the prior approval of Buyer. Sellers shall also obtain the written agreement of TD Bank, N.A. not to remove any funds from the account of any Seller from the Execution Date through and including the Filing Date.

   5.2.14 Sellers, or one of them as required, will (x) obtain the written consent of TD Bank, N.A. and provide notice to CI and Citibank NA prior to the filing of the Chapter 11 Cases and (y) obtain an order of the Bankruptcy Court after the Filing Date, in each case with respect to the Buyer providing to the Sellers a **FOUR HUNDRED THOUSAND Dollars and 00/100 ($400,000)** debtor in possession term loan from Buyer, of which **ONE HUNDRED THOUSAND Dollars and 00/100 ($100,000)** shall consist of the Good Faith Deposit (the "DIP Financing"). The DIP Financing shall be made subject to and in accordance with the terms and conditions of the loan agreement by and among Buyer and Sellers.

   5.2.15 From the Execution Date through and including the Filing Date, Sellers shall make no expenditure except those expenditures set forth in **Schedule 5.2.15**, without the consent of the Buyer, which consent shall not be unreasonably withheld nor delayed.

   5.2.16 The Closing shall take place on or before May 25, 2013.

   6. Limited Use of Cash. Upon the filing of the Chapter 11 Cases, Buyer shall be permitted to have a representative at the Sellers' offices, which representative shall have reasonable daily access during normal business hours to all Books and Records, transactions and business conducted, including the review of all cash expenditures, provided, however, that such reasonable daily access does not materially interfere with the operations of the Business, as determined by the Sellers in their sole discretion.

   7. WARN Act. In light of the nature of the circumstances described and contemplated herein, it is not anticipated that the Sellers will be required to give any notice under the federal Worker Adjustment and Retraining Notification Act ("WARN Act"), or any similar state of federal law. In any event, Buyer's obligation to perform hereunder is conditioned upon there being no delay in the closing of the transactions contemplated herein as a consequence of any actual or perceived WARN Act requirement, and that neither the Buyer nor the Purchased Assets will be subject to any claim under that Act or similar state law, and that Sellers will use commercially reasonable efforts to obtain an order of the Bankruptcy Court so providing.

   8. "AS IS" TRANSACTION. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED, LOSS OF USE, PROFIT OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL

PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHICH ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING OR ANY OTHER REAL PROPERTY OR IMPROVEMENTS COMPRISING A PART OF THE PURCHASED ASSETS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TERMS, AMOUNT, VALIDITY, COLLECTIBILITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES OR REAL PROPERTY LEASE OR OTHER LEASE OR CONTRACT, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF).

WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE AS TO ANY PORTION OF THE PURCHASED ASSETS.   BUYER HEREBY WAIVES, RELEASES AND RENOUNCES ANY WARRANTIES, OBLIGATIONS, LIABILITIES, RIGHTS AND REMEDIES ARISING BY LAW OR OTHERWISE INCLUDING INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL OR EXMPLARY DAMAGES.   BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL PORTIONS THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.   ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS, "WHERE IS," AND "WITH ALL FAULTS."

9.     Employee Matters.     Buyer may, at its sole option, but is not required to offer employment, commencing on the Closing Date, to any or all the Facility's employees of Sellers (the "Facility Employees") on the terms and conditions determined by Buyer in its sole and absolute discretion.   Sellers agree to terminate all of their employees immediately upon closing the transactions contemplated by this Agreement.   Those employees to whom offers of employment are made under this Section 9 and who commence employment as of the Closing Date or such other applicable date shall be collectively referred to as the "Transferred Employees."   Sellers shall cooperate with Buyer by making such announcements to the Facility Employees as may be reasonably requested by the Buyer in connection with any such offer of employment.   Notwithstanding anything herein to the contrary, the Buyer's offer of employment to any particular Transferred Employee shall be conditioned upon such individual satisfying reasonable pre-employment screening (e.g., background checks, drug testing) and accepting Buyer's terms of employment which it shall have the exclusive right to establish.

10.    Access to Records and Properties.  From and after the date of this Agreement until the Closing Date, Sellers shall afford to Buyer's officers, independent public accountants, counsel, lenders, consultants, prospective operators and other representatives, reasonable access for examination at all reasonable times to the Purchased Assets and all records pertaining to the Purchased Assets or the Business, including all information technology systems and computer systems.  Subject to Section 12.7.1, Sellers shall also afford Buyer access to key personnel.  Buyer, however, shall not be entitled to access to any materials containing privileged communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy.  Buyer expressly acknowledges that nothing in this Section 10 is intended to give rise to any contingency to Buyer's obligations to proceed with the transactions contemplated herein.

11.    Termination.  Unless expressly provided otherwise, and in addition to but notwithstanding any other provision of this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by mutual written consent of Buyer and Sellers; or

(b)    by Buyer or Sellers, if the Bankruptcy Court or any other court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued any Final Order restraining, enjoining or otherwise prohibiting or disallowing the purchase of the Purchased Assets by Buyer on the terms acceptable to Buyer in its sole discretion; or

(c)    by Buyer or Sellers, if the Chapter 11 Cases shall have been dismissed or converted to a proceeding under Chapter 7 of the Code prior to the Closing; or

(d)    by Buyer, if (i) there shall have been a material breach of any of the representations or warranties of Sellers or a material breach of any of the covenants or provisions set forth in this Agreement, on the part of Sellers; (ii) there shall have occurred, between the Execution Date and the Closing Date, a Material Adverse Effect; or (iii) Buyer reasonably determines, at any time, that any of the conditions set forth in Section 5.2 shall not be satisfied on or before the Closing Date; or

(f)    In the event of the termination of this Agreement pursuant to this Section 11, this Agreement shall forthwith become void and have no effect and there shall be no liability on the part of any Party hereto or its Affiliates, directors, officers, shareholders, members or agents.

12.    Representation; Additional Agreements.

12.1    Litigation.  Except as set forth on **Schedule 12.1**, no Seller has received any notice of any claim, litigation or other legal proceeding which is pending and, to the Sellers' knowledge, no claim, litigation or other legal proceeding is threatened, against any of the

Sellers or the Business, the Facility any Assumed Liabilities or any Purchased Asset before any court, arbitrator or other Governmental Authority, nor to Sellers' knowledge is there any order or judgment outstanding against any Seller or relating to or regarding any of the Business, the Facility, the Purchased Assets or Assumed Liabilities. Except as set forth on **Schedule 12.1**, there are no claims, litigation or other legal proceedings pending or threatened against any Seller which seek to enjoin or rescind the transactions contemplated by this Agreement, or prevent any Seller from complying with the terms and provisions of this Agreement or any other document, instrument or agreement related hereto, nor does any Seller have knowledge of the basis for any such claim, litigation or other legal proceeding.

12.2    <u>Restriction on Asset Transfer</u>. Sellers represent and agree that from and after February 28, 2013 until the time of the Closing of the sale of the Purchased Assets, Sellers have and will operate the Business in the Ordinary Course of Business. Sellers also agree that they have not and will not sell any equipment, tooling or any other fixed asset as reported on its February 28, 2013 balance sheet and equipment list set forth on **Schedule 12.2** prior to Closing.

12.3    <u>Financial Statements.</u>    AGC's chief executive officer and comptroller will certify that the Financial Statements are correct and accurate in all material respects to the best of their actual knowledge.

12.4    <u>No Amendment</u>. Notwithstanding any provision to the contrary herein, Seller shall not seek to amend or modify any provision of the Sale Order without the consent of Buyer.

12.5    <u>Notification of Certain Matters</u>. Each Party shall give prompt notice to the other of (i) any failure of such Party to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder and (ii) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would have a Material Adverse Effect; provided, however, that the delivery of any notice pursuant to this Section 12.5 shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice.

12.6    <u>Further Action</u>.

12.6.1    Upon the terms and subject to the conditions hereof, each of the Parties hereto shall use its reasonable best efforts to take or cause to be taken all appropriate action and to do or cause to be done all things necessary, proper or advisable under applicable Laws, subject to the requirements of Bankruptcy Court, to consummate the transactions contemplated by this Agreement as promptly as practicable, including using its reasonable best efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Authorities and parties to Sellers' contracts, and make any filings with respect thereto, as are necessary for the consummation of the transactions contemplated by this Agreement and to fulfill the conditions to the Closing.

12.6.2    Each Party hereto agrees to cooperate in obtaining any other consents and approvals that may be required in connection with the transactions contemplated by this Agreement; provided, however, that no Party hereto shall be required to compensate any Third Party to obtain any such consent or approval.

12.6.3    ITAR Disclosure Statement. Sellers acknowledge and agree that they shall cooperate with Buyer at Buyer's expense in connection with the Buyer's preparation of a disclosure statement in respect of the Business to be submitted to the U.S. Department of State and the U.S. Department of Commerce after the Closing Date.

12.7    Conduct of the Business.

12.7.1    Except (a)(i) as contemplated by this Agreement or (ii) with the prior written consent of Buyer, each Seller covenants and agrees that, during the period prior to the Closing, it shall, provide Buyer reasonable access to confer with Sellers' key employees to report operational matters and the general status of ongoing operations of the Facility and the Business; provided, however, that Buyer shall provide Sellers with advance notice of, and schedule any, such proposed meeting with any key employees by contacting the AGC comptroller at least three business days prior to such proposed meeting; provided, further, that notwithstanding anything to the contrary contained herein, Buyer shall not interfere in any respect with competing bidders conducting due diligence of the Business at the Facility or otherwise during the Chapter 11 Cases. No Seller shall, prior to the Closing Date, directly or indirectly do, or propose or commit to do, any of the following, except as provided by this Agreement or otherwise ordered by the Bankruptcy Court:

(b)    sell, pledge, dispose of or encumber, or authorize the sale, pledge, disposition or encumbrance of any Purchased Assets, except in the Ordinary Course of Business;

(c)    make any loan or advance to or enter into any other transaction with any of its equityholders, officers, directors, employees (other than advances historically made to employees in the Ordinary Course of Business in connection with the performance of their employment, vacation advances, relocation loans and travel advances, in each case made in the Ordinary Course of Business), or make any other loan or advance or enter into any transaction;

(d)    as to such Seller, pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction approved by the Bankruptcy Court or otherwise in the Ordinary Course of Business, or liabilities reflected or reserved against in the Financial Statements of Sellers or incurred in the Ordinary Course of Business, including the payment in accordance with an order of the Bankruptcy Court of reclamation claims; other than in the Ordinary Course of Business, restructure, write-off or forgive, or agree to restructure write-off or forgive, any receivables; or increase, except pursuant to existing contracts or established practice, the salary, compensation or benefits payable to any employees, directors or consultants or modify, establish or enter into any Plan;

(e)      except as otherwise contemplated by this Agreement, prior to the Closing, enter into any Contract or amend or modify any existing Contract with any officer, director, equity owner or Affiliate of such Seller or any Affiliate or any such officer, director, equity owner or Affiliate, in each case except with the prior written consent of Buyer; or

(f)      otherwise commit to take any of the actions prohibited by the foregoing clauses (a) through (d).

Promptly following the occurrence of any of the events set forth in Section 12.7.1(a)-(f) above, as an accommodation to Buyer, Sellers shall use commercially reasonable efforts to provide Buyer with written notice of such event, except that failure by Sellers to provide Buyer with such written notice pursuant to this Section 12.7 shall not be deemed to be a breach by Sellers of this Agreement.

12.8    Accounts Receivables/Collections.

12.8.1 After the Filing Date, Sellers covenant and agree to deposit all Accounts Receivable and any other funds received directly into an operating account owned by AGC.

12.8.2 After the Closing, Sellers shall permit, and hereby authorize, Buyer or its designee to collect, at Buyer's sole cost and expense, in the name of Sellers, all Accounts Receivable constituting part of the Purchased Assets and to endorse with the name of any applicable Seller for deposit in Buyer's account any checks or drafts received in payment thereof. Sellers shall promptly deliver to Buyer any cash, checks or other property that it may receive after the Closing in respect of any accounts receivable or other asset constituting part of the Purchased Assets.

12.9    DIP Financing. The DIP Financing will bear interest at the rate of 7% per annum and Sellers shall pay to Buyer a fee equal to $10,000 to cover the costs and expenses related to establishing such DIP Financing (the "DIP Fee"). The DIP Fee shall be payable upon the repayment of the DIP Financing. The proceeds of the DIP Financing shall be used for general working capital purposes which shall include, but not be limited to, the purchase of raw materials, outside processing, payroll and other operational needs of AGC. AGC agrees that none of the proceeds of the DIP Financing shall be used to make any payments to Rajon.

12.10    Pre-Bankruptcy Covenants. Prior to the filing of the Chapter 11 Cases:

12.10.1      Sellers shall use commercially reasonable efforts to secure the return of all Seller parts held by any vendor to the Facility.

12.10.2      Sellers shall not solicit the payment of any Receivables from AGC customers in advance of when such Receivables shall be due and payable and AGC shall not ship any finished goods from stock in advance of when such goods are due in accordance with the applicable purchase order or schedule.

12.10.3        AGC shall make all required employee 401K and medical insurance contributions on behalf of its employees.

12.10.4        Each Seller covenants and agrees that no Seller shall directly or indirectly (through a representative, broker or otherwise) solicit or furnish any information to any prospective buyer, commence or continue presently ongoing, negotiations with any other party or enter into any agreement with any other party concerning the sale of the Purchased Assets, the Business, the Facility or any part thereof or any equity securities of any Seller.

12.11   Vendors. Sellers shall reasonably cooperate with Buyer at Buyer's sole expense to assist and support Buyer in connection with the continuation of the existing business relationship as between AGC and its vendors identified on **Schedule 12.11** attached hereto. **Schedule 12.11** shall provide the names of any AGC vendors that as of the Execution Date hold AGC materials in their respective facilities.

12.12   Sellers' Name Change. As promptly as reasonably practicable after the Closing, Sellers shall take all steps necessary to change their name, making all such legal filings necessary including with the Connecticut Secretary of the State, and shall promptly petition the Bankruptcy Court to change the heading and title of their respective proceedings to their new name. Such new name shall in no way reflect, or be similar to the current Sellers' names.

12.13   Schedules. Notwithstanding any specific reference to the disclosure of any matter pursuant to any Schedule, all disclosures made pursuant to any section of this Agreement or to the Schedules shall be deemed made for all other sections to which such disclosure is reasonably apparent on its face that such disclosure is relevant to such other section or schedules, and any headings or captions on any section herein or therein are for convenience of reference only. Prior to the Closing Date, Buyer and Sellers shall, to the extent necessary, supplement or amend the Schedules delivered in connection herewith with respect to any matter arising after the Execution Date which, (i) if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in any such Schedule (a "Schedule Update") or (ii) which is necessary to correct any information in any such Schedule which has been rendered inaccurate thereby, and whether or not such matter is material (a "Post-Signing Update"). The Parties agree such Schedule Updates and Post-Signing Updates (or the failure to so provide such updates) by Sellers shall not constitute a material breach of this Agreement for purposes of Section 11 hereof.

12.14   Buyer's Default. Notwithstanding anything to the contrary contained in this Agreement, if Buyer shall default under or breach any of its obligations in this Agreement, the Good Faith Deposit shall constitute Sellers' full and complete liquidated damages, Seller shall have no further remedy at law or in equity for any default by Buyer hereunder, and the Parties shall have no further obligation to each other hereunder.

12.15   Professional Fees. Sellers shall not pay any legal, accounting, consulting or other professional fees prior to the Closing Date, other than through retainers that

have been funded prior to the Execution Date and previously disclosed to Buyer.

13.    Covenants of the Parties.

13.1    Cooperation.    Upon the reasonable prior request of a Party, the other Party shall cooperate (the "Cooperating Party") to fulfill or obtain the fulfillment of all conditions precedent set forth in this Agreement prior to the Closing Date. Notwithstanding the foregoing, nothing herein contained shall be deemed to require the Cooperating Party to expend any material amount in connection with such cooperation.

13.2    Litigation, Surveys and Financial Information.    Sellers will (a) promptly supply to Buyer, at Buyer's sole cost and expense, copies of all Actions pertaining to the Purchased Assets which may arise subsequent to the Filing Date but prior to the Closing Date; provided, however, that Sellers may withhold delivery to Buyer any documents subject to attorney-client or attorney work product privilege, (b) promptly advise Buyer in writing of any threat of litigation or other legal proceeding which is made between the Execution Date and the Closing Date pertaining to the Purchased Assets, Assumed Leases and Contracts, the Business or Sellers' ability to perform its obligations under this Agreement, and (c) promptly deliver to Buyer updated financial information as is reasonably requested by Buyer.

13.3    Public Announcements.    No Party shall issue any press release or make any other similarly disseminated public statement without the prior approval thereof by the other Party, which approval shall, in the case of Buyer, be in its sole discretion.

14.    Miscellaneous.

14.1    Notices.    Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, by registered or certified mail, postage prepaid, return receipt requested, or on the date sent by facsimile or email delivery of a PDF document (with confirmation of transmission) and shall be deemed communicated as of the date of mailing. Mailed notices shall be addressed as set forth below, but each Party may change its address by written notice in accordance with this Section 14.1.

To Sellers:

AGC Incorporated
106 Evansville Avenue
Meriden, Connecticut 06451
Fax No.: (203) 317-2619
Email: brucea@agcincorporated.com
Attention: Bruce Andrews, CEO

With a copy to:

Shipman & Goodwin LLP
300 Atlantic Street
Stamford, Connecticut 06901
Fax No.: (203) 324-8199
Email: mwidland@goodwin.com
Attention: Michael Widland, Esq.

To Buyer:

Harlow Aerostructures, LLC
1501 McLean Boulevard
Witchita, Kansas 67213
Fax No.: (316) 265-1799
Email: phil@pcfconsultingllc.com
Attn: Mr. Philip Friedman, CEO

With a copy to:

Updike, Kelly & Spellacy, P.C.
100 Pearl Street, 17th Floor
Hartford, CT 06103
Fax No.:(860) 548-2680
Email: tgugliotti@uks.com
Attn: Thomas A. Gugliotti, Esq.

      14.2   Entire Agreement.  Subject to the Sale Order, this Agreement (including any Schedule or Exhibit) and the documents to be executed pursuant hereto contain the entire agreement among the Parties relating to the sale of the Purchased Assets. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

      14.3   Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

      14.4   Closing Date.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or affected until all such actions, documents and transactions have been taken, delivered or effected.

      14.5   Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

14.6    Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

14.7    Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement, including without limitation, requiring such Party to expend any material amount in connection with such further assurances, and provided that any documents and instruments which Buyer requests Seller to execute and deliver shall be prepared, executed and delivered at the expense of Buyer.

14.8    Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

14.9    Brokerage Obligations.  Except for Alderman & Company LLC (the "Broker"), which Broker Sellers have engaged in connection with this transaction, Sellers and the Buyer each represent and warrant to the other that, such party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby.  It is agreed that with the exception of any fee or commission which may be payable to the Broker (which shall be paid to the Broker by Sellers with the proceeds of the sale of the Purchased Assets), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Sellers in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

14.10    Payment of Fees and Expenses.  Each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

14.11    Tax Matters.  Buyer shall not be responsible for the preparation and filing of any tax returns for Sellers including, without limitation, tax returns for any periods as to which tax returns are due (including the consolidated, unitary and combined tax returns for such Sellers) which include the operations of the Business for any period ending on or before the Closing Date.  Buyer shall not be responsible for any payments required with respect to any such tax returns.

14.12   Survival.  The respective covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing, except as otherwise set forth herein.

14.13   Assignments.   Seller may not assign its rights and obligations under this Agreement without the prior written consent of Buyer. Buyer may assign all or any of its rights and obligations to an Affiliate of Buyer or any other Third Party, provided, however, that such assignment shall not relieve Buyer of its obligations hereunder if such Affiliate, or Third Party does not perform such obligations.  This Agreement shall be binding on and inure to the benefit of the parties and their respective successors and permitted assigns.

14.14   Binding Effect.  This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and permitted assigns of the Parties hereto.

14.15   Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to its choice of law provisions.

14.16   Good Faith.  All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

14.17   Construction.   In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

14.18   Counterparts.  This Agreement may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of facsimile or other electronic transmission signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

14.19   Bankruptcy Court Jurisdiction.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.   SUCH COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

14.20   Interpretation and Rules of Construction.   In this Agreement, except to the extent that the context otherwise requires:

14.20.1  when a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference is to a Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

14.20.2  the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

14.20.3  whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

14.20.4  the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

14.20.5  all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

14.20.6  the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

14.20.7  any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

14.20.8  references to a person are also to its permitted successors and permitted assigns; and

14.20.9  the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Buyer and Sellers have executed this Agreement effective as of the day and year first above written.

**BUYER:**

**HARLOW AEROSTRUCTURES, LLC**

By: _____
Name: Philip C. Friedman
Its: CEO

**SELLERS:**

**AGC INCORPORATED**

By: _____
Name:
Its:

**RAJON REALTY CORPORATION**

By: _____
Name:
Its:

IN WITNESS WHEREOF, Buyer and Sellers have executed this Agreement effective as of the day and year first above written.

**BUYER:**                                **HARLOW AEROSTRUCTURES, LLC**

By:_____
Name:
Its:

**SELLERS:**                              **AGC INCORPORATED**

By:_____
Name:  R.Bruce Andrews
Its: President, CEO

**RAJON REALTY CORPORATION**

By:_____
Name:  R.Bruce Andrews
Its: Director

2757228v3

Exhibits "A" through "F"
And All Schedules

[TO BE ATTACHED]

Exhibit "A"

Escrow Agreement

[Attached]

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "**Agreement**") is dated as of April 16, 2013 by and among **HARLOW AEROSTRUCTURES, LLC** ("**Harlow**"), a Kansas limited liability company, **AGC Incorporated** ("**AGC**"), a Connecticut corporation, **Rajon Realty Corporation** ("**Rajon**"), a Connecticut corporation and **Updike, Kelly & Spellacy, P.C.** (the "**Escrow Agent**"), a Connecticut professional corporation (collectively sometimes herein referred to as the "**Parties**"), each of whom may enter into this Agreement by executing a counterpart signature page.

A.    Harlow proposes to purchase from AGC substantially all of AGC's assets, pursuant to a certain Asset Purchase Agreement (the "**APA**") by and among Harlow, Rajon and AGC, in accordance with the terms and conditions set forth therein.

B.    In accordance with the term of the APA, Harlow has agreed to provide a $100,000 deposit (the "**Deposit**") to be held in an IOLTA trust account with the Escrow Agent (the "**Escrow Account**").

C.    Escrow Agent agrees that having been requested to do so, it is willing to serve as Escrow Agent with respect to the Escrow Account and the Deposit, without compensation.

**NOW, THEREFORE**, in consideration of the foregoing recitals, the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and accepted, the Parties hereto agree as follows:

1.    <u>Escrow Account</u>.  The Deposit will be delivered to and deposited into the Escrow Account.  The Parties agree that the Deposit into the Escrow Account will not bear interest.

2.    <u>Escrow Period</u>.  The "**Escrow Period**" shall begin with the delivery of the Deposit to the Escrow Agent and shall terminate upon the earlier to occur of the following events:

2.1    The entry of an order (including an interim order) permitting AGC, as a debtor-in-possession in a bankruptcy proceeding to be filed in the Bankruptcy Court for the District of Connecticut, to enter into a debtor-in-possession financing relationship with Harlow, or Harlow's assignee, in an initial amount of not less than $100,000 (the "**DIP Loan**"), which order or interim order is not subject to any stay pending appeal, upon which event the Escrow Agent shall deliver the Deposit to AGC, debtor-in-possession as an advance under the DIP Loan.

2.2    Such earlier date upon which Harlow for cause as provided in the APA is declared to be in default of the APA by AGC, and such declaration of default is not subject to any proceeding contesting the declaration of default, in which event the Deposit shall be delivered to AGC, or AGC as debtor or debtor-in-possession, as the case may be.  Such delivery shall be first subject to five days prior written notice to the Parties, which must be sent by electronic means and regular mail.

2.3    Such earlier date upon which Harlow, for cause as provided in the APA has declared AGC to be in default of the APA, and such declaration of default is not subject to any proceeding contesting the declaration of default, in which event the Deposit shall be delivered to Harlow, or its designee. Such delivery shall be first subject to five days prior written notice to the Parties, which must be sent by electronic means and regular mail.

3.    Deposits into the Escrow Account.

3.1    The Escrow Agent agrees to accept delivery of the Deposit into the Escrow Account and to hold such funds in the Escrow Account subject to the terms and conditions of this Agreement. The Escrow Agent is entitled to rely on documents and notices provided to it by the Parties, the authenticity of all signatures, and such instructions given as valid and binding upon AGC and Harlow without any duty of inquiry.

4.    Providing Documents to the Escrow Agent.

4.1    AGC and Harlow shall provide Escrow Agent with copies of all documents and agreements referred to herein and on which Escrow Agent is entitled to rely.

5.    Duties and Responsibilities; Exculpation and Indemnification of Escrow Agent.

5.1    The Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein. Except as otherwise set forth herein, the Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery, to direct or cause any payment or delivery to be made, or to enforce any obligation of any person to make any payment or delivery, to direct or cause any payment or delivery to be made, or to enforce any obligation of any person to perform any act. The Escrow Agent shall be under no liability to anyone by reason of any failure on the part of any other party hereto, or any other person, or any maker, guarantor, endorser or other signatory of any document to perform such person's obligations under any such document.

5.2    The Escrow Agent shall not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith and in the exercise of its own best judgment, except to the extent such action or omission constitutes willful misconduct or gross negligence on the part of the Escrow Agent, and may rely conclusively and shall be protected in acting upon, any order, notice, demand, certificate, opinion or advice of counsel (including counsel chosen by the Escrow Agent), statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which is believed by the Escrow Agent in good faith to be genuine and to be signed or presented by the proper person or persons.

5.3     Except as otherwise provided in this Agreement, the Escrow Agent shall not be bound by any notice or demand, or any waiver, modification, termination or rescission of this Agreement or any of the terms hereof, unless evidenced by a writing delivered to the Escrow Agent signed by the proper party or Parties and, if the duties or rights of the Escrow Agent are affected, unless it shall give its prior written consent thereto.

5.4     The Escrow Agent shall not be responsible for the sufficiency or accuracy of the form of, or the execution, validity, value, or genuineness of, any document or property received, held or delivered by it hereunder, or of any signature or endorsement thereon, or for any lack of endorsement thereon, or for any description therein, nor shall the Escrow Agent be responsible or liable in any respect on account of the identity, authority or rights of the persons executing or delivering or purporting to execute or deliver any property or document including this Agreement.  The Escrow Agent shall have no responsibility with respect to the use or application of any funds or other property paid or delivered by the Escrow Agent pursuant to the provisions hereof; provided, however, that nothing herein shall relieve the Escrow Agent from liability for gross negligence or willful misconduct in connection with the use or application of any portion of the funds in the Escrow Account.

5.5     The Escrow Agent shall have the right to assume, in the absence of written notice to the contrary from the proper person or persons, that a fact or any event, by reason of which an action would or might be taken by the Escrow Agent, does not exist or has not occurred, without incurring liability for any action taken or omitted, in good faith and in the exercise of its own best judgment, in reliance upon such assumption.

5.6     To the extent that the Escrow Agent becomes liable for the payment of taxes, including withholding taxes, in respect of income derived from the investment of funds held hereunder or any payment made hereunder, the Escrow Agent may pay such taxes. The Escrow Agent shall be indemnified and held harmless by the other Parties hereto against any liability for taxes and for any penalties or interest in respect of taxes, on such investment income or payments in the manner provided in this Agreement.

5.7     The Escrow Agent shall be indemnified and held harmless, jointly and severally by the other Parties hereto, from and against any reasonable expenses, including reasonable fees and disbursements of counsel, or loss suffered by the Escrow Agent in connection with any action, suit or other proceedings involving any claim, or in connection with any claim or demand, which, in any way, directly or indirectly arises out of or relates to this Agreement, the services of the Escrow Agent hereunder, the monies or other property held by it hereunder or any income earned from investment of such monies (except from liability for its own gross negligence or willful misconduct). Promptly after the receipt by the Escrow Agent of notice of any demand or claim or the commencement of any action, suit or proceeding, the Escrow Agent shall, if a claim in respect thereof is to be made against any of the other Parties hereto, notify such other Parties thereof in writing, but the failure by the Escrow Agent to give such notice shall not relieve any party from any liability which such party may have to the Escrow Agent

hereunder, except to the extent such failure to give notice shall have prejudiced such party's ability to defend against such claim.

For the purposes hereof, the term "expense and loss" shall include all amounts paid or payable to satisfy any claim, demand or liability, or in settlement of any claim, demand, action, suit or proceeding settled with the express written consent of the indemnifying party, and all reasonable costs and expenses, including, but not limited to, reasonable counsel fees and disbursements, paid or incurred in investigation or defending against any such claim, demand, action, suit or proceeding. Notwithstanding anything herein to the contrary, the other Parties shall not be required to indemnify or hold harmless the Escrow Agent for any liabilities, costs or expenses incurred in connection with the Escrow Agent's willful misconduct.

5.8    This Agreement shall be governed in all respects by the laws of the State of Connecticut as such laws are applied to agreements between or among Connecticut residents entered into and to be performed entirely within Connecticut, and without regard to its conflicts of laws principles. Each party hereto irrevocably submits to the exclusive jurisdiction of any court of the State of Connecticut sitting in Hartford County or the United States District Court of the District of Connecticut in Hartford over any action, suit or proceeding relating to or arising out of this Agreement and the transactions contemplated hereby.    EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTIONS, SUIT OR PROCEEDING. Each party hereby irrevocably waives any objections, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens* which such party may now or hereafter have to the bringing of any such actions, suit or proceeding in any such court.

5.9    If any dispute or difference arises between AGC, AGC, debtor or debtor-in-possession or Harlow, or any other third party, or if any conflicting demand shall be made upon the Escrow Agent, the Escrow Agent shall not be required to determine the same or take any action in the premises; but the Escrow Agent may await settlement of the controversy by final appropriate legal proceedings or otherwise as it may require, or the Escrow Agent may file suit in the nature of an interpleader in the courts of the State of Connecticut as provided herein, for the purpose of having the respective rights of the Parties adjudicated and may deposit with the court any or all monies held hereunder. Upon institution of such interpleader suit or other action, depositing the Escrow Funds with the court and giving notice of such action to the Parties involved either by personal service, or in accordance with the order of the court, the Escrow Agent shall be fully released and discharged from all further obligations hereunder with respect to the Escrow Funds so deposited.

5.10    AGC and Harlow understand and acknowledge that the Escrow Agent presently serves as legal counsel to Harlow with respect to the transaction contemplated by the APA, and this Agreement. Each of AGC and Harlow specifically consent and agree to the Escrow Agent's continued representation of Harlow in the contemplated transaction. It is also further understood and agreed that in the event of any dispute between AGC and

Harlow relating to this Agreement, the APA or any matter relating to the anticipated bankruptcy proceeding of AGC, the Escrow Agent may, in its discretion and upon the request of Harlow represent Harlow in such dispute.

5.11    AGC and Harlow hereby each waive any conflicts of interests, appearance of impropriety or other claims of ethical considerations under the ABA Canons of Ethics or similar state laws, rules and guidelines, and agree never to assert any such conflicts or considerations against the Escrow Agent or its actions or inactions hereunder.

6.    Termination of Escrow Agreement and Resignation of Escrow Agent.

6.1    This Agreement shall terminate upon the later of the end of the Escrow Period, as described above, or the disbursement by the Escrow Agent of all of the Escrow Funds in accordance with this Agreement; provided, however, that the rights and obligations of the Parties hereto shall survive the termination hereof.

6.2    The Escrow Agent may resign at any time and be discharged from its duties as Escrow Agent hereunder by giving AGC and Harlow at least three (3) days written notice thereof.   Immediately upon its resignation, the Escrow Agent shall turn over to a successor, which shall be appointed by AGC and Harlow, all monies and property held hereunder upon presentation of the document appointing the successor and its acceptance thereof.   If no successor is so appointed within a thirty-day (30) period following such notice of resignation, the Escrow Agent may deposit the aforesaid monies and property with any court in the State of Connecticut that it deems appropriate.

7.    Notices.  All notices required by this Agreement shall be in writing and shall be deemed to have been duly given if sent by first-class mail, overnight courier service or by hand delivery (with signed return receipt) to the respective addresses as follows:

(a)    To AGC:
Michael L. Widland, Esq.
c/o Shipman & Goodwin
300 Atlantic Street
Stamford, CT 06901
mwidland@goodwin.com

    (b)     To Harlow:

            Mr. Phillip Friedman
            Harlow Aerostructures, LLC
            1501 McLean Boulevard
            Wichita, Kansas 67213
            phil@pcfconsultingllc.com

    (c)     To the Escrow Agent:

            Updike, Kelly & Spellacy, P.C.
            100 Pearl Street
            Hartford, CT 06103
            Attention: Thomas A. Gugliotti, Esq.
            tgugliotti@uks.com

    10.    <u>Counterparts, Facsimile Execution.</u>  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Instrument.  Facsimile execution and delivery of this Agreement is legal, valid and binding for all purposes.

[Signature Page Follows on Next Page]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their authorized representatives.

AGC Incorporated

By:_____    Date: _____
    Its:                              Duly Authorized

Rajon Realty Corporation

By:_____    Date: _____
    Its:                              Duly Authorized

Harlow Aerostructures, LLC


By: _____    Date: _____
    Philip Friedman, CEO              Duly Authorized

Escrow Agent:
Updike, Kelly & Spellacy, P. C.

By: _____    Date: _____
    Thomas A. Gugliotti, Esq., Vice President   Duly Authorized

Exhibit "B"

Bidding Procedure

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| AGC, INC. and | : | Case No. 13-_____ |
| RAJON REALTY CORPORATION, | : | Case No. 13-_____ |
| | : | |
| Debtors. | : | JOINTLY ADMINISTERED |
| | : | |

### AUCTION PROCEDURES

The following procedures (the "Auction Procedures") shall govern the auction

process under which substantially all of the assets and business operations (the "Assets")

of AGC, Inc. ("AGC") and Rajon Realty Corporation ("Rajon" and together with AGC,

the "Debtors") in the Chapter 11 cases of the Debtors (Case No. 13-_____; Case

No. 13-_____) pending in United States Bankruptcy Court for the District of

Connecticut (the "Bankruptcy Court") shall be offered for sale to the Qualified Bidder (as

defined below) making the highest and best Qualified Bid (as defined below). These

Auction Procedures have been approved and authorized by the Bankruptcy Court's order

dated April __, 2013 (the "Sale Procedures Order").

Business Judgment of the Debtors. The Debtors reserve the right in their reasonable

discretion (a) to send copies of these Auction Procedures together with any other

information to any potential interested party; (b) to determine whether to permit any person

to engage in due diligence with respect to the Debtors; (c) to determine which Bidders (as

defined below) are Qualified Bidders; (d) to determine whether the amendments and

changes contained in each Competing Agreement (as defined below) are acceptable as

terms and conditions to sell; (e) to determine which Qualified Bid, if any, is the highest

and best offer (the "Winning Bid"); or (f) to reject at any time prior to entry of an order of

the Bankruptcy Court approving the sale to the maker of the Winning Bid, any bid which

the Debtors deem to be (i) inadequate or insufficient, or (ii) not in conformity with the

requirements of the Bankruptcy Code (as defined below) or the Auction Procedures.

(A)     Asset Sale. The Debtors are offering for sale in a single transaction substantially all of the Assets. In furtherance of that sale, the Debtors, as sellers, and Harlow Aerostructures LLC and/or one ore more of its affiliates or subsidiaries, as buyer (the "Stalking Horse Buyer"), have entered into an Asset Purchase Agreement dated April 16, 2013 (the "APA"), providing for the sale of substantially all of the Assets (less defined Excluded Assets) to the Stalking Horse Buyer. The APA is subject to higher and better bids under these Auction Procedures and approval by the Bankruptcy Court (the "Sale Order") pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and certain other closing conditions.

(i)     The Stalking Horse Buyer is hereby deemed a Qualified Bidder that has satisfied all requirements to be a Qualified Bidder who has submitted a Qualified Bid, as set forth herein and is able to participate at the Auction without any further action or qualification.

(B)     Due Diligence Materials.

(i)     From the Debtors. Only Bidders (as defined below) that comply with the following requirements are eligible to receive due diligence access or additional non-public information from the Debtors. A Bidder shall be provided with reasonable access to all relevant business and financial information necessary to enable such person(s) to evaluate the assets and liabilities of the Debtors for the purpose of submitting a bid for the Assets and be afforded the opportunity to inspect the Assets. If a Bidder that has satisfied the following requirements does not constitute a Qualified Bidder (as defined herein), then such Bidder's right to receive due diligence access or additional non-public information shall terminate. The Debtors have designated Alderman & Company Capital, LLC, the Debtors' financial advisor, to coordinate all reasonable requests for additional information and due diligence access from Bidders or Qualified Bidders. A representative from Alderman & Company Capital, LLC can be reached at: balderman@aldermanco.com. The Debtors shall not be obligated to furnish any due diligence information or entertain any offers from persons who are not Qualified Bidders after the Bid Deadline (as defined below). Bidders shall be required to:

2

(a) Provide requested information, including certified financial statements and other financial information, reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to consummate the contemplated transaction.

(b) Sign a confidentiality agreement with regard to the Debtors' confidential financial information.

(ii)     <u>From Bidders</u>. Each Bidder or Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors regarding such Bidder or Qualified Bidder and its contemplated transaction.  Failure by a Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Bidder is not a Qualified Bidder.  Failure by a Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Winning Bid.  By participating in the Auction, all Bidders are deemed to acknowledge that they have had sufficient and reasonable access to the Debtors' books, records, and executives for the purposes of conducting due diligence and having the opportunity to conduct such due diligence.

(iii)     **DEBTORS' COUNSEL HAS NOT PREPARED ANY OF THE INFORMATION REGARDING THE DEBTORS, OR ANY OF THEIR OPERATIONS, ASSETS OR FINANCIAL CONDITION TO BE PROVIDED TO A BIDDER IN CONNECTION WITH THE PROCEDURES SET FORTH HEREIN. CONSEQUENTLY, NO REPRESENTATION IS MADE BY THE DEBTORS' COUNSEL REGARDING THE ACCURACY, RELIABILITY, VERACITY, ADEQUACY, OR COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION WITH THE BIDDING PROCEDURES, AND ALL BIDDERS ARE ENCOURAGED TO CONSULT WITH THEIR OWN ADVISORS REGARDING ANY SUCH INFORMATION.**

(C)     <u>Submitting a Bid for the Assets</u>.  Any party other than the Stalking Horse Buyer that is interested in being a participant in the Auction (as defined below) and acquiring all or substantially all of the Assets (each a "<u>Bidder</u>"), must submit a "<u>Qualified Bid</u>" in conformance with the subparagraphs below on or prior to May 8, 2013 at 4:00 p.m. prevailing Eastern time (the "<u>Bid Deadline</u>").

(i)     To be a Qualified Bid, the submission by a Bidder must contain a signed definitive asset purchase agreement (a "<u>Competing Agreement</u>"), together with a copy of the signed version of the Competing Agreement that is marked in red-line to show changes from the APA.  Modifications or amendments to the APA that are contained in the Competing Agreement

2709893v4

that are not "red lined" shall not be enforceable against the Debtors in the event the Competing Agreement is approved as the Winning Bid. The Competing Agreement must satisfy, at a minimum, the following requirements:

(a)     It must have similar or better terms and conditions as the APA, with higher or better consideration by having an aggregate value to the Debtors' estate of not less than (x) the sum of (i) $5,700,000.00, and (ii) $328,000.00 (which amount is the 4% Break-Up Fee (defined below) plus an initial bid increment of $100,000.00) and which aggregate amount shall exclude post-closing adjustments that do not guarantee additional consideration to the Debtors' estates and (y) the assumption of all Assumed Liabilities, as defined in the APA; provided, however, that each Competing Agreement must provide for the payment of the Break-Up Fee in cash (the "Minimum Consideration");

(b)     Provide that the Bidder will forfeit its Deposit (as defined herein) as liquidated damages if such Bidder defaults under its Competing Agreement;

(c)     Not be subject to any: (1) financing contingency; (2) contingency relating to the completion of unperformed due diligence; (3) contingency relating to the approval of the Bidder's board of directors or other internal approvals or consents (for newly formed entities, written evidence of the approval of the contemplated transaction by the equity holders of such Bidder must be provided); or (4) any conditions precedent to the Bidder's obligation to purchase the Assets other than those included in its Competing Agreement; provided, however, that a bid may be subject to the confirmation of the accuracy and completeness of the specified representations and warranties in all material respects at the closing of the sale of the Assets or the satisfaction of specified conditions in all material respects at such closing. None of the immediately foregoing conditions shall be materially more burdensome or unfavorable to the Debtors than those set forth in the APA (except that a condition with respect to satisfaction of Hart-Scott-Rodino compliance may be included if the bid is accompanied by the draft submissions of the Bidder relating to the approval of the Bidder's purchase of the Assets by the Federal Trade Commission);

(d)     No Competing Agreement shall provide for the payment to the Bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement;

2709893v4

(e)      All Competing Agreements shall have a value to the Debtors' estate equal to or greater than the Minimum Consideration;

(f)      All Competing Agreements must be for all or substantially all of the Assets and must identify each Contract or Lease required to be assigned;

(g)      The Bidder must consent to the core jurisdiction of the Bankruptcy Court, waive any claim that the Bankruptcy Court lacks constitutional authority to enter a final judgment, and waive any right to a jury trial in connection with any disputes relating to the Auction or the Competing Agreement; and

(h)      Notwithstanding anything herein, the Competing Agreement must provide for the closing of the Asset Sale on a date no later than the date set forth in the APA subject to satisfaction of all conditions to closing.

(ii)      Any such Competing Agreement shall be accompanied by a deposit (the "Deposit") in the form of a certified check or wire transfer or other suitable form of security in the amount of at least $100,000.00, payable to the order of the Debtors, and such Deposit shall be held in escrow in the trust account of the Debtors' counsel or suitable escrow agent pending the closing of the asset sale.

(iii)      The Competing Agreement must be accompanied by a letter signed by the Bidder affirmatively (i) setting forth the identity of the Bidder, the contact information for the Bidder, and full disclosure of any affiliates or insiders of the Debtors involved in the bid, and identifying persons with full authority to bind the Bidder at the Auction; (ii) stating that the Bidder offers to purchase the Assets upon the terms and conditions set forth in the Competing Agreement, (iii) representing that the Bidder is prepared immediately to initiate all actions necessary to obtain all applicable regulatory approvals for the qualifying bid and provide its best estimate of the time within which such approvals will be obtained; (iv) summarizing the proposed consideration the Bidder proposes to pay under the Competing Agreement, (v) stating the portion of consideration to be paid in cash and the portion to be paid in any other form of value and providing such information as to permit the Debtors accurately to assess the value of such non-cash consideration (which statement of value shall not be binding on the Debtors or the Bankruptcy Court), (vi) confirming that the offer to purchase set forth in the Competing Agreement cannot be withdrawn by the Bidder prior to and may be accepted by the Debtors for a period terminating at 11:59 p.m. (prevailing Eastern Time) of the day on which approval by the Bankruptcy Court of the Winning Bid and entry of the Sale Order occurs;

(iv)    To the extent not previously provided to the Debtors, include an executed confidentiality agreement (in form and substance reasonably satisfactory to the Debtors);

(v)    To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors, in their commercially reasonable discretion, that the Bidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under its Competing Agreement in the event that it submits the Winning Bid at the Auction, including, but not limited to, providing the following information:

> (a) The Bidder's current financial statements, audited if available;

> (b) Contact names and numbers for verification of financing sources;

> (c) Evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

> (d) Any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the contemplated transaction.

(vi)    To the extent not previously provided to the Debtors, be accompanied by evidence establishing the Bidder's ability to provide adequate assurance of future performance for Contracts and Leases[1] to be assigned to the Bidder, which evidence shall be in a form suitable for the Debtors to provide upon request to the non-Debtors parties to the Contracts and Leases to be assigned; and

(vii)    Be submitted so as to be received not later than the Bid Deadline to the following:

> (a)  the Debtors: AGC, Inc. and Rajon Realty Corporation, c/o William H. Alderman, Alderman & Company Capital, LLC, via email at: balderman@aldermanco.com;

> (b)  Counsel for the Debtors: Kathleen M. LaManna, Esq. and Eric Goldstein, Esq., Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103;

---

[1] Capitalized terms not defined herein shall have the mean ascribed to them in the Sale Procedures Order.

(c) Counsel for the Stalking Horse Buyer: Thomas A. Gugliotti, Esq., Updike, Kelly & Spellacy, P.C., 100 Pearl Street, 17th Floor, Hartford, CT 06103; and

(d) any official committee appointed in the Debtors's Bankruptcy Case.

(D)    Auction. In the event the Debtors timely receive a Qualified Bid from a Bidder determined by the Debtors to be willing, authorized, capable and qualified financially, legally and otherwise of unconditionally performing all obligations under its Competing Agreement (a "Qualified Bidder"), then the Debtors will conduct an auction (the "Auction") for the Assets at Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, on May 13, 2013 at 10:00 a.m. (prevailing Eastern Time), or another time and location as noticed to Qualified Bidders. The Auction shall be conducted openly and only the United States Trustee, and Qualified Bidders and their professionals and representatives will be permitted to attend and participate. The Auction will be transcribed or videotaped. Immediately prior to the Auction, each Qualified Bidder shall confirm that it has not engaged in any collusion with respect to the bidding or the sale. The Auction will conclude no later than May 14, 2013, at 4:00 p.m. (prevailing Eastern Time).

(i)    If no conforming Competing Agreement from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and this Court's hearing held to approve the highest or best offer for the Assets (the "Sale Hearing") will proceed with respect to the Stalking Horse Buyer. The Stalking Horse Buyer is deemed a Qualified Bidder. In the event there is no Auction, the APA shall be deemed to be the Winning Bid.

(ii)    The Debtors and their professionals shall direct and preside over the Auction.

(iii)    Prior to commencing the Auction for the Assets, the Debtors shall select the Qualified Bid for the opening bid and describe such opening bid to the Bidders. The determination of which Qualified Bid constitutes the opening bid shall take into account any factors the Debtors reasonably deems relevant to the value of each Qualified Bid to the estates, including, *inter alia,* the following: (A) the amount and nature of the consideration; (B) the ability of the Qualified Bidder to close the proposed transaction; (C) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (D) any purchase price adjustments; (E) the impact of the contemplated transaction on any actual or potential litigation; (F) the net economic effect of any changes from the APA, if any, contemplated by any Competing Agreement, (G) the net after-tax consideration to be received by the Debtors' estates, and (H) the effect of the Break-Up Fee.

7

(iv)    All bids made at the Auction shall be made and received on an open basis, and all material terms of each subsequent bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the opening bid, all subsequent bids, and the Winning Bid.

(v)    At the Auction, Qualified Bidders may submit successive overbids, each of which must itself constitute a Qualified Bid, as follows:

(a) Subsequent bids shall be in increments as determined by the Debtors, but not less than $100,000.00, and such incremental consideration for each overbid must be in cash; and

(b) Subsequent bids must identify specifically any changes to such Bidder's prior Qualified Bid.

(vi)    The Debtors may make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in its reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the current high bid amount.

(vii)    Prior to or at the Auction, the Debtors may disclose the contents of a Qualified Bid received by the Bid Deadline to all Qualified Bidders, along with the Debtors' determination as to the value of such bid and the discount, if any, that they are applying to such bid as a result of changes to the APA or otherwise, to assist Qualified Bidders in (a) answering any questions and (b) preparing an increased bid.

(viii)    The Debtors may adopt additional rules for the Auction at or prior to the Auction that, in its reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of these Auction Procedures or the Sales Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the principals submitting the bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

2709893v4

(ix)     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors, shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the closing, and (ii) immediately identify the Winning Bid and the second best bid (hereinafter, the "Back-up Bid" and its maker, the "Back-up Bidder"). Bids made after the close of the Auction shall not be considered by the Debtors.

(x)     When bidding at the Auction, the Stalking Horse Buyer shall be entitled to credit bid with respect to the Break-Up Fee, plus any post-petition financing extended by Stalking Horse Buyer to Debtors under 11 U.S.C. § 364.

(xi)     The Qualified Bidder submitting the Winning Bid shall be required to amend and deliver to the Debtors before leaving the Auction, if possible, but at least within twelve (12) hours of the conclusion of the Auction executed originals of their respective asset purchase agreements reflecting the terms of its final bid made at the Auction.

(E)     Preliminary Status of Winning Bid. The Debtors shall sell the Assets to the Winning Bidder upon the approval and entry of the Sale Order by the Bankruptcy Court after the Sale Hearing in accordance with the terms of the Winning Bid and the Sale Order. If the Winning Bidder does not close the asset Sale in accordance with the Sale Order, the Back-up Bid shall automatically be deemed the Winning Bid, and the Debtors shall sell the Assets to the Back-up Bidder. The Debtors' presentation of one or more particular Qualified Bids to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of such bid. The Debtors will be deemed to have accepted such bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing and the applicable asset purchase agreement has been executed by the Debtors.

(F)     Bid Protections. Recognizing the Stalking Horse Buyer's expenditure of time, energy, and resources, the Debtors has agreed that if the Stalking Horse Buyer is not the Winning Bidder, the Seller will, in certain circumstances, pay to the Stalking Horse Buyer a fee in the amount of four percent (4%) of the purchase price in the Winning Bid (the "Break-Up Fee"). The payment of the Break-Up Fee will be governed by the provisions of the APA and the Sale Procedures Order. Under no circumstances will a break-up fee, expense reimbursement or other similar bid protections be provided by the Debtors to any potential bidder or bidder other than the Stalking Horse Buyer.

(G)     Sale "As Is," "Where Is". The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the applicable purchase agreement for the Assets. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; that it has relied solely upon its

own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these procedures.

(H)    Sale Free and Clear.  Subject to the Sale Order and except as otherwise provided in any agreement to acquire the Assets, all of Debtors' right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

(I)    Sale Hearing. The Sale Hearing shall be held at the Bankruptcy Court, 157 Church Street, New Haven, Connecticut 06510, at [ ] a.m./p.m. (prevailing Eastern Time) on May 20, 2013.  If the Debtors does not receive any Qualified Bids (other than the Qualified Bid of the Stalking Horse Buyer), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Assets described in the APA to the Stalking Horse Buyer upon entry of the Sale Order.

(J)    The Stalking Horse Buyer's Deposit shall be returned to the Stalking Horse Buyer, if ever, pursuant to the terms of the APA, these Auction Procedures, and the order authorizing debtor-in-possession financing under § 364 of the Bankruptcy Code.  In any event, the Stalking Horse Buyer's Deposit shall be returned by no later than the fifth (5th) business day following the conclusion of the Auction if the Stalking Horse Buyer is not the Winning Bidder.

(K)    Return of Deposits.  Deposits, with any accrued interest, of the Court approved and accepted Winning Bid shall be applied to the purchase price of such transaction at closing.  Deposits, with any accrued interest, of all other Bidders shall be held in an interest-bearing escrow account, and immediately returned to the respective Bidders at the earlier of any of the following: (i) if the Bidder is determined not to be a Qualified Bidder, (ii) the Debtors cancel the proposed sale of the Assets or withdraws the Sale Motion, or (iii) the Bidder is not the Winning Bidder and the Debtors close the sale of its assets to the Winning Bidder.  The Bidder shall forfeit the Deposit if (i) the Bidder is determined to be a Qualified Bidder and withdraws its bid or any subsequent increased bid before the Bankruptcy Court approves the Debtors' selection of the Winning Bid, and/or (ii) the Bidder is determined to have made the Winning Bid and withdraws or breaches the Competing Agreement without the Debtors' consent before the consummation of the sale. Each Deposit received by the Debtors' counsel shall be maintained in an interest-bearing account and be subject to the jurisdiction of the Court.

(L)    Bid Procedure Modifications.  These procedures may not be modified except with the express written consent of the Debtors and the Stalking Horse Buyer, and pursuant to an Order of the Bankruptcy Court.  The Debtors may (a) determine, which

10

Qualified Bid, if any, is the highest or best; and (b) reject at any time before entry of an Order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, these procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.  At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors determines to be in the best interests of the Debtors' estate, its creditors and other parties in interest.

11

Exhibit "C"

ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS

This Assignment and Assumption of Leases and Contracts (this "Assignment") is entered into as of this ____th day of _____, 2013, among _____, _____, and _____, each a **Debtor and Debtor in Possession under Case No.** _____ **in the Bankruptcy Court** for the District of Connecticut (collectively, the "Assignor"), on the one hand, and _____, a _____ (the "Assignee"), on the other hand, with respect to the following facts and circumstances:

A.    Assignor, as Seller, and Assignee, as Buyer, have heretofore entered into that certain Asset Purchase Agreement dated _____, 2013 (the "Purchase Agreement"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 4.3.1 and 4.4.1 of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.    Assignment.  Effective as of the Closing Date, to the extent of their respective interests therein, the parties comprising Assignor hereby assign to Assignee all of their right, title and interest in and to the Other Leases and Contracts described on Exhibit "A" attached hereto and incorporated herein by this reference (collectively, the "Assigned Contracts").

2.    Assumption.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.    Amendments.  This Assignment may only be amended by a writing signed by both Assignor and Assignee.

4.    Execution in Counterparts.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile or other electronic transmission signatures; provided, however, that if the parties exchange facsimile or other electronic transmission signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

2757228v3                                      2

5.    <u>Delivery Pursuant to Purchase Agreement</u>.    Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement.

6.    <u>Governing Law</u>.    This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Connecticut without giving effect to its choice of law provisions.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

ASSIGNOR:

_____, a

_____

and Debtor and Debtor in Possession

By: _____

    Name:

    Its:

_____, a

_____

and Debtor and Debtor in Possession

By: _____

    Name:

    Its:

ASSIGNEE:

_____, a

_____

By: _____

    Name:

    Its:

Exhibit "D"

<u>BILL OF SALE</u>

Pursuant to Section 4.3.2 of that certain Asset Purchase Agreement dated as of _____, 2013 (the "<u>Agreement</u>"), by and between_____, a _____ (the "<u>Buyer</u>"), on the one hand, and _____, _____, and _____, each a **Debtor and Debtor in Possession under Case No.** _____ **in the Bankruptcy Court** for the District of Connecticut (collectively, the "<u>Sellers</u>"), on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, to the extent of their respective interests therein, each entity comprising Sellers hereby sells, transfers, assigns and delivers to Buyer all of its right, title and interest in and to the Purchased Assets.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Agreement.

IN WITNESS WHEREOF, Sellers haves caused this Bill of Sale to be executed as of the _____ day of _____, 2013.


_____, a
_____

and Debtor and Debtor in Possession

By: _____
Name: _____
Its:


_____, a
_____

and Debtor and Debtor in Possession

By: _____
Name: _____
Its:

Exhibit "E"

ASSIGNMENT OF INTANGIBLE PROPERTY

_____ __, _____, _____, and _____, each a **Debtor and Debtor in Possession under Case No.** _____ in **the Bankruptcy Court for the District of Connecticut** (collectively, the "Assignor") are executing this Assignment of Intangible Property (the "Assignment") in favor of _____, a _____ (the "Assignee"), with respect to the following facts and circumstances:

(A)   Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated _____, 2013 (the "Agreement"). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B)   Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Agreement. Pursuant to Sections 4.3.3 and 4.4.2 of the Agreement, Assignor and Assignee are required to mutually execute and deliver this Assignment at the Closing.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which Assignor hereby expressly acknowledges, to the extent of their respective interests therein, each entity comprising Assignor hereby assigns, conveys, transfers and sets over unto Assignee, all of its right, title and interest, if any, in and to all (i) Intangible Property, including, but not limited to, its right, title and interest, if any, in and to the Intangible Property identified on **Schedule 1** attached hereto and incorporated herein by this reference, and (ii) Governmental Permits. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, the parties comprising Assignor are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Connecticut without giving effect to its choice of law provisions.

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the ___ of _____, 2013.


_____, a
_____

and Debtor and Debtor in Possession

By: _____
    Name:
    Its:

_____, a

_____

and Debtor and Debtor in Possession

By: _____
    Name:
    Its:

**Schedule 1 to Exhibit E**
**Intangible Property**

1.     Website:  www.agcincorporated.com

2.     Registered email addresses: @agcincorporated.com

3.     Patents:  None

4.     Processes: None

5.     Trademarks:  None

6.     Trade Names:  AGC, Inc., Rajon, Inc.

7.     Service Marks:  None

8.     All catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, including all brochures, selling and promotional materials, handouts and promotional materials.

9.     Software Programs:  No internally developed software. Internally developed manufacturing drawings and software for product manufacturing.

10.    Telephone Exchange Numbers: (203) 317-2600 through (203) 317-2699, (203) 235-3361, (203) 639-7125

11.    Facsimile numbers:

    (203) 235-6543
    (203) 317-2602
    (203) 317-2606
    (203) 317-2607
    (203) 317-2610
    (203) 317-2611
    (203) 317-2613
    (203) 317-2617
    (203) 317-2619
    (203) 317-2628

12.    Certificates:

    G.E. - Quality System

2758314v1

G.E. Approval for Fusion Welding

AS-9100C Certified Cert # 02830-2003-AQ-HOU-ANAB Rev 1

NADCAP Certified for Fusion, Resistance welding and torch Brazing Certification # 3118152756

NADCAP Certified for F.P.I.

FAA PMA System Approval

13.    Proprietary Products: See Addendum 1 attached hereto and hereby incorporated by reference herein.

14.    Government Source Approved Parts:  See Addendum 2 attached hereto and hereby incorporated by reference herein.

**ADDENDUM 1**
to
**Schedule 1 of Exhibit E**


[Attached]

AGC Incorporated Material Listing

| SPEC NO | AGC COMP NO |
|---|---|
| AMS 3222 | 1-10-5 |
| AMS 3346 | 1-118-3 |
| AMS 3345 | 1-138-1 |
| XEROX 33-5061 | 1-138-1 |
| SIKORSKY SS 935 | 1-138-1 |
| ZZ-R-765 CL. III, A, GR. 50 | 1-138-2 |
| AMS 3202 | 1-14-1 |
| HS 42 | 1-14-1 |
| AMS 3215 | 1-16-1 |
| AMS 7272 | 1-16-22 |
| AMS 7270 | 1-18-2 |
| MIL-R-3065 TY. SC 315 (F2) | 1-192-1 |
| MIL-R-3065 TY. SC 415 (F2) | 1-192-2 |
| AMS 7274 | 1-20-6 |
| AMS 3208 | 1-24-4 (PWA) |
| HS 199-50 | 1-24-5 |
| AMS 3208 | 1-24-5 (HS) |
| HS 199-71 | 1-26-2 |
| HS 199-70 TY I | 1-26-2 |
| AMS 3209 | 1-26-2 |
| AMS 7271 | 1-32-10 |
| AMS 3212 | 1-36-14 |
| HS 244 B | 1-36-15 |
| AMS 3207 | 1-38-1 |
| AMS 3220 | 1-40-1 |
| AMS 3226 | 1-42-1 |
| AMS 3213 | 1-46-1 |
| AMS 3229 | 1-48-3 |
| | |
| AMS 3214 | 1-60-15 (INT. REF. 10-230-1) MIL-R-6855 ONLY |
| AMS 3228 | 1-62-2 |
| AMS 3242 | 1-64-7 |
| AMS 3251 | 1-66-19 |
| HS 186-35 | 1-90-1 |
| ASTM-D-2000 (M3FC407) | 10-104-1 |
| HS 59B | 10-114-1 |
| ASTM-D-2000 (4AA 410) (A13, Z1, Z2) | 10-124-2 |
| MIL-R-3065 TY. SC 815 (E3) | 10-126-1 |
| ASTM-D-2000 (4AA 515) (A13, Z1, Z2) | 10-130-1 |
| MIL-R-3065 TY. SB 615 (A1, B1, E5, F2 | 10-140-1 |
| ASTM-D-2000 (3BA 515) (A14, B13, F19, Z) | 10-142-1 |
| ASTM-D-2000 (3AA 610) (A, B, C, L14, Z) | 10-144-1 |
| MIL-R-1149 CL.S, TYII | 10-150-1 |
| ASTM-D-2000 (4AA 710) (A13, C12, Z1, Z2) | 10-158-1 |
| PES 3075 | 10-160-1 |
| PES 3074 | 10-164-2 |
| PES 3076 | 10-180-1 |
| MIL-R 3065 TY. SB 910 A (EXCEPT CHLOROPRENE) | 10-209-1 |
| HS 199-70 TY II | 10-226-1 (ref 7-156-1 I.R.) |
| MIL-R-6855 CL.I, GR.60 | 10-228-1 |
| MIL-R-6855 CL.I, GR. 40 | 10-230-1 |
| ASTM-D-2000 (BG 815) (A14.B14, E14, E34, E61, F16, F17, L14) | 10-238-1 |
| AGC T-2997 UNIMATION BOOT | 10-240-1 |
| GENERAL ELECTRIC A 12 C 6 B | 10-244-1 |
| CURTISS-WRIGHT CPS 5010 | 10-244-1 |
| ASTM-D-2000 (2CH 820) (A25, B14, F17, Z) | 10-246-1 |
| MIL-STD-417 CL. SC-525 A1, B1, E3 | 10-248-1 |
| HS 186-65 | 10-248-1 |
| MIL-R-3065 TY. SB 410 | 10-250-1 |
| AMS 3201 | 10-250-1 |
| MIL-STD-417 CL. SB, GR. 512, 515, A, B, F2 | 10-252-1 |

Information contained herein is to be considered Proprietary and Confidential to AGC Incorporated. It shall not be used, disseminated or
shared without the expressed written permission of AGC Incorporated.

AGC Incorporated Material Listing

| | |
|---|---|
| MIL-G-1149 TY.I, CL.5 | 10-252-1 |
| MIL-R-3065 TY SB 512; 515 (A, B, F2) | 10-252-1 |
| 50±5 DURO A NITRILE | 10-252-1 |
| CURTIS-WRIGHT CPS 5009 F | 10-258-1 |
| GENERAL ELECTRIC A 12 C 11 D 7 | 10-260-1 |
| PES 3077 | 10-262-1 |
| MIL-R-7362D TY.I & II | 10-262-1 |
| | |
| 65±5 DURO A (COLOR BLACK) SYNTHETIC NATURAL RUBBER COMPOUND | 10-270-1 |
| MIL-STD-417 CL. RN-530 (A, B, C, F2) | 10-276-1 |
| MIL-G-1149 TY. I CL.1 | 10-280-1 |
| I.B.M. 25-113 (ZI) | 10-282-1 |
| MIL-STD-417 CL. SC-615 A1, B1, E3, F2 | 10-286-1 |
| MIL-R-6855 CL.II, GR.80 TY. A&B | 10-288-1 |
| MIL-R-6855 CL.II, GR.40 | 10-294-1 TY A&B |
| MIL-R-6855 CL.II, GR.60 TY. A&B | 10-296-1 |
| HS 55 | 10-90-1 |
| HS186-90 | 10-94-4 |
| HS 2644 TY A | 11-102-8 |
| MIL-R-83285 GR 80 | 11-102-8 |
| PWA 597 | 11-104-6 |
| MIS-13937 TY I, CL-50 | 11-160-1 |
| PWA 427 | 11-164-1 |
| PWA 426 | 11-174-1 |
| PES 3084 | 11-202-1 |
| HS 875 TY A | 11-42-3 |
| 70±5 DURO A CONDUCTIVE EPDM FOR INFODEX | 12-116-1 |
| AMS 3240 | 12-154-1 |
| MIL-STD-417 CL. SC TY. S GR. 620 A1, B1, E3, F2 | 12-156-1 |
| MIL-STD-417. 615 | 12-156-1 |
| MIL-STD-417  GR. 605 | 12-156-1 |
| MIL-STD-417. 625 | 12-156-1 |
| MIL-STD-417 GR. 610 | 12-156-1 |
| MIL-R-6855 CL.II, GR.50 TY. A&B | 12-160-1 |
| AMS 3205 | 12-160-1 |
| ASTM-D-2000 (3BC 730) (A14, B14, E14, E34, F17, F19, G21) (PLUS ADDITIONAL GRADES 725, 720, 715, 710,705) | 12-162-1 |
| ASTM-D-2000 (3BC 630) (A14, B14, E14, E34, F17, F19, G21) (PLUS ADDITIONAL GRADES 625, 620, 615, 610,605) | 12-164-1 |
| HS 490-70 | 12-166-1 |
| ASTM-D-2000 (M2BE514) (B14, F17, Z, ) (Z=DURO-A TO 55±-5) | 12-176-1 |
| AMS 3207 | 12-188-1 |
| AMS 3200 | 12-200-1 |
| MIL-R-3065 TY.SB 615 (A1, B1, F2) | 12-202-1 |
| HS 54 | 12-202-1 (formerly 10-88-2) |
| MIL-STD-417 CL. SB, TY. S (GR. 410, 415, A1, B1, E3, E5) | 12-208-1 |
| FDA SANCTIONED INGREDIENT 55±5 DURO A NITRILE | 12-210-1 |
| MIL-R-6855 CL.I, GR.80 | 12-230-1 |
| ASTM-D-2000 (BG 725) (720,715, ETC., WITH VARIOUS SUFFIXES) | 12-232-1 |
| 75±5 DURO A NITRILE FOR WIRE WORKS CO. | 12-234-1 (FORMERLY AEX 1069-2) |
| MIS-30963 | 12-236-1 |
| MIL-G-3036 C COMPOSITION-A | 12-238-1 |
| MIL-G-3036 C COMPOSITION-A | 12-238-2 |
| HS 445 TY A | 12-240-1 |
| HS 445 TY B | 12-242-1 |
| HS 445 TY C | 12-244-1 |
| HS 186-45 | 12-246-1 |
| MIL-R-6855 CL.I, GR.50 | 12-250-1 |
| MIL-R-6855 CL.I, GR.70 | 12-252-2 |
| HS 45 TY II | 12-254-1 |
| ASTM-D-2000 (5AA 625) (A13, B13, F19, K11, L14) | 12-294-1 |
| ASTM-D-2000 (4AA 730) (A13, B13, F17, L14) | 12-300-1 |
| CURTISS-WRIGHT CPS 5906 D | 12-38-1 |

Information contained herein is to be considered Propietary and Confidential to AGC Incorproated. It shall not be used, disseminated or shared without the expressed written permission of AGC Incorporated.

AGC Incorporated Material Listing

| | |
|---|---|
| MIL-R-25988 CL. III, TY.I & II GR.75 | 15-10-1(BLUE) |
| MIL-G-3036 C COMPOSITION-B | 15-120-1 |
| FLAME RESISTANT SILICONE RUBBER (FLUE-GREY COLOR) | 15-142-1 (FORMERLY AEX 1420-1) |
| PWA 36450 BROWN | 15-144-1 SUPPORTED |
| HS 724 TY C | 15-16-1 |
| MIL-R-25988 CL. I, TY.I & II GR.70 | 15-16-1 (BLUE) |
| AMS 3301 | 15-190-1 (BLACK) |
| HS 724 TY A | 15-24-1 |
| MIL-R-25988 CL. I, TY.I & II GR.80 | 15-8-1(BLUE) |
| PWA 401 | 2-148-6 |
| VITON TUBING | 2-160-5 |
| BROWN VITON TUBING | 2-292-1 |
| AMS 3241 | 3-14-1 |
| PWA 810 | 3-2-1 |
| PWA OIL TANK STRAP CUSHION | 3-230-1 (REF: 8-68-3 |
| HS 490-50 | 3-24-1 |
| AGC FLUOROSILICONE | 3-254-2 |
| HS 103 | 3-32-1 |
| HS 124 | 3-40-1 |
| AMS 7267 | 3-54-6 |
| GRAY SILICONE STRAPS | 3-68-1 (REF 8-70-1) |
| AMS 7260 | 3-80-1 |
| PWA 402 | 4-140-5 |
| CURTISS-WRIGHT CPS 5907 | 4-140-5 (REF 8-146-1) |
| CURTISS-WRIGHT CPS 5044 | 5-162-5 |
| CPS 5044 CURTIS-WRIGHT | 5-162-5 (REF: 8-70-1) |
| HS 45 TY 1 | 5-188-1 |
| MIL-P-5315 | 5-206-1 |
| AMS 7279 | 5-218-1 |
| AMS 7259 | 5-218-1 |
| AGC 64-47-10 (COMPOSITE) LS-63 (RED) FLUOROSILICONE | 5-224-2 |
| HS 701 TY A | 5-260-2 |
| MIL-R-5847 CL. II GR. 50 | 5-270-1 |
| AMS 3326 | 5-270-1 |
| HS 163 TY A | 5-54-2 |
| AMS 3227 | 5-58-5 |
| LS-53 COMPOUNDED WITH VAROX BS | 5-70-1 |
| LS-53 COMPOUNDED WITH VAROX BS | 5-70-1V |
| MIL-STD-417 CL. SB TY. S GR. 615 | 5-82-1 |
| PWA 36063 | 64-130-3 |
| PWA 403 | 64-132-3 (REF 9-296-1) |
| MIL-P-5125 (SC 520) (B1, E1, E3, K2) | 7-134-4 |
| REF: KAMAN P/N 2000-1 B/P A-6379 | 7-136-1 |
| HS 199-89 | 7-192-1 |
| AGC CALANDERING FLUOROCARBON ELASTOMER FOR ANDERSON-GREENWOOD | 8-130-1 |
| ABLATABLE NO FLUOROCARBON ELASTOMER COMPOUND FOR PLASMA SPRAY MASKING | 8-132-6 |
| FLUOROCARBON COMPOUND WITH IMPROVED ADHESION TO METAL | 8-138-1 |
| CURTISS-WRIGHT CPS 9014 D | 8-140-1 |
| 70 ± 5 DURO A FLUOROCARBON ELASTOMER FOR ANDERSON-GREENWOOD 6" SEAT, TYPE 23 | 8-142-1 |
| ASTM-D-2000 (2HK 915) (A1-10, E38, E61, E88) | 8-148-1 |
| 70±5 DURO A FLUOROCARBON COMPOUND (ULCS TYPE) | 8-150-1 |
| SIKORSKY MIL-R-25897 CL. I, TY. I&II | 8-152-1 |
| HS 757 TY D | 8-157-1 (FORMERLY 3-126-5) |
| 60±5 DURO A ULTRA LOW COMPRESSION SET FLUOROCARBON ELASTOMER COMPOUND | 8-160-1 |
| 80±5 DURO A IMPROVED CHEMICAL RESISTANT FLUOROCARBON ELASTOMER COMPOUND | 8-180-1 |
| SIKORSKY | 8-206-1 |
| AMS 3216 | 8-216-1 |
| MIL-R-83485 TYI & II | 8-234-1 |

Information contained herein is to be considered Propietary and Confidential to AGC Incorporated. It shall not be used, disseminated or shared without the expressed written permission of AGC Incorporated.

AGC Incorporated Material Listing

| | |
|---|---|
| VITON B 90 VERSION) FOR H.S. ONLY | 8-60-1 |
| PWA 408 | 8-66-1 |
| PWA415 | 8-66-1 |
| AMS 7280 | 8-66-1 |
| ALLISON EMS 22670 D | 8-66-1 |
| AMS 7278 | 8-66-1 |
| ASTM-D-2000 (4HK 712) (A1-11, E61, K, Z) | 8-66-1 |
| AMS 7276 | 8-66-1 |
| HS 13,344 | 8-68-3 |
| LOW DURO | 8-68-3 |
| HS 757 TY G (Is now MIL-R-83248 TY I&II CL 1) | 8-76-1 |
| HS 757 TY A (is now MIL-R-83248 TY I&II CL 1) | 8-76-1 |
| LYCOMING MIL-R-83248 CL. I | 8-76-1 |
| MIL-R-83248 CL. I TY. I, II | 8-76-1 |
| CPW 244A | 8-76-1 |
| HS 757 TY B (Is now MIL-R-83248 TY I&II CL 2) | 8-76-2 |
| MIL-R-83248 CL. II TY. I, II | 8-76-2 |
| HS 3676 TY A AMEND 2 | 8-86-1 |
| AMS 7276 | 8-88-1 |
| HS 757 TY H | 8-88-2 |
| AMS 7276 | 8-88-2 |
| GENERAL ELECTRIC A 50TF156 CL. A&B | 8-88-2 |
| AMS 3348 | 9-100-2 (V) |
| AMS 3337 | 9-102-1 |
| AMS 3357 | 9-102-1 |
| SELF BONDING SILICONE | 9-112-1 |
| MIL-R-25988 CL. I, TY.II GR.60 | 9-124-3 (BLUE) |
| AMS 3325 | 9-124-3 (RED) |
| MIL-R-5847 CL. III, GR.50 | 9-136-2 |
| LS-53 COMPOUNDED WITH VAROX BS | 9-142-2 |
| AMS 3357 | 9-152-2A |
| AMS 3347 | 9-176-1 |
| AMS 7273 | 9-180-1 |
| AMS 3327 | 9-180-1 |
| AMS 3304 | 9-210-1 (RED) |
| ZZ-R-765 CL. II, A&B, GR. 40 | 9-210-4 (RED) |
| AMS 3301 | 9-210-4 (RED) |
| AMS 3302 | 9-210-5 (RED) |
| ZZ-R-765 CL. II, A&B, GR. 50 | 9-210-5 (RED) |
| MIL-STD-417 TY. TA-505 | 9-210-5 (RED) |
| MIL-R-5847 CL. II, GR. 60 | 9-210-6 (RED) |
| AMS 3303 | 9-210-6 (RED) |
| ZZ-R-765 CL. II, A&B, GR. 60 | 9-210-6 (RED) |
| ZZ-R-765 CL. II, A&B, GR.70 | 9-210-7 (RED) |
| AMS 3305 | 9-210-8 (RED) |
| AMS 3349 | 9-214-1 |
| | |
| 55±5 DURO A RADIATION AND HIGH TEMP RESISTANT SILICONE COMPOUND | 9-234-1 |
| MIL-R-25988 CL. II, TY.II GR.50 | 9-246-1(BLUE) |
| ZZ-R-765 (CL. IA, IB, GR. 70) | 9-254-1 |
| ZZ-R-765 (CL. IA, IB, GR. 50) | 9-266-1 |
| 30±5 DURO A GRAY SILICONE IBM CONTAINER SEAL | 9-272-2 |
| AMS 3334 | 9-276-1 |
| ZZ-R-765 CL. IA, GR. 40 | 9-276-1 |
| HS 701 TY B | 9-278-1 |
| ZZ-R-765 CL.III, B, GR.30 | 9-280-1 |
| AMS 3348 | 9-280-1 (TS-50) |
| ZZ-R-765 CL. III, B, GR. 70 | 9-282-1 |
| PWA 36076 | 9-288-1 |
| MIL-R-25988 CL. I, TY.II GR.40 | 9-290-1 (BLUE) |
| CPW 376 | 9-292-1 |
| MIL-R-25988 CL. I, TY.I &II GR.60 | 9-294-1 (BLUE) |
| MIL-R-25988 CL. I, TY.I & II GR.60 | 9-294-1 (BLUE) |

Information contained herein Is to be considered Proprietary and Confidential to AGC Incorporated. It shall not be used, disseminated or shared without the expressed written permission of AGC Incorporated.

AGC Incorporated Material Listing

| | |
|---|---|
| AGC DC 6-128 (REPLACEMENT) | 9-300-2 |
| COMPOUND FOR GRAY FABRIC REINFORCED CUSHION BELTS (REF PWA P/N 743817, 743723 | 9-54-4 |
| 50±5 DURO DURO A (NATURAL COLOR HIGH TEMP RESISTANT SILICONE COMPOUND) | 9-78-2 |
| PWA 36074 | 9-78-3 |
| 50±5 DURO A HIGH TEMP RESISTANT SILICONE (UP TO +600 DEG F. ) (SIM REF: HS 701, TY.B, 9-278-1) | 9-78-3A |
| AMS 3332 | 9-82-1 |
| FOR PWA TAM JOBS NOT AMS 3332 25-40 DURO A GRAY SILICONE | 9-82-1 |
| | |
| PWA 36453 BROWN | AEX 1244 A-Y (now AGC 15-144-1 unsupported) |
| SC 515 | ASTM 735 (SC 515B) |
| PWA 597 | U14-014 (NON-MOCA) |
| PWA 597 | U14-154 (NON-MOCA) |
| PWA 426 | U14-156 (NON-MOCA) |
| HS 186-70 TY I & TY III | U14-172 (ref formerly 3-4-2) |
| SIKORSKY SS 9529 TY. I, CL. 2, GR. 60 | U14-186 |
| HS 786 TY A REV D | U14-196 A&B |
| SIKORSKY SS 9529 TY. II, CL. 1, GR. 90 | U14-222 |

Information contained herein is to be considered Proprietary and Confidential to AGC Incorporated. It shall not be used, disseminated or shared without the expressed written permission of AGC Incorporated.

**ADDENDUM 2**
**to**
**Schedule 1 of Exhibit E**


[Attached]

AGC Incorporated Government Source Approved Parts List

| 1  | 4001687    |
|----|------------|
| 2  | 4002452    |
| 3  | 4027960    |
| 4  | 4042334    |
| 5  | 4060313    |
| 6  | 4065812    |
| 7  | 4066407    |
| 8  | 4069099    |
| 9  | 4070107    |
| 10 | 4071804    |
| 11 | 4072948    |
| 12 | 4073641    |
| 13 | 4076128    |
| 14 | 4076459    |
| 15 | 4078182-01 |
| 16 | 4078304    |
| 17 | 4081140-01 |
| 18 | 4082667-01 |
| 19 | 4082986    |
| 20 | 4082994-01 |
| 21 | 4083668-01 |
| 22 | 4084030    |
| 23 | 4084790-01 |
| 24 | 4084915    |
| 25 | 4071804    |

Information contained herein is to be considered Propietary and Confidential to AGC Incorporated. It shall not be used, disseminated or shared without the expressed written permission of AGC Incorporated.

Exhibit "F"

<u>QUITCLAIM DEED</u>

Return to:
Updike, Kelly & Spellacy, PC
100 Pearl Street, 17th Floor
Hartford, CT 06103
Attn: Thomas A. Gugliotti

## QUITCLAIM DEED

To all People to whom these Presents shall come, Greeting:

KNOW YE, THAT **RAJON REALTY CORPORATION**, a Debtor and Debtor in Possession under Case No. 13-_____ in the Bankruptcy Court for the District of Connecticut, whose case is being jointly administered under Case No. 13-_____ in the Bankruptcy Court for the District of Connecticut, with an office located in the Town of Meriden, County of New Haven and State of Connecticut ("Grantor") acting on order of the Bankruptcy Court for the District of Connecticut pursuant to the case numbers referenced above, a certified copy of which order is recorded in the land records immediately preceding the recording of this Quitclaim Deed, for and in consideration of the sum of One ($1.00) Dollar paid and other valuable consideration to Grantor the receipt and sufficiency of which are hereby acknowledged, Grants to _____ a _____ _____ with an office located in the Town of _____, County of _____ and State of _____("Grantee")

WITH QUIT-CLAIM COVENANTS, all such right and title as it the said Grantor has or ought to have in or to that certain piece or parcel of land, together with all buildings and improvements thereon, situated in the Town of Meriden, County of New Haven and State of Connecticut, being known as 106 Evansville Avenue, being the same premises conveyed to the Grantor herein by virtue of a _____ Deed from _____ dated _____ and recorded _____ in Volume ____ at Page ____ of the Meriden Land Records, and being more particularly bounded and described in Schedule A attached hereto and made a part hereof.

IN WITNESS WHEREOF, **RAJON REALTY CORPORATION** has hereunto set its hand this _____ day of _____, 2013.

Signed and Delivered in the presence of:

**RAJON REALTY CORPORATION**

_____         By: _____

                                          Its _____
_____         Duly Authorized

STATE OF CONNECTICUT  }
                      } ss.    _____ __, 2013
COUNTY OF             }

     Personally appeared _____ the _____ of Rajon Realty Corporation, a a Debtor and Debtor in Possession, as aforesaid, Signer of the foregoing Instrument, and acknowledged the same to be his/her free act and deed as such _____ and the free act of said corporation, before me.

_____
Notary Public
Commissioner of Superior Court

655551

<u>SCHEDULE A</u>
(legal description)

<u>Schedules</u>

[TO BE ATTACHED]

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In Re: | : | Chapter 11 |
|  | : |  |
| AGC, INC. and | : | Case No. 13-30681 |
| RAJON REALTY CORPORATION, | : | Case No. 13-30682 |
|  | : |  |
| Debtors. | : | JOINTLY ADMINISTERED |
|  | : |  |
|  | : |  |
| AGC, INC. and | : |  |
| RAJON REALTY CORPORATION, | : |  |
|  | : |  |
| Movants. | : |  |
|  | : |  |
| VS. | : |  |
|  | : |  |
| TD BANK, N.A., CONNECTICUT | : |  |
| INNOVATIONS, INCORPORATED, | : |  |
| CITIBANK, N.A. TOWN OF GROTON, | : |  |
| DE LAGE LANDEN FINANCIAL | : |  |
| SERVICES, INC., AND | : |  |
| CITY OF MERIDEN | : |  |
| Respondents. | : |  |
|  | : | Re: Doc. Id. No. _____ |

## PROPOSED ORDER GRANTING MOTION TO (I) SELL SUBSTANTIALLY ALL OF THEIR ASSETS OUT OF THE ORDINARY COURSE OF BUSINESS AND FREE AND CLEAR OF ALL SECURITY INTERESTS, LIENS, CLAIMS, (II) ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY, AND (III) APPROVE PAYMENT OF KEY EMPLOYEE INCENTIVE PAYMENT OUT OF SALE PROCEEDS

Upon the Motion (the "Sale Motion") of AGC, Inc.("AGC") and Rajon Realty

Corporation ("Rajon" and together with AGC, the "Debtors"), the above captioned

debtors and debtors in possession, for an Order authorizing (I) the sale of substantially all

of their assets out of the ordinary course of business and free and clear of security

interests, claims, and encumbrances (the "Sale"), (II) the assumption and assignment of

certain executory contracts and unexpired leases of nonresidential real property in

connection with such sale, (III) a key employee incentive plan for R. Bruce Andrews (the

"KEIP"), and (IV) payment out of the sale proceeds to the City of Meriden on its sewer

lien, TD Bank on its first priority secured claim, and R. Bruce Andrews under the KEIP;

and

  The Debtors having entered into that certain Asset Purchase Agreement with

Harlow Aerostructures LLC and/or one or more of its affiliates or subsidiaries

(hereinafter, the "Buyer"), as buyer, signed on April 16, 2013 (the "APA"); and

  Due notice of the proposed Sale, the Sale Motion, this Order, and the hearing on

the Sale Motion (the "Sale Hearing") having been given to all parties entitled to notice

under this Court's Order (I) Approving Auction Procedures to be Employed in

Connection with the Sale of Substantially All of the Debtors' Assets Pursuant to 11

U.S.C. §§ 105 and 363; (II) Scheduling Date, Time and Place for Sale Hearing; (III)

Approving Break-Up Fee; (IV) Approving Form and Manner of Notice; and (V)

Dispensing with Appraisal Requirements (Doc. Id. No. __ ), as evidenced by the

Certificates of Service and Notice of Publication previously filed with this Court and

affirmed on the record in this proceeding; and

  The Debtors having determined, in consultation with its financial advisors, that

the APA represented the highest and best offer for substantially all of the Debtor's assets

as more particularly described in the APA (the "Assets"); and

  The Debtor having filed the Sale Motion to sell the Assets to the Buyer and to

consummate the APA with the Buyer; and

2

The Sale Hearing having been held before this Court on May __, 2013, to approve the Sale pursuant to the APA to the Buyer, to authorize and approve the assumption and assignment to the Buyer of certain unexpired leases and executory contracts, at which time all parties in interest were afforded an opportunity to be heard; and

NOW, THEREFORE, based upon all of the pleadings previously filed by the Debtors and other interested parties in connection with the Sale, the evidence presented, proffered, attested to, or adduced at or in connection with the Sale Hearing, and upon the entire record of the Sale Hearing (collectively, the "Record"); and after due deliberation thereon; and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED AS FOLLOWS:**

A.      <u>Jurisdiction, Final Order, And Statutory Predicates</u>

1.      This Court has jurisdiction to hear and determine this matter and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(b).

2.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

3.      Notwithstanding Bankruptcy Rule 6004(h), the Court finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

4.      This matter is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O).

5.      The statutory predicates for the relief sought in the Sale Motion are 11

U.S.C. §§ 105, 363 and 365 and Bankruptcy Rules 2002, 6004, 6006, 9014, and 9019.

**B.**    Notice of the Sale Motion and the Sale Hearing

6.      Pursuant to the Certificate of Service of Notice of the Sale Hearing filed

by the Debtors on _____ ___, 2013, with this Court and based upon the

representations of counsel at the Sale Hearing, timely Notice of the Sale Motion, the

Sale, and the Sale Hearing (collectively, the "Sale Notice"), was transmitted to: (a) the

Office of the United States Trustee and (b) to all (i) creditors (as defined in 11 U.S.C.

§101(1)); (ii) equity security holders; (iii) entities known to the Debtors to assert any

rights in any of the Assets; (iv) parties in interest and other entities and persons so

entitled and that are known to the Debtors; (v) parties to the Assumed Leases and

Assumed Contracts (as hereinafter defined); (vi) all applicable federal, state, and local

tax and regulatory authorities with jurisdiction over the Debtors and/or the Assets; and

(vii) all entities that have requested notice in the Debtors' Chapter 11 cases.

7.      The Sale Notice was adequate and sufficient under the circumstances of

this Chapter 11 case and this proceeding and complied with the various applicable

requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and

the procedural due process requirements of the United States Constitution. A reasonable

opportunity to object or be heard with respect to the Sale Motion and the Sale was

afforded to all interested persons identified in paragraph 6 above.

8.      In accordance with the Sale Motion, notice of the Sale was served upon all

counterparties (the "Section 365 Counterparties") to all of the Debtor' unexpired leases

4

and executory contracts, the Section 365 Counterparties each had a full and fair

opportunity to object to the Debtors' assumption and assignment to the Buyer of those

unexpired leases (the "Assumed Leases") and executory contracts (the "Assumed

Contracts") listed on Exhibit A hereto.  The service of the Sale Notice and the Cure

Amount Notice (as defined in the Sale Motion) to the Section 365 Counterparties of the

potential assumption and assignment of the Assumed Leases and Assumed Contracts was

good, sufficient, and appropriate under the circumstances and no further notice need be

given in respect of the assumption and assignment of the Assumed Leases and Assumed

Contracts contemplated hereby.  Section 365 Counterparties to the Assumed Leases and

Assumed Contracts have had a reasonable opportunity to object to the assumption and

assignment of such pre-petition leases and contracts to the Buyer.  As of the date hereof,

no objection to the Debtors' assumption and assignment to the Buyer, of the Assumed

Leases or the Assumed Contracts remains pending.  Any cure required, pursuant to

Section 365 of the Bankruptcy Code, by the Debtors or the Buyer with respect to any of

the Assumed Leases and Assumed Contracts will be paid at closing of the Sale.

9.    As demonstrated by the testimony and other evidence at the Sale Hearing,

the Debtors have marketed the Assets and conducted the Sale process fairly and with

adequate opportunity for interested parties to submit bids.

## C.    Section 363 Sale Free and Clear of Claims, Liens, Interests and Encumbrances

10.    For the reasons set forth in the Record and the Sale Motion, there are

good and sound business reasons for the Sale to occur in accordance with the Sale

2719031v2

Motion, the APA and this Order.  Among other things, to maximize the value of the

Assets, it is essential that the Sale occur within the time constraints set forth herein.

11.    The Debtors' primary secured creditor, T.D. Bank, N.A. ("TD Bank"),

has approved the entry of this Order. At the Closing, the secured claims of TD Bank

shall be satisfied in full by the payment of $4,500,000.00 of the sale proceeds.

12.    The Assets are property of the Debtor's estate and title thereto is vested in

the estate.

13.    The Debtors are authorized to sell the Assets, pursuant to 11 U.S.C. §

363(b), free and clear of all liens, claims, interests, and encumbrances, because, with

regard to the Assets, one or more of the applicable provisions of 11 U.S.C. § 363(f)(1)-

(5) have been satisfied.

14.    Based on the Record, the provisions of 11 U.S.C. § 363(f) of the

Bankruptcy Code have been satisfied, and the Assets shall be sold free and clear of all

liens, claims, interests, and encumbrances other than the Permitted Encumbrances and

any other Assumed Liabilities (as each are defined in the APA) which are expressly

assumed by the Buyer under the APA.

15.    Any holder of a lien, claim, interest, or encumbrance of any kind or

nature related either to the Assets and who did not object to the Sale, or who objected

and then withdrew any such objection, is deemed to have consented to the Sale pursuant

to 11 U.S.C. § 363(f)(2).

16.    The purchase terms for the Assets, each as set forth in the APA, including the consideration therefor, are fair and reasonable under the circumstances of these Chapter 11 cases and this proceeding.

17.    The Sale Motion and the Sale should be approved as they are in the best interests of the Debtors, the Debtors' estate, and the Debtors' creditors.

18.    The Sale is not being entered into in order to escape liability for the debts of the Debtors' estate, and the estate is otherwise unable to satisfy the Debtors' debts. The Debtors have full corporate power and authority necessary to consummate the transactions contemplated by the APA and has taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby.

19.    Given all of the circumstances of the Chapter 11 cases and the adequacy and fair value of the purchase price under the APA, the Sale of the Assets to the Buyer is in the best interests of the Debtors, their estates, creditors, and other parties in interest and constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

20.    The value of the Assets and the Debtors' estates would be manifestly harmed by any delay in any sale, assumption, assignment, or other transactions contemplated in the APA.

21.    Time is of the essence in consummation of the transactions contemplated by the APA.

7

22.     The APA was not entered into for the purpose of hindering, delaying, or

defrauding Debtors' creditors, and the parties are not entering into the transactions

contemplated by the APA fraudulently.

23.     Buyer's obligation to close the transaction contemplated by the APA

remains subject to satisfaction (or waiver by Buyer) of all conditions set forth in the

APA.

### D.      Good Faith of the Buyer

24.     The Buyer is purchasing the Assets in good faith and is a good faith

purchaser within the meaning of 11 U.S.C. § 363(m), and is therefore entitled to all of

the protections of that provision. The Buyer has proceeded in good faith in all respects in

connection with the Sale and this proceeding in that, among other things (a) the Buyer

recognized that the Debtors were free to deal with any other party interested in acquiring

the Assets; (b) all payments to be made by the Buyer, and other agreements or

arrangements entered into by the Buyer in connection with the transactions set forth in

the APA, have been disclosed; (c) the Buyer has not violated 11 U.S.C. § 363(n) by any

action or inaction; (d) the Buyer is a third-party purchaser unrelated to the Debtors and is

not an "insider" as that term is defined in Section 101(31) of the Bankruptcy Code; and

(e) the Debtors and Buyer negotiated and executed the APA and all other agreements or

instruments related thereto was without collusion, from arm's-length bargaining

positions, and in good faith.

25.     Neither the Buyer nor the Debtors have engaged in any conduct that would

cause or permit the Sale, the APA or the transactions contemplated therein, to be avoided

2719031v2

(or the validity of any sale or transfer affected) pursuant to Section 363(n), or any other provisions of the Bankruptcy Code.

### E.    Auction and Competing Offers

26.    The Debtor has been actively marketing its assets for approximately one year to potential strategic and financial buyers. The APA represents the Debtors' best chance to sell the Assets as a going concern.

27.    The Debtor conducted an auction on May 13, 2013. The APA is both the highest and best offer for the Assets and the only offer for substantially all of the Assets.

28.    Failure to obtain approval of the APA would likely result in the secured creditors foreclosing on their collateral, thereby disrupting the Debtors' operations with serious and potentially disastrous effects for the Debtors' employees and creditors.

29.    The Sale under the APA will provide funds for distribution to certain of the Debtors' creditors and will minimize the damage to them.

30.    The consummation of the Sale will allow the Debtors' business to continue to operate without interruption. The proposed sale is the best alternative available to the Debtors, their estates, and the various parties in interest.

31.    The Buyer has submitted the highest and best possible offer for the Assets because (a) the Buyer may be the only identified potential purchaser that can buy the Assets on a "going concern" basis, (b) a "going concern" sale pursuant to the APA is necessarily a higher and better offer than any liquidation sale; (c) the Debtors, after consulting with their counsel and financial advisors have determined that no other party has made an offer for the Assets for greater economic value to the Debtors than the offer

9

of the Buyer currently under consideration; and (d) the consideration to be paid to the

Debtors, coupled with the Buyer's assumption of the Assumed Liabilities in accordance

with the APA, constitute reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory,

possession, or the District of Columbia.

32.    The Debtors adequately marketed the Assets and conducted the Sale

process and the auction in a non-collusive, fair, and good faith manner.

33.    The terms and conditions of the APA are fair and reasonable. The

purchase price of the Assets under the APA (i) represents the highest and best offer for

the Assets, (ii) is fair and reasonable, and (iii) will provide a greater recovery for

creditors than would be provided by any other practical available alternative.

**F.    No Successor Liability**

34.    The Buyer would not have entered into the APA and would not

consummate the transactions contemplated thereby if the Sale of the Assets were not free

and clear of all liens, claims, interests, and encumbrances of any kind or nature

whatsoever (other than the Permitted Encumbrances and Assumed Liabilities under the

APA) or if the Buyer would, or in the future could, be liable for any such liens, claims,

interests, or encumbrances.

35.    Protection from potential successor liability claims was a material

consideration in the negotiated bargain set forth in the APA.  Without such protection

and assurances, the Buyer would have insisted upon a lower purchase price.

10

36.     Based on the Record, (i) the Buyer does not constitute a successor to the

Debtors or their estates; (ii) the Sale does not constitute a consolidation or merger, or de

facto merger or consolidation, of the Buyer and the Debtors and/or their estates; (iii) the

Buyer and its businesses are not merely a continuation or substantial continuation of the

Debtors or their businesses in that there is not substantial continuity between the Buyer

and the Debtors and/or their estates and there is no continuity of enterprise between the

Buyer and the Debtors and/or their estate; and (iv) the Buyer does not have any common

incorporators, directors, or shareholders with the Debtors.

37.     Based on the foregoing, the Buyer shall not have any successor or other

liability for any liens, claims, interests, or encumbrances of any kind or nature against or

related to the Debtors, the Debtors' estates, or the Assets whatsoever (other than the

Permitted Encumbrances and Assumed Liabilities under the APA).

G.     <u>Assumption of Unexpired Leases and Executory Contracts</u>

38.     The Buyer would not have entered into the APA and would not

consummate the transactions contemplated thereby if it could not take the assignment of

the Assumed Leases and Assumed Contracts of the Debtors. The assumption by the

Debtors and the assignment to the Buyer of the Assumed Leases and Assumed Contracts,

therefore, is essential to the Sale and are essential assets that the Buyer is acquiring under

the APA.

39.     To the extent any Assets constitute an executory contract or unexpired

lease, (i) the Buyer has demonstrated to the satisfaction of the Court and all Section 365

Counterparties, its financial wherewithal and expertise relative to the management and

11

operation of the Assets and (ii) the Buyer's promise to perform under the terms of the

applicable Assets constitutes adequate assurance of future performance pursuant to

Sections 365(b)(3) and 365(f)(2) of the Bankruptcy Code.

40.    It is necessary, appropriate, and in the best interests of Debtors and their

estates (a) for assumption and assignment of the Assumed Leases and Assumed Contracts

to Buyer to be free and clear of any claims of defaults arising prior to the Petition Date

(as defined in the Sale Motion) and/or arising on or after the Petition Date, but on or

before the Closing Date (as defined in the APA), and (b) for the Buyer to be responsible

for curing those defaults necessary to assume and assign each Assumed Lease and

Assumed Contract as set forth on Exhibit A hereto.  All obligations under each Assumed

Lease and Assumed Contract that arise after the Closing Date shall be that of the Buyer.

41.    It is in the best interests of the Debtors that, in accordance with the

provisions of Section 363 of the Bankruptcy Code, the Assumed Leases and Assumed

Contracts be transferred and assigned free and clear of all Interests (as hereinafter

defined).

42.    Any extension or renewal option in an Assumed Lease or Assumed

Contract that purports to be "personal" only to the Debtors or to be exercisable only by

the Debtors is an unenforceable restriction on assignment and, in fact, may be freely

exercised by Buyer to its full extent.

43.    It is in the best interests of the Debtors' estates, and necessary and

appropriate, that the assumption and assignment of the Assumed Leases and Assumed

12

Contracts shall be deemed effective and binding as of the Closing Date and shall require

no further order of the Bankruptcy Court to take place.

      H.      **KEIP**

      44.      It is in the best interests of the Debtors, their estates and creditors, as well

as an appropriate exercise of the Debtors' business judgment to enter into the KEIP, as

described in the Sale Motion, for the benefit of R. Bruce Andrews ("Mr. Andrews").

      45.      The KEIP is appropriately designed to provide incentives to Mr. Andrews

to compensate him for the additional responsibilities that he has undertaken and will

continue to perform in connection with the Debtors' bankruptcy and the successful

consummation of the Sale.  In addition to his ordinary course activities in connection

with the Debtors' operations, Mr. Andrews has been tasked with, among other things,

providing extensive assistance to the Debtors' bankruptcy counsel and advisors with

respect to issues arising in these Chapter 11 cases, due diligence in connection with the

Sale, providing information to potential buyers, and meeting with potential buyers.

      46.      The implementation of the KEIP is not prohibited under § 503(c)(3) of the

Bankruptcy Code because it is justified by the "facts and circumstances" of the case.

The KEIP is properly calculated to achieve the desired performance because

compensation is tied directly to the success of the Sale.  The cost of the KEIP is

reasonable in relationship to the purchase price of the Assets.  The scope of the KEIP is

fair and reasonable because it only includes Mr. Andrews, the employee who has the

most significant ability to accomplish the goal of consummating the Sale.  The KEIP has

been discussed with and approved by TD Bank, the Debtors' primary secured lender.

13

I.    Retention of Jurisdiction

47.    It is necessary and appropriate for this Court to retain jurisdiction to interpret and enforce the terms and provisions of this Order and the APA and to adjudicate, if necessary, any and all disputes concerning the assumption and assignment of the Assumed Leases and Assumed Contracts, any right, title, or property interest, including ownership claims, relating to the Assets and the proceeds thereof, as well as the extent, validity, and priority of all liens relating thereto.

J.    Miscellaneous

48.    To the extent appropriate, findings of fact in this Order shall be construed as conclusions of law and conclusions of law in this Order shall be construed as findings of fact.

BASED ON THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:

A.    The relief requested in the Sale Motion is granted and approved in all respects, and any objections thereto that have not been otherwise withdrawn, waived, or settled are overruled.  The APA, the Sale, the KEIP, and the proposed distribution of certain of the Sale proceeds (as described in the Sale Motion) are hereby approved in all respects.

B.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled. Those parties who did not object, or who withdrew their objections, to the

14

Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the

Bankruptcy Code.

C.      The Debtors are authorized and directed to take any and all actions

necessary or appropriate to (i) consummate the Sale of the Assets to the Buyer

(including, without limitation, to convey to the Buyer any and all of the assets intended

to be conveyed) at the Closing in accordance with the Sale Motion, the APA, and this

Order; (ii) perform, consummate, implement, and close fully the APA together with all

additional instruments and documents that may be reasonably necessary or desirable to

implement the APA; and (iii) perform the obligations contemplated by the APA including

all actions reasonably requested by the Buyer in regard thereto.

D.      The Debtors are authorized pursuant to Section 365(a) of the Bankruptcy

Code to assume the Assumed Leases and Assumed Contracts and to assign the Assumed

Leases and Assumed Contracts to the Buyer.  Each of the Assumed Contracts set forth

on Exhibit A to this Order constitute executory contracts or unexpired leases within the

meaning of section 365 of the Bankruptcy Code and will be deemed assumed and

assigned by the Debtors effective upon the sale of the Assets. Pursuant to section

365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall pay to the Section 365

Counterparties the cure amounts, if any, set forth on Exhibit A hereto, at closing of the

Sale or such other lesser amounts as the Section 365 Counterparties shall have agreed to

accept in lieu of such cure amounts.

15

E.      The Debtors and the Buyer have demonstrated adequate assurance of future performance by the Buyer under the Assumed Leases and Assumed Contracts in accordance with Sections 365(b)(3)(d) and 365(f)(2)(b) of the Bankruptcy Code.

F.      Except for allowed claims for cure amounts as set forth on Exhibit A hereto, each Section 365 Counterparty shall, as of the sale closing date, be forever barred and enjoined from asserting against the Debtors, their bankruptcy estates, the Buyer, or any of the Assets: (a) any default, monetary or non-monetary, existing as of the Closing Date,[1] or (b) any objection to the assumption and assignment of such Section 365 Counterparty's Assumed Lease or Assumed Contract, whether or not such Section 365 Counterparty filed a proof of claim.

G.      Upon the Closing, the Assets to be transferred, sold, and delivered to the Buyer shall be free and clear of any and all encumbrances, obligations, liabilities, interests, pledges, contractual commitments, claims (including, without limitation, any and all "claims" as defined in §101(5) of the Bankruptcy Code), rights of setoff/off-set, rights of recoupment, security interests, mortgages, liens, charges, adverse claims, claims of possession, right of ways, licenses, easements, or restrictions of any kind or nature whatsoever whether based in law or equity, including, without limitation any claim or interest based on or related to any employee benefit obligations, patent or trademark laws, the Employee Retirement Income Security Act ("ERISA"), the Comprehensive Omnibus Budget Reconciliation Act ("COBRA"), CERCLA, other environmental laws, or product liability laws or any claim or interest based on any theory

---

[1] Any capitalized term not defined herein shall have the meaning ascribed to it in the APA.

of successor liability, de facto merger, substantial continuity, or similar theory, whether

secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled,

noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated

or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown,

whether arising prior to or subsequent to the petition date, whether imposed by

agreement, understanding, law, equity or otherwise (collectively referred to as

"Interests," such term to be deemed to exclude any and all Permitted Encumbrances and

Assumed Liabilities expressly permitted or assumed under the APA), with all such

Interests to attach to the net proceeds of the Sale in the order of their priority.

      H.     The Buyer is not a successor to the Debtors or their estate by reason of

any theory of law or equity, and the Buyer shall not assume or in any way be responsible

or liable for any liability or obligation of the Debtors or their estates, except as may

otherwise expressly be provided in the APA.  Except with respect to the Assumed

Liabilities, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and

entities, including, but not limited to, all parties holding any Interest against the Debtors,

their estates or assets, the Debtors' employees, former employees and shareholders,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, including such officials maintaining any authority relating to

environmental, labor and health and safety laws, and their respective successors or

assigns, are hereby permanently and forever barred, restrained and enjoined from

commencing or continuing in any manner any action or other proceeding of any kind or

the employment of any process or any act to collect, offset or recover any Interest

17

against the Buyer, or that seeks to impose liability upon the Buyer or any affiliate,

successor or assign thereof, or against the Assets or the Assumed Contracts and Assumed

Leases, under the laws of the United States, any state, territory or possession thereof or

the District of Columbia based, in whole or in part, directly or indirectly, on any theory

of law, including, without limitation, any theory of successor or transferee liability or

any liability for pre- or post-petition Interests by reason of the transfer of the Assets to

the Buyer, including, without limitation, pre- and post-petition Interests of any federal,

state or local governmental entities, of any current or former employee for claims arising

out of employment and termination of employment, including, without limitation, claims

for wages, bonuses, commissions, accrued vacation, severance, continuation of coverage

under COBRA, or pension, welfare, fringe benefits or any other benefits of any kind

including, without limitation, obligations in respect of retiree medical coverage or

benefits.

   I.  Effective on the date of entry of this Order, except as may otherwise

expressly be provided in the APA, all Persons and Governmental Units (as defined in

sections 101(27) and 101(41) of the Bankruptcy Code), including, but not limited to, the

Debtors, the Debtors' estates, creditors, employees, former employees, equity security

holders, persons holding any Interest against or Interest in the Debtors' estates, the

Assets (including any Interests arising under any applicable revenue, pension, patent,

trademark, ERISA, tax, labor, environmental, or product liability law), administrative

agencies, governmental departments, secretaries of state, federal, state and local

authorities, any entity maintaining any authority relating to any environmental laws, and

their respective successors or assigns, shall be permanently and forever barred,

restrained, and enjoined from commencing or continuing in any manner any action or

other proceeding of any kind against the Buyer, or its successors, assigns, officers,

directors, affiliates, or shareholders, as the alleged successors or otherwise, with respect

to the operation of the Debtors' business prior to the Closing Date.

     J.     The sale of the Assets to the Buyer under the APA constitutes a transfer

for reasonably equivalent value and fair consideration under the Bankruptcy Code and

laws of all applicable jurisdictions, including, but not limited to the laws of the State of

Connecticut. The sale approved by this Order is not subject to avoidance pursuant to

Section 363(n) of the Bankruptcy Code.

     K.     Each and every term and provision of the APA, together with the terms

and provisions of this Order, shall be binding in all respects upon all entities, including

the Debtors, the Debtors' estate, creditors, employees, former employees, equity security

holders, shareholders, persons holding any Interest against or Interest in the Debtors'

estate or any of the Assets (including any Interests arising under any applicable revenue,

pension, patent, trademark, ERISA, tax, labor, environmental, or product liability law),

administrative agencies, governmental departments, secretaries of state, federal, state and

local authorities, any entity maintaining any authority relating to any environmental laws,

and their respective successors or assigns, including, but not limited to all Section 365

Counterparties to the Assumed Leases and Assumed Contracts.

     L.     Except as otherwise provided in the APA, the Buyer shall not be obligated

to (i) continue or maintain in effect, or assume any liability in respect of any employee

19

pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other

agreements to which the Debtor is a party or have any responsibility therefor, including,

without limitation, medical, welfare and pension benefits payable after retirement or

other termination of employment, or (ii) assume any responsibility as a fiduciary, plan

sponsor or otherwise, for making any contribution to, or in respect of the funding,

investment or administration of any employee pension plan or the termination of any

such plan.

     M.     The transactions contemplated by the APA and this Order are undertaken

by the Buyer in good faith, as that term is used in 11 U.S.C. § 363(m) and accordingly,

the reversal or modification on appeal of the authorization provided herein to

consummate the Sale shall not affect the validity of the Sale unless such authorization is

duly stayed pending such appeal prior to the Closing.  The Buyer is entitled to all of the

protections afforded by 11 U.S.C. § 363(m).

     N.     This Order: (a) is and shall be effective as a determination that, upon

Closing, all Interests existing as to the Assets have been and hereby are adjudged and

declared to be unconditionally released, discharged, and terminated, and (b) shall be

binding upon and govern the acts of all entities, including, all filing agents, filing

officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, administrative agencies or units, governmental departments or units,

secretaries of state, federal, state, and local officials, and all other persons and entities

who may be required by operation of law, the duties of their office, or contract, to

accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the

Assets conveyed to the Buyer.  All Interests of record as of the date of this Order shall

be forthwith removed and stricken as against the Assets. All such Entities described

above in this Paragraph are authorized and specifically directed to strike all such

recorded Interests against the Assets from their records, official and otherwise.

O.    The Debtors are authorized to execute such documents and take all other

actions as may be necessary to release any Interests of any kind against the Assets as

such Interests may have been recorded or may otherwise exist. If any person or entity

that has filed statements or other documents or agreements evidencing Interests on or in

the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of liens and easements, and any other documents necessary for the

purpose of documenting the release of all Interests that the person or entity has or may

assert with respect to the Assets, the Debtors are hereby authorized to execute and file

such statements, instruments, releases, and other documents on behalf of such person or

entity with respect to the Assets as the case may be.

P.    Any and all Assets in the possession or control of any person or entity,

including, without limitation, any former vendor, supplier, landlord or employee of the

Debtor (a) shall be transferred to the Buyer free and clear of the Interests and (b) shall be

delivered at the Closing to the Buyer unless, pursuant to the APA, such person, entity,

vendor, supplier, landlord or employee may retain temporary possession or control of

21

any of such assets, in which case the possession of such item shall be delivered to the

Buyer at such time as is designated by the Buyer.

Q.      Nothing contained in any order of any type or kind entered in this Chapter

11 case or any related proceeding subsequent to the entry of this Order shall conflict

with, alter, or deviate from the provisions of the APA or the terms of this Order. Any

plan of reorganization related to the Debtors shall incorporate the provisions of this

Order in all respects.

R.      This Court retains jurisdiction, even after the closing of the Chapter 11

case, to:

> (i)      Interpret, implement, and enforce the terms and provisions of this
> Order and the terms of the APA, all amendments thereto, and any waivers
> and consents thereunder and each of the agreements executed in
> connection therewith;

> (ii)     Protect the Buyer or any of the Assets from and against any of the
> Interests;

> (iii)    Compel delivery of all Assets to the Buyer;

> (iv)     Resolve any disputes arising under or related to the APA, the Sale,
> or the Buyer's peaceful use and enjoyment of the Assets;

> (v)      Adjudicate all issues concerning (alleged) pre-Closing Interests and
> any other (alleged) Interest(s) in and to the Assets, including the extent,
> validity, enforceability, priority, and nature of all such (alleged) Interests;

> (vi)     Adjudicate any and all issues and/or disputes relating to the
> Debtors' right, title, or interest in the Assets and the proceeds thereof, the
> Sale Motion, and/or the APA; and

> (vii)    Adjudicate any and all remaining issues concerning the Debtors'
> obligations, rights, and authority to assume and assign the Assumed
> Leases and Assumed Contracts and the Buyer's rights and obligations with
> respect to such assignment.

2719031v2

S.      No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.

T.      No employee or former employee of the Debtors shall be deemed to be an employee of the Buyer absent an agreement between the Buyer and the employee or former employee establishing new terms of employment.

U.      Except for any fee that may be approved by this Court to Alderman & Company Capital, LLC, which fee shall be paid out of the proceeds of the Sale, neither the Buyer nor the Debtors shall be liable for any other broker's fee, finder's fee, or similar fee relating in any manner to the Sale.

V.      The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the APA and each and every provision, term, and condition thereof be, and therefore is, authorized and approved in its entirety; provided however that the APA may be modified, amended, or supplemented by the parties thereto, in a writing signed by all parties, without further order of this Court, provided that any such modification, amendment, or supplementation does not have a material adverse effect on the Debtors' estates.

W.      The terms of this Order, the APA and all instruments, documents and agreements approved herein or signed and delivered on behalf of the Debtors in furtherance of this Order shall be binding on and inure to the benefit of the Debtors, the Buyer, and the Debtors' creditors and all other parties-in-interest, and any affiliates, successors or assigns thereof, including any trustee or examiner appointed in these cases

2719031v2

or any subsequent or converted cases of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

X.    The Debtors are authorized to implement the KEIP as described in the Sale Motion and to pay at Closing out of the Sale proceeds the following parties in the following order:

1.    City of Meriden - $68,434.42 (plus any additional statutory interest) in full satisfaction of its sewer lien;

2.    TD Bank - $4,500,000.00 in full satisfaction of its secured claims; and

3.    Mr. Andrews - $65,000.00 in satisfaction of amounts owed to him under the KEIP.

Y.    All remaining proceeds from the Sale shall be retained by the Debtors until further order of this Court.

Z.    This Order shall be effective immediately upon entry and Federal Rules of Bankruptcy Procedure 6004(h) is waived, and no automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, applies with respect to this Order.

2719031v2